1  RANDALL TODD THOMPSON
   MAIR, MAIR, SPADE & THOMPSON
2  238 A.F.C. Flores Street
   Suite 801, Pacific News Building
3  Hagåtña, Guam 96910
   Telephone: (671) 472-2089
4  Telefax: (671) 477-5206

5  ROBERT J. O'CONNOR
   O'CONNOR BERMAN DOTTS & BANES
6  2nd Floor, Nauru Building, Susupe
   P.O. Box 501969,
7  Saipan, MP 96950-1969
   Telephone: (670) 234-5684
8  Telefax: (670) 234-5683

9  Attorneys for Defendant/Third-Party Plaintiff/Cross-Defendant
   Winzler & Kelly Consulting Engineers

10

11

12                UNITED STATES DISTRICT COURT

13                 FOR THE DISTRICT OF GUAM

14 HUN SANG LEE,                          ) CIVIL CASE NO.: CIV04-00027
                                          )
15              Plaintiff,                )
                                          )
16              v.                        ) AFFIDAVIT OF JOHN F. JONES
                                          ) IN SUPPORT OF
17 MANHATTAN GUAM, INC. dba ROYAL )        DEFENDANT/THIRD-PARTY
   ORCHID HOTEL, ANTHONY ROBINS )          PLAINTIFF WINZLER & KELLY
18 AND ASSOCIATES, O.A. COLOMA, P.C.,)     CONSULTING ENGINEERS'
   PHOENIX UNITED CORP., LTD.,           ) MOTION FOR
19 WINZLER & KELLY CONSULTING )            SUMMARY JUDGMENT;
   ENGINEERS, and DOE DEFENDANTS )        CERTIFICATE OF SERVICE
20 One through Ten,                       )
                                          )
21              Defendants.               )
                                          )
22 ─────────────────────────────────      )
                                          )
   MANHATTAN GUAM, INC. dba ROYAL )
23 ORCHID HOTEL,                          )
                                          )
24              Cross-Claimant,           )
                                          )
25              v.                        )
                                          )
26 ANTHONY ROBINS AND ASSOCIATES,)
   O.A. COLOMA, P.C., PHOENIX UNITED )
27 CORP., LTD., WINZLER & KELLY )
   CONSULTING ENGINEERS,                 )
28                                        )
                Cross-Defendants.         )
                                          )
   ─────────────────────────────────     )

FILED
DISTRICT COURT OF GUAM

MAR 3 1 2006

MARY L.M. MORAN
CLERK OF COURT

ORIGINAL

-1-

**WINZLER & KELLY CONSULTING ENGINEERS,** )
)
        **Third-Party Plaintiff,** )
)
        **v.** )
)
**VSL PRESTRESSING (GUAM), INC.** )
)
        **Third-Party Defendant.** )
—————————————————————— )
)
**ANTHONY ROBINS AND ASSOCIATES,** )
)
        **Cross-Claimant,** )
)
        **v.** )
)
**MANHATTAN GUAM, INC. dba ROYAL ORCHID HOTEL,** )
)
        **Cross-Defendant.** )
—————————————————————— )

I, John F. Jones, hereby declare under penalty of perjury that the following is based upon my personal knowledge, that I am competent to testify thereto, and it is true and accurate.

1. I am currently employed by Winzler & Kelly Consulting Engineers (hereinafter "Winzler & Kelly") as a structural engineer in its San Francisco, California, office. I have been employed by Winzler & Kelly since prior to 1997.

2. I was employed by Winzler & Kelly in its Guam office at all times mentioned in this affidavit. During that time, I was a licensed civil engineer in both Guam and California and a licensed structural engineer in Guam from July 1996.

3. Winzler & Kelly was approached in 1997 by Manhattan Guam, Inc., to provide certain civil engineering and structural engineering services for the project to expand the Royal Orchid Hotel in Tumon, Guam. I represented Winzler & Kelly in its contract negotiations with Manhattan Guam, Inc., the corporation that owned what is now called the Royal Orchid Hotel.

1

2      4.   Manhattan Guam, Inc., had an existing two-floor building which it wanted to expand

3   into a six to eight story hotel with restaurants, retail shops, parking facilities and a swimming

4   pool atrium.   As a result of my negotiations on behalf of Winzler & Kelly with Manhattan

5   Guam, Inc., Winzler & Kelly entered into four separate contracts, all in writing, with Manhattan

6   Guam, Inc., in connection with the expansion project.  The four contracts are attached hereto as

7   Exhibits "13", "14", "15" and "16."[1]   Winzler & Kelly and Manhattan Guam, Inc., operated

8   under these four contracts for the project.

9

10     5.   Under the first two contracts (Exhibits "13" and "14"), Winzler & Kelly agreed to

11   provide a structural analysis and structural design for the expansion project.  In the construction

12   industry, the term "structural" refers to the load-bearing, force-resisting members of a building,

13   i.e., those elements (columns, beams, rebar and the like) that provide support for the weight of

14   the building.  Such terms as "structural design," "structural analysis," "structural system," etc.,

15   all refer to these elements of a building.  The work of a "structural engineer" is likewise focused

16   to these elements.  The meaning of "structural" is further explained in the Rules and Regulations

17   of the Guam Board of Registration for Professional Engineers, Architects and Land Surveyors

18   (PEALS), and in the National Practice Guidelines For the Structural Engineer of Record (4th ed.

19   2000) ("Guidelines"), published by the Council of American Structural Engineers, which are

20   attached hereto as Exhibit "A" and "B" respectively. [2]

21

22     6.   Winzler & Kelly's understanding of its contractual duties under Exhibits "13" and

23   "14" was in accord with the meaning of "structural" discussed above, particularly with what the

24   Guidelines term the "primary structural system."  Our understanding of the meaning of these

25   contracts, therefore, is that Winzler & Kelly was hired to review the existing structure to see to

26   _____

27   [1]  Unless otherwise noted, the exhibit numbers referred to in this affidavit will match the exhibit
28   numbers used by the parties in the depositions taken in this case.

      [2]  Exhibits to this affidavit that have not yet been used as deposition exhibits are designated by
      letters, beginning with "A."

1    what extent it could support or accommodate a larger hotel being built on top or around it; to
2    review architectural plans showing the proposed expansion; and to prepare a design of the load-
3    bearing, force-resisting elements of the expansion to the hotel, such as the walls, floors,
4    columns, beams, etc.

6        7.  In performing these contracts, we took the architectural plans and did a computerized
7    structural analysis for seismic loads, dead load and critical stresses.  We then did a structural
8    design for the walls, floors, columns, beams, etc., to make sure the building as constructed
9    could support and resist these forces and loads.  Our structural designs for the Royal Orchid are
10   attached hereto as Exhibit "C."  (They are also part of Exhibit "23.")

12       8.  Included therein, and also attached separately as Exhibit "19," is our structural design
13   for the swimming pool area (Drawing S 4.6), which shows the dimensions and supports for the
14   pool, but does not provide any design for swimming pool steps.  Winzler & Kelly never
15   designed or constructed any steps or stairs for the Royal Orchid Hotel swimming pool.  It did
16   not design the configuration of the pool, or select the paint color or the signage (including depth
17   markers) around the pool.  It was not a party to the design the pool steps or configuration or
18   painting.  The pool steps are not part of the primary structural system of a building as defined in
19   the Guidelines, and their design was not within the scope of Winzler & Kelly's contracts.  They
20   are not a load-bearing element, and do not contribute to the strength or stability of the structure.
21   The color of the steps and the signs are entirely non-structural.  The design of pool steps is an
22   issue exclusively for the discipline of an architect, not a structural engineer.

24       9.  The third contract (Exhibit "15") was for civil engineering work, such as site grading,
25   water drainage, retaining walls, underground water tanks and sewage.  This work did not involve
26   the swimming pool area in any way.

28       10.  Winzler & Kelly's fourth contract with Manhattan Guam, Inc., was to do limited
     special inspections, also known as §1701 inspections, after the section of the Uniform Building

Code that refers to them. Exhibit "16" is a Winzler & Kelly special inspection "proposal" which was ultimately accepted and signed by Manhattan Guam, Inc. I have been unable to find the signed copy, but both Winzler & Kelly and Manhattan Guam, Inc., operated under and followed the terms outlined in this proposal letter as if it were their contract for the services contained therein. In this contract, Winzler & Kelly did not agree to inspect the swimming pool. Winzler & Kelly agreed to inspect the installation of the structural elements of the building for their conformance with the structural designs that Winzler & Kelly has already prepared (which did not include a design for the pool or its steps), and for workmanship. Winzler & Kelly's inspection contract was limited to inspection of the types of work described in those subsections of UBC §1701.5 that are circled in the attachment to Exhibit "16" -- i.e., subsections 1 through 4.

11. In performing this contract, Winzler & Kelly did not inspect the construction of the swimming pool. Winzler & Kelly's §1701 inspections concluded in August, 1998, and Winzler & Kelly issued its final report on September 1, 1998. By September 1, 1998, the Royal Orchid Hotel structural system was completed. On September 1, 1998, there was no swimming pool, but instead there was an opening in the 6th floor slab and the structural slab and support beams at the 5th floor to support whatever pool would later be installed. The pool, with its steps, was not installed until the year 2000, more than one year after Winzler & Kelly concluded its structural inspections of the Royal Orchid Hotel project.

12. Winzler & Kelly had a "team" to work on the Royal Orchid expansion project: myself, Richard Chien and Patrick Taitano. I was the team leader and overall supervisor of Winzler & Kelly's work on the project. Richard Chien, an employee of Winzler & Kelly and a structural engineer, did the structural analysis and prepared the structural drawings with my input and assistance, and also supervised inspections. Patrick Taitano's work was limited to §1701 special inspections under the supervision of Richard Chien. Richard Chien authored Winzler & Kelly's September 1, 1998, Final Report (Exhibit "18"), under my supervision and review.

1

2      13.   Winzler & Kelly had neither the opportunity nor the authority to alter the

3   contractor's construction techniques or the architect's design of the pool.   Winzler & Kelly's

4   contracts with Manhattan Guam, Inc., placed responsibility for the means and methods of

5   construction on the owner or its contractor.   At no time during the construction of the Royal

6   Orchid Hotel expansion project did Winzler & Kelly have the power to stop work in the project.

7   The structural drawings and specifications explicitly state that the structural construction

8   observer "is not authorized to . . . stop or delay work." See first page of Exhibit "C" (S1.1).

9

10     14.  Neither before nor during my work on the Royal Orchid Hotel was I aware of the

11  existence of Guam's Department of Public Health Regulations on public swimming pools,

12  regarding recessed stairs or the coloring of said stairs.  This was not an issue that was relevant to

13  the work that Winzler & Kelly had contracted to do.

14

15     15.  I am familiar though personal experience with the Guam construction industry

16  standards and practices, and with the standard of care for structural engineers and §1701

17  inspectors on Guam.  Winzler & Kelly's understanding and performance of its contractual duties

18  toward Manhattan Guam, Inc., and all of its work in connection with the Royal Orchid Hotel

19  expansion project, fully complied with these standards.  In particular, the Guam standard of care

20  imposed no duty on Winzler & Kelly, as either a structural designer or inspector, to consider the

21  pool steps in any way -- for example, to inspect them, to observe their construction, to be aware

22  of regulations concerning them, to notice anything unusual or improper in plans or drawings

23  concerning their design or proposed design, or to notify anyone regarding the same.

24

25  \\

26

27  \\

28

1    I swear under penalty of perjury that the foregoing is true and correct.

2

3    Signed in San Francisco, California, U.S.A., on March 20, 2006.

4

5

6                                                                    _____
7                                                                    JOHN F. JONES

8

9    **CALIFORNIA, U.S.A.**                    )
                                               ) ss.
10   **SAN FRANCISCO**                         )
                                               )
11   _____

12   On this 20th day of March , 2006 before me, the undersigned Notary Public

13   in and for the State of California, personally appeared **John F. Jones**, known to me to be the

14   same person whose name is subscribed to the foregoing instrument, and acknowledged to me

15

16   that he executed the same as his free and voluntary act and deed for the uses and purposes

17   therein set forth.

18

19       **IN WITNESS WHEREOF**, I have hereunto set my hand and affixed my Official Seal

20   the day and year above written.

21

22          ANDREW F ALBRIGHT
            COMM. #1463871
23          NOTARY PUBLIC-CALIFORNIA
            SAN FRANCISCO COUNTY             _____
24          My Comm. Expires Feb 7 2008      Notary Public

25   2003-11-060313-PL-M summary judgment - DEC (jones) R1

26

27

28

# CERTIFICATE OF SERVICE

I, **SANDRA E. CRUZ**, hereby certify that I have caused a copy of the **AFFIDAVIT OF JOHN F. JONES IN SUPPORT OF DEFENDANT/THIRD-PARTY PLAINTIFF WINZLER & KELLY CONSULTING ENGINEERS' MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE**, to be served upon the following offices as set forth below:

On March 21, 2006, to:

Patrick F. McTernan, Esq.
Cronin, Fried, Sekiya, Kekina & Fairbanks
841 Bishop Street, Suite 600
Honolulu, Hawaii 96813-3962
Telefax: (808) 536-2073

(by fax)

Jason S. Kim, Esq.
Law Offices of Jason S. Kim
Suite 303, Young's Professional Building
788 N. Marine Drive
Upper Tumon, Guam 96913

(by personal delivery)

*Attorneys for Plaintiff Hun Sang Lee*

G. Patrick Civille, Esq.
Civille & Tang, PLLC
330 Herman Cortez Avenue, Suite 200
Hagåtña, Guam 96910

(by personal delivery)

*Attorneys for Defendant, Cross-Claimant and Cross-Defendant*
*Manhattan Guam, Inc. dba Royal Orchid Hotel*

Michael A. Pangelinan, Esq.
Jennifer Calvo-Quitugua, Esq.
Calvo & Clark, LLP
655 South Marine Corps Drive, Suite 202
Tamuning, Guam 96913

(by personal delivery)

-8-

Michael C. Carrolle, Esq.
Harvey J. Lung, Esq.
Bays, Deaver, Lung, Rose & Baba
1099 Alakea St. 16th Floor
Honolulu, Hawaii 96813
Fax No. (808) 533-4184

(by fax)

*Attorneys for Defendant, Cross-Defendant and Cross-Claimant
Anthony Robins and Associates*

Oscar A. Coloma
O.A. Coloma, P.C.
Suite 35, Paraoceana Business Center
674 Harnon Loop Road
Dededo, Guam 96929

*Pro se*

(by first class US Mail)

Dated this 31 day of March, 2006.

_____
SANDRA E. CRUZ

# EXHIBIT 13


PLAINTIFF'S
EXHIBIT
13

W&K Job No. 974430801

# W & K CONSULTING ENGINEERS

## STANDARD AUTHORIZATION FOR
## PROFESSIONAL SERVICES

W & K Office Address  Suite 904, GCIC Building, 414 West Soledad Ave., Agana, Guam  96910

Project Description  Su Center Expansion (Hotel, Parking, & Retail Space)

San Vitores Road, Tumon, Guam       7 story M/C

CLIENT  Manhattan Guam

Address  720 Pale San Vitores Road, Suite 201, Tumon, Guam

CLIENT hereby requests and authorizes W & K Consulting Engineers (ENGINEER) to perform services as set forth in this agreement.

SCOPE OF SERVICES as set forth below or in specified attachment(s).

PER ATTACHMENT A

Terms of COMPENSATION as set forth below or in specified attachment(s).

Lump sum of $58,000.  Charges based on percent completion will be invoiced monthly and are due within 30 days.  A charge at the maximum legal rate of interest will be assessed on past due accounts.

In the event collection efforts are necessary to enforce the payment provisions of this Agreement, W & K shall be entitled to collect from the client any judgment or settlement sums, reasonable attorney's fees, court costs and other expenses incurred in connection therewith including, but not limited to, time spent in connection with the collection effort by its employees.

Services covered by this authorization shall be performed in accordance with PROVISIONS attached to this Standard Authorization and in the following attachment(s): NONE

Approved for CLIENT Date  8/12/97

By _____

Print Name  Ronald Su

Title _____

Accepted for ENGINEER Date  8/6/97

By _____

Print Name  Roland S. Miller, P.E.

Title  Asia-Pacific Region Manager

SAP.DOC

REV. 2/15/95

# PROVISIONS

**1. Authorization to Proceed**
Signing this form shall be construed as authorization by CLIENT for ENGINEER to proceed with the work, unless otherwise provided for in the authorization.

**2. Standard of Care**
The standard of care applicable to ENGINEER'S services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.

**3. Subsurface Investigations**
In subsurface investigations, the actual characteristics may vary between successive test points (and between test points and locations other than where investigations have been made). Because of the uncertainties in subsurface evaluations, changed or unanticipated underground conditions may occur and could affect PROJECT cost. The effect of any such changes on total PROJECT cost is not the responsibility of the ENGINEER. ENGINEER makes no warranty, express or implied, that conditions found to exist in one location are to be found at other locations or throughout the PROJECT area.

**4. Ownership of Documents**
All drawings, specifications and other work products of ENGINEER for this PROJECT are instruments of service for this PROJECT only and shall remain the property of ENGINEER whether the PROJECT is completed or not. Reuse of any of the instruments of service of ENGINEER by the CLIENT on extensions of this PROJECT or on any other project without the written permission of ENGINEER shall be at the CLIENT's risk and the CLIENT agrees to defend, indemnify and hold harmless ENGINEER from all claims, damages, and expenses, including in-house costs and attorney's fees, arising out of such unauthorized reuse of ENGINEER's instruments of service by CLIENT or by others acting through CLIENT.

**5. Invoicing and Payments**
All fees and charges will be billed monthly and shall be due at the time of billing unless otherwise specified in this agreement. Fees will include the costs of preparing non-routine invoices prepared at the request of the CLIENT. No deductions shall be made from the ENGINEER'S compensation on account of penalty, liquidated damages, or other circumstances except those for which the ENGINEER has been found to be legally liable.

The CLIENT shall have ten (10) days from the receipt of each billing to notify the ENGINEER, in writing, of perceived inaccuracies, discrepancies or errors. After such time the billing shall be deemed correct and binding on the CLIENT.

The client agrees to pay a monthly late payment interest charge, equivalent to the lesser of one and one-half percent (1½%) per month or the maximum legal rate, applied to any unpaid balances commencing thirty (30) days after the date of the original billing. Payments will be credited first to interest and then to principal.

**6. ENGINEER's Personnel at Construction Site**
The presence of the ENGINEER's personnel at the PROJECT site, whether as on-site representative or otherwise, shall not make the ENGINEER responsible for those duties that belong to the CLIENT, the construction contractors or others; nor does the ENGINEER'S presence relieve the construction contractors or others of their obligations, duties and responsibilities. Construction methods, means, techniques, sequences and procedures necessary for coordinating and completing all portions of the PROJECT in accordance with the Contract Documents, and any health or safety precautions required by such construction work, are not the ENGINEER's responsibility.

**7. Opinions of Cost, Financial Considerations, and Schedules**
The ENGINEER makes no warranty, express or implied, that the CLIENT's actual PROJECT costs, financial aspects, economic feasibility or schedules will not vary from the ENGINEER's opinions, analyses, projections, or estimates. When the ENGINEER must prepare quantity and material takeoffs or estimates of cost from plans and specifications that are less than 100 percent complete, the CLIENT will hold the ENGINEER harmless from any and all loss, liability, or claims resulting from the incompleteness.

**8. Construction Progress Payments**
Recommendations by the ENGINEER to the CLIENT for periodic construction progress payments to the construction contractor will be based on the ENGINEER's knowledge, information, and belief (from selective sampling) that the work has progressed to the point indicated. Such recommendations do not represent that 1) continuous or detailed examinations have been made by the ENGINEER to ascertain that the construction contractor has completed the work in exact accordance with the contract documents; or that 2) the final work will be acceptable in all respects.

**9. ENGINEER's and CLIENT's liability**
ENGINEER's liability for all acts, errors, omissions or negligence, whether active or passive, shall not exceed in the aggregate $100,000 or the fees for this contract, whichever is less, for all injuries or losses stemming from radioactive, hazardous or toxic material, chemical, or condition. ENGINEER's liability for injuries or losses not described above shall not exceed in the aggregate $1,000,000 or the fees for this contract, whichever is less.

CLIENT agrees to defend, indemnify and hold harmless ENGINEER (including its officers, directors, employees, agents, or subcontractors) from any claim, liability or defense cost in excess of the limits set forth above for injuries or losses sustained or alleged by any person or entity (whether a party to this agreement or not) arising out of or related to ENGINEER's performance of services under this agreement.

**10. CLIENT - Furnished Data**
CLIENT will provide to ENGINEER all technical data in CLIENT's possession relating to ENGINEER's services on the PROJECT. ENGINEER will reasonably rely upon the accuracy, timeliness, and completeness of the information provided by CLIENT.

**11. Access to Site**
CLIENT will make the site accessible to ENGINEER as required for ENGINEER's performance.

**12. Advertisements, Permits and Access**
Unless otherwise agreed to in the Scope of Services, CLIENT will obtain, arrange, and pay for all advertisements for bids and approvals from any public or private entity, and access necessary for the ENGINEER's services.

**13. Timely Review and Prompt Notice**
CLIENT will examine ENGINEER's studies, reports, sketches, drawings, specifications, proposals, and other documents; obtain advice of an attorney, insurance counselor, accountant, auditor, and other consultants as CLIENT deems appropriate; and render decisions required of CLIENT in a timely manner. CLIENT will give prompt written notice to ENGINEER whenever CLIENT observes or becomes aware of any development that affects the scope or timing of ENGINEER's services, or any defect in the work of ENGINEER or construction contractor.

**14. CLIENT's Personnel**
CLIENT will be responsible for all acts of CLIENT's personnel.

**15. Contractor Indemnification**
If the Scope of Service calls for ENGINEER to make onsite amendments to plans and specifications, then in any contract to complete the work contemplated by the PROJECT, CLIENT agrees to include notice (to the contractor) that the ENGINEER may exercise the CLIENT's authority to make the amendments. In addition CLIENT shall include in any such contract an indemnification provision for ENGINEER's benefit, which shall state as follows:

Contractor will hold harmless, indemnify and defend CLIENT and ENGINEER and their officers, employees, and agents from all claims, losses, damages and injuries, including attorneys' fees and other litigation costs relating to personal injuries or property damage suffered by any person arising out of the work performed by contractor. The contractor will carry comprehensive general liability insurance naming CLIENT and ENGINEER as additional insureds which shall include a contractual liability endorsement providing for the contractor's indemnity of CLIENT and ENGINEER as herein provided. Contractor will further provide CLIENT and ENGINEER with a certificate of insurance evidencing the coverage herein specified, and evidencing that the insurance shall not be cancelled or amended without first giving twenty (20) days' notice, in writing, to CLIENT and ENGINEER.

**16. Insurance**
ENGINEER will provide CLIENT with evidence of insurance (to include WORKER'S COMPENSATION, GENERAL LIABILITY, AUTOMOBILE LIABILITY, and PROFESSIONAL LIABILITY).

CLIENT will provide for a waiver of subrogation as to all CLIENT-carried insurance during construction and thereafter, in favor of ENGINEER (including its officers, employees, agents, and subcontractors); and will require similar waivers from CLIENT's other contractors and their subcontractors.

**17. Litigation Assistance**
Scope of Services does not include the ENGINEER's assistance in litigation undertaken or defended by the CLIENT. All such services requested of the ENGINEER will be paid by CLIENT under ENGINEER's fee schedule then in effect.

In the event of any lawsuit or other claim for breach of contract or other economic damages brought by the CLIENT's contractor or other person in which CLIENT and ENGINEER are jointly named as defendants, or in which the ENGINEER is named as the sole defendant, the CLIENT shall be solely responsible for all litigation expenses, including attorneys' fees, incurred by the ENGINEER in defense of the claim. Notwithstanding the foregoing, CLIENT shall have no such responsibility for litigation expenses where it is determined, in a court of competent jurisdiction, that the ENGINEER is liable to the claimants hereinabove described and where such liability resulted from a breach of ENGINEER's obligations described in this agreement.

**18. Termination**
This agreement may be terminated for convenience on thirty (30) days' written notice, or for cause if either party fails substantially to perform through no fault of the other and does not commence correction of such nonperformance within five (5) days of written notice and diligently complete the correction thereafter. On termination, the ENGINEER will be paid for all authorized work performed up to the termination date plus termination expenses, such as, but not limited to, reassignment of personnel, subcontract termination costs, and related closeout costs.

**19. Assignment**
Neither party may assign all or any part of this agreement without the prior written consent of the other party.

**20. Severability and Survival**
If any of the provisions contained in this agreement are held to be unenforceable, other provisions shall remain in effect and this agreement shall be construed as if unenforceable provisions had never been contained herein.

**21. Entire Agreement**
This agreement, including all attachments and schedules, constitutes the entire agreement between the parties and supersedes all prior written or oral understandings. This agreement may only be changed by a written agreement executed by both parties.

SAPS-PRO
10/2/96

REV.

## ATTACHMENT A

### Scope of Work

### Preliminary Design Phase

The Preliminary Design Phase will consist of reviewing the design of the existing building structure and determining any limitations for the proposed structure. We will perform a thorough review of the original design calculations, construction documents, and of the actual construction.

### Construction Document Phase

This phase of the work will include completion of the construction documents for the structural system of the proposed expansion. Included will be connections to the existing structure. We have assumed that the existing structure will not require any retrofit work.

### Construction Phase Services

Construction phase services are not included in this proposal. Any construction phase services are considered additional services and will be performed at a time and materials basis at our latest billing rates.

# EXHIBIT 14

# W & K CONSULTING ENGINEERS

## STANDARD AUTHORIZATION FOR
## PROFESSIONAL SERVICES

**W & K Office Address** Suite 904, GCIC Building, 414 West Soledad Ave., Agana, Guam 96910

**Project Description** Sun Plaza Third Story Addition

San Vitores Road, Tumon, Guam

**CLIENT** Manhattan Guam

**Address** 720 Pale San Vitores Road, Suite 201, Tumon, Guam

CLIENT hereby requests and authorizes W & K Consulting Engineers (ENGINEER) to perform services as set forth in this agreement.

**SCOPE OF SERVICES as set forth below or in specified attachment(s).**

PER ATTACHMENT A

Terms of COMPENSATION as set forth below or in specified attachment(s).

Lump sum of $7,000. Charges based on percent completion will be invoiced monthly and are due within 30 days. A charge at the maximum legal rate of interest will be assessed on past due accounts.

In the event collection efforts are necessary to enforce the payment provisions of this Agreement, W & K shall be entitled to collect from the client any judgment or settlement sums, reasonable attorney's fees, court costs and other expenses incurred in connection therewith including, but not limited to, time spent in connection with the collection effort by its employees.

Services covered by this authorization shall be performed in accordance with **PROVISIONS** attached to this Standard Authorization and in the following attachment(s): NONE

Approved for CLIENT Date 8/1/97

By _____

Print Name Ronald Su

Title _____

Accepted for ENGINEER Date 8/6/97

By _____

Print Name Roland S. Miller, P.E.

Title Asia-Pacific Region Manager

SAP.DOC

PLAINTIFF'S EXHIBIT 14

REV. 2/15/95

1. **Authorization to Proceed**

Signing this form shall be construed as authorization by CLIENT for ENGINEER to proceed with the work, unless otherwise provided for in the authorization.

2. **Standard of Care**

The standard of care applicable to ENGINEER'S services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.

3. **Subsurface Investigations**

In subsurface investigations, the actual characteristics may vary between successive test points (and between test points and locations other than where investigations have been made). Because of the uncertainties in subsurface evaluations, changed or unanticipated underground conditions may occur and could affect PROJECT cost. The effect of any such changes on total PROJECT costs is not the responsibility of the ENGINEER. ENGINEER makes no warranty, express or implied, that conditions found to exist in one location are to be found at other locations or throughout the PROJECT area.

4. **Ownership of Documents**

All drawings, specifications and other work products of ENGINEER for this PROJECT are instruments of service for this PROJECT only and shall remain the property of ENGINEER whether the PROJECT is completed or not. Reuse of any of the instruments of service of ENGINEER by the CLIENT on extensions of this PROJECT or on any other project without the written permission of ENGINEER shall be at the CLIENT's risk and the CLIENT agrees to defend, indemnify and hold harmless ENGINEER from all claims, damages, and expenses, including in-house costs and attorney's fees, arising out of such unauthorized reuse of ENGINEER's instruments of service by CLIENT or by others acting through CLIENT.

5. **Invoicing and Payments**

All fees and charges will be billed monthly and shall be due at the time of billing unless otherwise specified in this agreement. Fees will include the costs of preparing non-routine invoices prepared at the request of the CLIENT. No deductions shall be made from the ENGINEER's compensation on account of penalty, liquidated damages, or other circumstances except those for which the ENGINEER has been found to be legally liable.

The CLIENT shall have ten (10) days from the receipt of each billing to notify the ENGINEER, in writing, of perceived inaccuracies, discrepancies or errors. After such time the billing shall be deemed correct and binding on the CLIENT.

The client agrees to pay a monthly late payment interest charge, equivalent to the lesser of one and one-half percent (1 ½ %) per month or the maximum legal rate, applied to any unpaid balances commencing thirty (30) days after the date of the original billing. Payments will be credited first to interest and then to principal.

6. **ENGINEER's Personnel at Construction Site**

The presence of the ENGINEER's personnel at the PROJECT site, whether as onsite representative or otherwise, shall not make the ENGINEER responsible for those duties that belong to the CLIENT, the construction contractors or others; nor does the ENGINEER's presence relieve the construction contractors or others of their obligations, duties and responsibilities. Construction methods, means, techniques, sequences and procedures necessary for coordinating and completing all portions of the PROJECT in accordance with the Contract Documents, and any health or safety precautions required by such construction work, are not the ENGINEER's responsibility.

7. **Opinions of Cost, Financial Considerations, and Schedules**

The ENGINEER makes no warranty, express or implied, that the CLIENT's actual PROJECT costs, financial aspects, economic feasibility or schedules will not vary from the ENGINEER's opinions, analyses, projections, or estimates. When the ENGINEER must prepare quantity and material takeoffs or opinions of cost from plans and specifications that are less than 100 percent complete, the CLIENT will hold the ENGINEER harmless from any and all loss, liability, or claims resulting from the incompleteness.

8. **Construction Progress Payments**

Recommendations by the ENGINEER to the CLIENT for periodic construction progress payments to the construction contractor will be based on the ENGINEER's knowledge, information, and belief (from selective sampling) that the work has progressed to the point indicated. Such recommendations do not represent that 1) continuous or detailed examinations have been made by the ENGINEER to ascertain that the construction contractor has completed the work in exact accordance with the contract documents; or that 2) the final work will be acceptable in all respects.

9. **ENGINEER's and CLIENT's liability**

ENGINEER's liability for all acts, errors, omissions or negligence, whether active or passive, shall not exceed in the aggregate $100,000 or the fees for this contract, whichever is less, for all injuries or losses stemming from radioactive, hazardous or toxic material, chemical, or condition. ENGINEER's liability for injuries or losses not described above shall not exceed in the aggregate $1,000,000 or the fees for this contract, whichever is less.

CLIENT agrees to defend, indemnify and hold harmless ENGINEER (including its officers, directors, employees, agents, or subcontractors) from any claim, liability or defense cost in excess of the limits set forth above for injuries or losses sustained or alleged by any person or entity (whether a party to this agreement or not) arising out of or related to ENGINEER's performance of services under this agreement.

10. **CLIENT - Furnished Data**

CLIENT will provide to ENGINEER all technical data in CLIENT's possession relating to ENGINEER's services on the PROJECT. ENGINEER will reasonably rely upon the accuracy, timeliness, and completeness of the information provided by CLIENT.

11. **Access to Site**

CLIENT will make the site accessible to ENGINEER as required for ENGINEER's performance.

12. **Advertisements, Permits and Access**

Unless otherwise agreed to in the Scope of Services, CLIENT will obtain, arrange, and pay for all advertisements for bids and approvals from any public or private entity, and access necessary for the ENGINEER's services.

13. **Timely Review and Prompt Notice**

CLIENT will examine ENGINEER's studies, reports, sketches, drawings, specifications, proposals, and other documents; obtain advice of an attorney, insurance counselor, accountant, auditor, and other consultants as CLIENT deems appropriate; and render decisions required of CLIENT in a timely manner. CLIENT will give prompt written notice to ENGINEER whenever CLIENT observes or becomes aware of any development that affects the scope or timing of ENGINEER's services, or any defect in the work of ENGINEER or construction contractor.

14. **CLIENT's Personnel**

CLIENT will be responsible for all acts of CLIENT's personnel.

15. **Contractor Indemnification**

If the Scope of Service calls for ENGINEER to make onsite amendments to plans and specifications, then in any contract to complete the work contemplated by the PROJECT, CLIENT agrees to include notice (to the contractor) that the ENGINEER may exercise the CLIENT's authority to make the amendments. In addition CLIENT shall include in any such contract an indemnification provision for ENGINEER's benefit, which shall state as follows:

Contractor will hold harmless, indemnify and defend CLIENT and ENGINEER and their officers, employees, and agents from all claims, losses, damages and injuries, including attorneys' fees and other litigation costs relating to personal injuries or property damages suffered by any person arising out of the work performed by contractor. The contractor will carry comprehensive general liability insurance naming CLIENT and ENGINEER as additional insureds which shall include a contractual liability endorsement providing for the contractor's indemnity of CLIENT and ENGINEER as herein provided.

Contractor will further provide CLIENT and ENGINEER with a certificate of insurance evidencing the coverage herein specified, and evidence that the insurance shall not be cancelled or amended without first giving twenty (20) days' notice, in writing, to CLIENT and ENGINEER.

16. **Insurance**

ENGINEER will provide CLIENT with evidence of insurance (to include WORKER'S COMPENSATION, GENERAL LIABILITY, AUTOMOBILE LIABILITY, and PROFESSIONAL LIABILITY).

CLIENT will provide for a waiver of subrogation as to all CLIENT-carried insurance during construction and thereafter, in favor of ENGINEER (including its officers, employees, agents, and subcontractors); and will require similar waivers from CLIENT's other contractors and their subcontractors.

17. **Litigation Assistance**

Scope of Services does not include the ENGINEER's assistance in litigation undertaken or defended by the CLIENT. All such services requested of the ENGINEER will be paid by CLIENT under ENGINEER's fee schedule then in effect.

In the event of any lawsuit or other claim for breach of contract or other economic damages brought by the CLIENT's contractor or other person in which CLIENT and ENGINEER are jointly named as defendants, or in which the ENGINEER is named as the sole defendant, the CLIENT shall be solely responsible for all litigation expenses, including attorneys' fees, incurred by the ENGINEER in defense of the claim. Notwithstanding the foregoing, CLIENT shall have no such responsibility for litigation expenses where it is determined, in a court of competent jurisdiction, that the ENGINEER is liable to the claimants hereinabove described and where such liability resulted from a breach of ENGINEER's obligations described in this agreement.

18. **Termination**

This agreement may be terminated for convenience on thirty (30) days' written notice, or for cause if either party fails substantially to perform through no fault of the other and does not commence correction of such nonperformance within five (5) days of written notice and diligently complete the correction thereafter. On termination, the ENGINEER will be paid for all authorized work performed up to the termination date plus termination expenses, such as, but not limited to, reassignment of personnel, subcontract termination costs, and related closeout costs.

19. **Assignment**

Neither party may assign all or any part of this agreement without the prior written consent of the other party.

20. **Severability and Survival**

If any of the provisions contained in this agreement are held to be unenforceable, without provisions shall remain in effect and this agreement shall be construed as if unenforceable provisions had never been contained herein.

21. **Entire Agreement**

This agreement, including all attachments and schedules, constitutes the entire agreement between the parties and supersedes all prior written or oral understandings. This agreement may only be changed by a written agreement executed by both parties.

Case 1:04-cv-00027    Document 107    Filed 03/31/2006    Page 16 of 20

# ATTACHMENT A

## Scope of Work

### Construction Document Phase

This phase of the work will include completion of the construction documents for the structural system of the proposed expansion. The structure will be an independent structure straddling the existing building. The project will consist of the addition of one floor to the building, with a square footage of approximately 7,000 square feet.

### Construction Phase Services

Construction phase services are not included in this proposal. Any construction phase services are considered additional services and will be performed at a time and materials basis at our latest billing rates.

# EXHIBIT 15

**WINZLER & KELLY**
**CONSULTING ENGINEERS**



PLAINTIFF'S
EXHIBIT
15

*Guam Office*

Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910 USA
Tel: (671) 472-6792, 472-6793
Fax: (671) 477-6229

# FAX MEMORANDUM

| | | |
|---|---|---|
| TO: | Mr. Ronald Su | Job No.: P7440001.008 |
| COMPANY: | Manhattan Pacific Corporation | FAX No: |
| FROM: | Tor Gudmundsen, P.E. | |
| COPY: | John Jones | No. of Pages 2 |
| DATE: | 01 November 1997 | |
| RE: | Su Commercial Center | |
| | Revised Fee Proposal for Civil Engineering Services | |

Dear Mr. Su:

Winzler & Kelly Consulting Engineers is pleased to provide our proposal for engineering services for the referenced project.

## PROJECT DESCRIPTION

The Su Center project includes a multi-story hotel and commercial building in Tumon Bay. The site is adjacent to San Vitores Boulevard and south of the Pacific Islands Club Hotel.

## SCOPE OF SERVICES

1.     The scope of Civil Engineering services will be as follows:

   a.     Horizontal and Vertical Geometry
   b.     Site Grading
   c.     Storm Water Drainage and Disposal
   d.     Water Service (Including an Underground Storage Tank)
   e.     Sanitary Sewer Service
   f.     Site Retaining Walls - Miscellaneous Site Features

2.     Structural engineering services are provided for the underground tank(s) only.

The work will begin with our review of the concept plans and a site inspection.

We discussed the current TLUC application with Mr. Dave McVeigh at HNC Architects and understand the basic site and building concept. We also obtained a copy of the TENTATIVE DEVELOPMENT PLAN / VARIANCE APPLICATION package and reviewed the Preliminary Infrastructure Analysis, prepared by MS Consultants, dated June 2, 1997. The report indicates that there is sufficient capacity in the utility lines in San Vitores Boulevard to service the project.

The scope of our work is generally to provide the Design Development and Construction Documents.

FEES

Our fees for the civil design work are $18,750. We have estimated $2,000 for Construction Phase (civil) Services. The construction phase work will be billed on an hourly, Time & Materials basis, with the $2,000 limit not to be exceeded with out your approval.

The structural services for the underground tank totals $3,670.

SCHEDULE

We are prepared to begin this work immediately upon receipt of a Notice to Proceed. We understand the Architectural and other Engineering design is currently in the design development phase.

ASSUMPTIONS

1.  The topographic survey in electronic format will be provided by others.

2.  Percolation data for sizing the percolation basins will be provided by others.

3.  The Concept and Schematic design has been approved by the appropriate government agencies and we can use the Preliminary Infrastructure Analysis information as a basis for continuing with the design development.

4.  The underground storage tank(s) civil design will include the geometry, earthwork/grading and water service to the water tank. We assume that the piping/plumbing/pumping design from the tank(s) into the building will be provided by others.

5.  The horizontal and vertical geometry for the upper level parking areas will be provided by others.

We appreciate the opportunity to provide our proposal for these services. We are prepared to meet to discuss the scope and fees further at your convenience.

Si Yu'os Ma'ase,

# EXHIBIT 16

# WINZLER & KELLY

Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910 USA
Tel: (671) 472-6792, 472-6793
Fax: (671) 477-6229

March 12, 1998



Mr. David Su
Manhattan Guam
Fountain Plaza Building
720 Pale San Vitores, Suite 201
Tumon, Guam 96911

Re: Special Inspection for Su Center Hotel Building

Dear David;

Winzler & Kelly is pleased to present this proposal for the Special Inspection on Su Center Hotel Building. The special inspection will follow the requirements of Guam Public Law 22-83 and the Special Inspection Provisions of The 1994 UBC Section 1701. The relevant sections of the code are attached and highlighted for your reference. A copy of our letter to send DPW at your request is also attached.

We propose to provide these services on an hourly basis per the attached fee schedule. As you know, construction work is currently continuing in progress 7 days a week. Therefore to comply with the code requirements, we estimate that one of our inspectors will be required to be on site approximately 32 hours/week.

If this proposal meets with your approval, please sign where indicated and return (fax OK). Thank you for allowing W&K to further serve you on this project.

Sincerely;

Bruce Swanney, S.E.
Chief Structural Engineer


accepted _____ for Manhattan Guam
                    (signed)
name _____date _____


CONSULTING ENGINEERS

SAIPAN OFFICE:
Saipan Office Supply Bldg. B
Beach Rd., Garapan
Caller Box PPP 596, Box 10000
Saipan, MP 96950
Tel: (670) 234-0483, 234-5392
Fax: (670) 234-5615

PALAU OFFICE:
JR Professional Center
P.O. Box 1704, W105
Meketii, Koror, Palau 96940
Tel/Fax: (680) 488-3738

EXHIBIT "F"

# Chapter 17

# STRUCTURAL TESTS AND INSPECTIONS

## SECTION 1701 — SPECIAL INSPECTIONS

**1701.1 General.** In addition to the inspections required by Section 108, the owner or the engineer or architect of record acting as the owner's agent shall employ one or more special inspectors who shall provide inspections during construction on the types of work listed under Section 1701.5.

**EXCEPTION:** The building official may waive the requirement for the employment of a special inspector if the construction is of a minor nature.

**1701.2 Special Inspector.** The special inspector shall be a qualified person who shall demonstrate competence, to the satisfaction of the building official, for inspection of the particular type of construction or operation requiring special inspection.

**1701.3 Duties and Responsibilities of the Special Inspector.** The special inspector shall observe the work assigned for conformance with the approved design drawings and specifications.

The special inspector shall furnish inspection reports to the building official, the engineer or architect of record, and other designated persons. All discrepancies shall be brought to the immediate attention of the contractor for correction, then, if uncorrected, to the proper design authority and to the building official.

The special inspector shall submit a final signed report stating whether the work requiring special inspection was, to the best of the inspector's knowledge, in conformance with the approved plans and specifications and the applicable workmanship provisions of this code.

**1701.4 Standards of Quality.** The standards listed below labeled a "U.B.C. standard" are also listed in Chapter 35, Part II, and are part of this code.

1. Concrete.

   U.B.C. Standard 19-3, Ready-mixed Concrete

2. Connections.

   Chapter 22, Division IV, High-strength Bolting

3. Fireproofing.

   U.B.C. Standard 7-6, Thickness and Density Determination for Spray-applied Fireproofing

**1701.5 Types of Work.** Except as provided in Section 1701.1, the types of work listed below shall be inspected by a special inspector.

1. **Concrete.** During the taking of test specimens and placing of reinforced concrete. See Item 12 for shotcrete.

   **EXCEPTIONS:** 1. Concrete for foundations conforming to minimum requirements of Table 18-I-D or for Group R, Division 3 or Group M, Division 1 Occupancies, provided the building official finds that a special hazard does not exist.

   2. For foundation concrete, other than cast-in-place drilled piles or caissons, where the structural design is based on an $f'_c$ no greater than 2,500 pounds per square inch (psi) (17.2 MPa).

   3. Nonstructural slabs on grade, including prestressed slabs on grade when effective prestress in concrete is less than 150 psi. (1.03 MPa).

   4. Site work concrete fully supported on earth and concrete where no special hazard exists.

2. **Bolts installed in concrete.** Prior to and during the placement of concrete around bolts when stress increase permitted by Footnote 5 of Table 19-E or Section 1925 are utilized.

3. **Special moment-resisting concrete frame.** As required by Section 1921.9 of this code.

FIGURE 16-3—NORMALIZED RESPONSE SPECTRA SHAPES



**SPECTRAL ACCELERATION
EFFECTIVE PEAK GROUND ACCELERATION**

PERIOD, T
(Seconds)

ROCK AND STIFF SOILS
(SOIL TYPE 1)

DEEP COHESIONLESS OR STIFF
CLAY SOILS (SOIL TYPE 2)

SOFT TO MEDIUM CLAYS AND
SANDS (SOIL TYPE 3)

2–43

EXCEPTION: The special inspections may be limited to an initial inspection to check the deck surface and placement of reinforcing. The special inspector shall supervise the preparation of compression test specimens during this initial inspection.

**10. Spray-applied fireproofing.** As required by U.B.C. Standard 7-6.

**11. Piling, drilled piers and caissons.** During driving and testing of piles and construction of cast-in-place drilled piles or caissons. See Items 1 and 4 for concrete and reinforcing steel inspection.

**12. Shotcrete.** During the taking of test specimens and placing of all shotcrete and as required by Sections 1922.10 and 1922.11.

EXCEPTION: Shotcrete work fully supported on earth, minor repairs and when, in the opinion of the building official, no special hazard exists.

**13. Special grading, excavation and filling.** During earth-work excavations, grading and filling operations inspection to satisfy requirements of Chapter 18 and Appendix Chapter 33 of this code.

**14. Smoke-control system.**

14.1 During erection of ductwork and prior to concealment for the purposes of leakage testing and recording of device location.

14.2 Prior to occupancy and after sufficient completion for the purposes of pressure difference testing, flow measurements, and detection and control verification.

**15. Special cases.** Work which, in the opinion of the building official, involves unusual hazards or conditions.

**1701.6 Continuous and Periodic Special Inspection.**

**1701.6.1 Continuous special inspection.** Continuous special inspection means that the special inspector is on the site at all times observing the work requiring special inspection.

**1701.6.2 Periodic special inspection.** Some inspections may be made on a periodic basis and satisfy the requirements of continuous inspection, provided this periodic scheduled inspection is performed as outlined in the project plans and specifications and approved by the building official.

**1701.7 Approved Fabricators.** Special inspections required by this section and elsewhere in this code are not required where the work is done on the premises of a fabricator registered and approved by the building official to perform such work without special inspection. The certificate of registration shall be subject to revocation by the building official if it is found that any work done pursuant to the approval is in violation of this code. The approved fabricator shall submit a certificate of compliance that the work was performed in accordance with the approved plans and specifications to the building official and to the engineer or architect of record. The approved fabricator's quality control procedures shall be contingent on compliance with the following:

1. The fabricator has developed and submitted a detailed fabrication procedural manual reflecting key quality control procedures which will provide a basis for inspection control of workmanship and the fabricator plant.

2. Verification of the fabricator's quality control capabilities, plant and personnel as outlined in the fabrication procedural manual shall be by an approved inspection or quality control agency.

3. Periodic plant inspections shall be conducted by an approved inspection or quality control agency to monitor the effectiveness of the quality control program.

4. It shall be the responsibility of the inspection or quality control agency to notify the approving authority in writing of any change to the procedural manual. Any fabricator approval may be revoked for just cause. Reapproval of the fabricator shall be contingent on compliance with quality control procedures during the past year.

**SECTION 1702 — STRUCTURAL OBSERVATION**

Structural observation shall be provided in Seismic Zone 3 or 4 when one of the following conditions exist:

---

**4. Reinforcing steel and prestressing steel tendons.**

4.1 During all stressing and grouting of tendons in prestressed concrete.

4.2 During placing of reinforcing steel and prestressing tendons for all concrete required to have special inspection by Item 1.

EXCEPTION: The special inspector need not be present continuously during placing of reinforcing steel and prestressing tendons, provided the special inspector has inspected for conformance with the approved plans prior to the closing of forms or the delivery of concrete to the jobsite.

**5. Structural welding.**

5.1 General. During the welding of any member or connection which is designed to resist loads and forces required by this code.

EXCEPTIONS: 1. Welding done in an approved fabricator's shop in accordance with Section 1701.7.

2. The special inspector need not be continuously present during welding of the following items, provided the materials, qualifications of welding procedures and welders are verified prior to the start of work; periodic inspections are made of work in progress; and a visual inspection of all welds is made prior to completion or prior to shipment of shop welding:

2.1 Single-pass fillet welds not exceeding 5/16 inch (7.9 mm) in size.

2.2 Floor and roof deck welding.

2.3 Welded studs when used for structural diaphragm or composite systems.

2.4 Welded sheet steel for cold-formed steel framing members such as studs and joists.

2.5 Welding of stairs and railing systems.

5.2 Special moment-resisting steel frames. During the welding of special moment-resisting steel frames. In addition to Item 5.1 requirements above, nondestructive testing as required by Section 1703 of this code.

5.3 Welding of reinforcing steel. During the welding of reinforcing steel.

EXCEPTION: The special inspector need not be continuously present during the welding of ASTM A 706 reinforcing steel not larger than No. 5 bars used for embedments, provided the materials, qualifications of welding procedures and welders are verified prior to the start of work; periodic inspections are made of work in progress; and a visual inspection of all welds is made prior to completion or prior to shipment of shop welding.

**6. High-strength bolting.** As required by Chapter 22, Division IV. Such inspections may be performed on a periodic basis in accordance with the requirements of Section 1701.6.

**7. Structural masonry.**

7.1 For masonry, other than fully grouted open-end hollow-unit masonry, during preparation and taking of any required prisms or test specimens, placing of all masonry units, placement of reinforcement, inspection of grout space, immediately prior to closing of cleanouts, and during all grouting operations.

EXCEPTION: For hollow-unit masonry where the $f'_m$ is no more than 1,500 psi (10.34 MPa) for concrete units or 2,600 psi (17.93 MPa) for clay units, special inspection may be performed as required for fully grouted open-end hollow-unit masonry specified in Item 7.2 below.

7.2 For fully grouted open-end hollow-unit masonry during preparation and taking of any required prisms or test specimens, at the start of laying units, after the placement of reinforcing steel, grout space prior to each grouting operation, and during all grouting operations.

EXCEPTION: Special inspection as required in Items 7.1 and 7.2 above need not be provided when design stresses have been adjusted as specified in Chapter 21 to permit noncontinuous inspection.

**8. Reinforced gypsum concrete.** When cast-in-place Class B gypsum concrete is being mixed and placed.

**9. Insulating concrete fill.** During the application of insulating concrete fill when used as part of a structural system.

1. The structure is defined in Table 16-K as Occupancy Category I, II or III, or

2. The structure is required to comply with Section 403, or

3. When so designated by the architect or engineer of record, or

4. When such observation is specifically required by the building official.

The owner shall employ the engineer or architect responsible for the structural design, or another engineer or architect designated by the engineer or architect responsible for the structural design, to perform structural observation as defined in Section 220. Observed deficiencies shall be reported in writing to the owner's representative, special inspector, contractor and the building official. The structural observer shall submit to the building official a written statement that the site visits have been made and identifying any reported deficiencies which, to the best of the structural observer's knowledge, have not been resolved.

## SECTION 1703 — NONDESTRUCTIVE TESTING

In Seismic Zones 3 and 4, welded connections between the primary members of special moment-resisting frames shall be tested by nondestructive methods for compliance with approved standards and job specifications. This testing shall be a part of the special inspection requirements of Section 1701.5. A program for this testing shall be established by the person responsible for structural design and as shown on plans and specifications.

As a minimum, this program shall include the following:

1. All complete penetration groove welds contained in joints and splices shall be tested 100 percent either by ultrasonic testing or by radiography.

EXCEPTION: When approved, the nondestructive testing rate for an individual welder or welding operator may be reduced to 25 percent, provided the reject rate is demonstrated to be 5 percent or less of the welds tested for the welder or welding operator. A sampling of at least 40 completed welds for a job shall be made for such reduction evaluation. Reject rate is defined as the number of welds containing rejectable defects divided by the number of welds completed. For evaluating the reject rate of continuous welds over 3 feet (914 mm) in length where the effective throat thickness is 1 inch (25.4 mm) or less, each 12-inch increment (305 mm) or fraction thereof shall be considered as one weld. For evaluating the reject rate on continuous welds over 3 feet (914 mm) in length where the effective throat thickness is greater than 1 inch (25.4 mm), each 6 inches (152 mm) or length or fraction thereof shall be considered one weld.

For complete penetration groove welds on materials less than $5/16$ inch (7.9 mm) thick, nondestructive testing is not required; for this welding, continuous inspection is required.

When approved by the building official and outlined in the project plans and specifications, this nondestructive ultrasonic testing may be performed in the shop of an approved fabricator utilizing qualified test techniques in the employment of the fabricator.

2. Partial penetration groove welds when used in column splices shall be tested either by ultrasonic testing or radiography when required by the plans and specifications. For partial penetration groove welds when used in column splices, with an effective throat less than $3/4$ inch (19.1 mm) thick, nondestructive testing is not required; for this welding, continuous special inspection is required.

3. Base metal thicker than $1 1/2$ inches (38.1 mm), when subjected to through-thickness weld shrinkage strains, shall be ultrasonically inspected for discontinuities directly behind such welds after joint completion.

Any material discontinuities shall be accepted or rejected on the basis of the defect rating in accordance with the (larger reflector) criteria of approved national standards.

## SECTION 1704 — PREFABRICATED CONSTRUCTION

1704.1 General.

1704.1.1 Purpose. The purpose of this section is to regulate materials and establish methods of safe construction where any structure or portion thereof is wholly or partially prefabricated.

1704.1.2 Scope. Unless otherwise specifically stated in this section, all prefabricated construction and all materials used therein shall conform to all the requirements of this code. (See Section 104.2.8.)

1704.1.3 Definition.

PREFABRICATED ASSEMBLY is a structural unit, the integral parts of which have been built up or assembled prior to incorporation in the building.

1704.2 Tests of Materials. Every approval of a material not specifically mentioned in this code shall incorporate as a proviso, the kind and number of tests to be made during prefabrication.

1704.3 Tests of Assemblies. The building official may require special tests to be made on assemblies to determine their durability and weather resistance.

1704.4 Connections. See Section 1612.1 for design requirements of connections for prefabricated assemblies.

1704.5 Pipes and Conduits. See Section 1612.2 for design requirements for removal of for pipes, conduit and other equipment.

1704.6 Certificate and Inspection.

1704.6.1 Materials. Materials and the assembly thereof shall be inspected to determine compliance with this code. Every material shall be graded, marked or labeled where required elsewhere in this code.

1704.6.2 Certificate. A certificate of approval shall be furnished with every prefabricated assembly, except where the assembly is readily accessible to inspection on the site. The certificate of approval shall certify that the assembly in question has been inspected and meets all the requirements of this code. When mechanical equipment is installed so that it cannot be inspected at the site, the certificate of approval shall certify that such equipment complies with the laws applying thereto.

1704.6.3 Certifying agency. To be acceptable under this code, every certificate of approval shall be made by an approved agency.

1704.6.4 Field erection. Placement of prefabricated assemblies at the building site shall be inspected by the building official to determine compliance with this code.

1704.6.5 Continuous Inspection. If continuous inspection is required for certain materials where construction takes place on the site, it shall also be required where the same materials are prefabricated construction.

EXCEPTION: Continuous inspection will not be required during prefabrication if the approved agency certifies to the construction and furnishes evidence of compliance.

# EXHIBIT 18

# ROYAL RIVIERA HOTEL SPECIAL INSPECTION FINAL REPORT



**CLIENT:**      MANHATTAN GUAM
720 Pale San Vitores Road
Suite 201, Tumon, Guam 96911

**CONSULTANT:**      WINZLER & KELLY
Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910

**DATE:**      SEPTEMBER, 1998

September 1, 1998

Mr. Ed Borja, Chief Inspector
Administrator – One Stop
Department of Public Works, Building Permit Division
One Stop Permit Center
Agana, Guam

RE:    **Special Inspection Final Report for Royal Riviera Hotel, Tumon, Guam**

Dear Mr. Borja,

Special inspection of the Royal Riviera Hotel began in March 1998 in conformance with Guam Public Law 22-83 and the Special Inspection provisions of the 1994 Uniform Building Code (UBC), Section 1701.

Patrick Taitano and Richard Chien of Winzler and Kelly, performed special inspections from March 1998 to August 1998 under my direction. The inspections included verifying the dimensions, quantities, and quality of construction specified on the plans correspond with the subcontractor's work and with the constructed structure. Daily inspections of construction discrepancies as well as reparations to correct discrepancies are itemized in the attached inspection reports. Pictures of the site and of addressed items are attached for the records. Also attached are concrete test results, structural drawings, bonded post-tensioned floor system information, and post-tensioned floor shop drawings.

The completed structure, following the inspection and the revisions arranged as per the inspection, conform to the completed design drawings and workmanship standards outlined in Guam Public Law 22-83 and the 1994 UBC.

Sincerely,

John F. Jones, S.E.
Asia-Pacific Region Manager

# TABLE OF CONTENTS

A. **DAILY/WEEKLY INSPECTION REPORTS**
   **(REP - 001 TO REP – 026)**
   **(SLAB CONCRETE POURING SCHEDULE)**

B. **PHOTOS**

C. **CONCRETE COMPRESSION TEST RESULTS**

D. **STRUCTURAL DRAWINGS**

E. **BONDED POST-TENSIONED FLOOR SYSTEM**
   **MATERIAL TEST CERTIFICATES AND**
   **SYSTEM INFORMATION**

F. **POST-TENSIONED FLOOR TENDON &**
   **REINFORCEMENT SHOP DRAWINGS**

# A. DAILY/WEEKLY INSPECTION REPORTS
## (REP - 001 TO REP – 026)
## (SLAB CONCRETE POURING SCHEDULE)

**REP-001**

City of  TUMON, GUAM                                      for (dated)      3/17/98

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous              [ X ] Periodic

Time Beginning Inspection:      8:45 AM          Time Ending Inspection:  12:00 PM

**Describe Inspections Made, Including Locations:**  Inspection of the reinforcing steel was made to the beams of special moment-resisting concrete frame supporting the fourth (4th) floor.  The beams that were inspected were limited to building lines 2, 3, 4, and up to but not including building line 5.  See diagram-1, dated 3/17/98.  The extent of the inspection included the following:

- Size & quantity of continuous rebar.
- Size, length and quantity of additional rebar, both sides of beam.
- Spacing of shear ties.
- Quantity of closed ties at column-beam joints.
- Anchored length of rebar at end-columns.
- Length of top/bottom splices.

**List Tests Made:**          None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1) Confinement Steel at grid intersections C2, C3, B4, F3 and F4, required additional #4 rebar at 6" o.c. Contractor began corrections immediately.
2) Additional top steel at beam F2-F3, required 10'-0" length, actual length was 9'-8".  (Also, bottom splice length, required 4'-4", actual 4'-0".)
3) Additional top steel at beams E2-E3, E3-E4, and D3-D4 require 10'-0" length, actual length was 9'-10". Contractor instructed by (R.C.) engineer that 2" variance was okay.  No corrections were made.
4) Top splice length at beam D4-D5 requires 5'-8" length, actual 5'-7".  No corrections were made.
5) Additional top steel at beam E4-D4, required 12'-9" length, actual length was 12'-0".  Contractor made correction immediately, correction was re-inspected and found okay.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**       In general, the most common discrepancy was the top additional steel lengths.  In most cases, the discrepancy was approximately 1" to 2".  Contractor was briefed, concerning the sort of items that we were looking for in the inspection of beams.

The Contractor was also briefed concerning splice bends.  For future construction,  the 1 to 6 slope bend for splice purposes shall be on the main rebar which are further away from columns.

Also note, that at the time of inspection, all the column-beam joints were missing one closed tie.  Contractor had the ties prepared, but they were not placed.  Before the concrete pour the closed ties should be checked.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed:  _Patrick R. Traitano_ _____          Date:  ___3/17/98___

Print Full Name:  _PATRICK  TRAITANO_ _____          I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**SPECIAL INSPECTOR DAILY REPORT**

**REP-002**

City of _TUMON, GUAM_                                         for (dated) _____March 25, 1998_____

Project Name/Address:     Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous           [ X ] Periodic

Time Beginning Inspection:    2:30 PM       Time Ending Inspection:  5:30 PM

**Describe Inspections Made, Including Locations:** Inspection of 4th level, zone 1 rebar, confinement steel, tendons and workmanship.

**List Tests Made:**    None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1. There were discrepancies with our drawings from VSL and what we saw in on the job site, concerning the tendons. The VSL foreman informed us that there were changes. To avoid this problem, we request that VSL issue revised drawings to W&K along with issuing the drawings to the job site.

2. There were horizontal curves in a few of the tendons, this was discussed with the VSL foreman who informed us that there was a shift in the mechanical opening and that the shift conflicted with the tendon. This problem will be corrected by adding additional rebar around the opening.

3. There were several locations were the intermost #4 ties were not touching the tendon anchor as called for in the drawings. These areas were corrected immediately.

4. There were still some perimeter #9 rebar that were missing. The drawings called out 2-#9's continuous around the perimeter. We were informed that this would be done before the concrete pouring Thursday night (3/26).

5. Under the direction of R.C. (W&K) #4 ties were placed at the live anchor ends in the North-West corner of the building.

6. There was no reinforcing at the dead end tendons on the east side. We were informed that this work was not completed yet.

7. The anchor end tendons on the east side of the building conflict with the 8-#9's in the C-1 columns. The anchors caused the two middle #9's to be bent. The solution to this problem was discussed in a meeting with Mark (VSL). Two additional epoxy grouted #9's would be added. The contractor was notified immediately to make changes. In the future, it was agreed that VSL would use two-2strand tendons through the columns to avoid having to bend the #9 column rebar.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**    This inspection is leading up to the first concrete pour. We have expected that there will be a learning curve established, however, there appeared to be many problems with the workmanship. In general, it does not seem that the site will be prepared before the concrete pour is scheduled.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _Patrick L. Taitano_          Date: _3/25/98_

Print Full Name: _PATRICK TAITANO_        I.D. Number_____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-003**

City of  TUMON, GUAM                                    for (dated)      3/26/98

Project Name/Address:        Su Center Building
                             San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                             [   ] Continuous              [ X ] Periodic

Time Beginning Inspection:        6:30 PM        Time Ending Inspection:  6:00 AM

**Describe Inspections Made, Including Locations:**  4th level, zone-1 concrete pouring.

**List Tests Made:**        Concrete samples were made, note that we expect higher strengths because of the use of plasticizer admixture to the cement batch.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

- 12-#5's  top rebar at end column and beam joints were not placed in five locations. Rebar was immediately corrected.

- Experienced 4000 psi concrete flow into column-beam joint at gridline C3. The column-beam joint should be controlled. We experienced flow problems throughout the earlier part of the evening. We had better results controlling the flow and pouring of the 6000psi and 4000psi concrete, when using slump 2 or 3 for the 6000psi.

- On the east side, near line (3H), the 7-#5's were not centered on columns as called out on the drawings. This was corrected before the concrete pour.

- Under the direction of R.C. (W&K), the 6-#6 rebars on the east side, between grid (1) & (2) at grid (I), were extended to reach the columns.

- There was not enough rebar at column (3G), the drawings called out 14-#8's and 18-#5's.

- We experienced some discrepancies due to the late issue of the post-tensioning drawings. These drawings contained additional reinforcement. To aid our inspection, and to ensure that we are inspecting the latest design, we request that VSL issue an electronic drawing to W&K when they deliver any revised drawings to the job site. This will ensure that W&K has the latest revised plan with which to inspect.

- Under the direction of R.C. (W&K), two additional #9's were placed in the C-1 columns on the east side of the building. This was because the initial #9's, were placed in the wrong location. The initial-additional #9's were placed as a solution to the post-tensioning anchors running directly between the columns. This was discussed in the meeting with Mark (VSL) on Wednesday March 25, 5:00pm.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**        We experienced some difficulty with the 1st concrete pour. One of the pipes broke down and we had communication problems with the concrete strengths. The contractor had extreme difficulty placing the 6000 and 4000 strength concrete.   It appeared that there were instances were a possible cold-joint was formed due to the breakdown of the pumps.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _Patrick A Taitano_____        Date: ___3/26/98___
Print Full Name:  ___PATRICK A TAITANO_____        I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-004**
City of  TUMON, GUAM                                      for (dated)      3/27/98

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:
                               [   ] Continuous            [ X ] Periodic

Time Beginning Inspection:          7:00 PM          Time Ending Inspection:  5:00 AM

**Describe Inspections Made, Including Locations**:  Inspection of 4th level, zone-2 pouring of concrete slab and beams.

**List Tests Made**:          None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items**:

1.  Under the direction of R.C. (W&K) the over-spill of concrete at the construction joint from Zone I into Zone II, into the beams shall have an epoxy coat applied.   Also, 6000psi concrete will be poured at the construction joint.

2.  Winzler & Kelly will come up with a continuous numbering system for the columns, beams for convenience.

3.  Suggest that before the concrete pouring, that the pipes be inspected for hardened concrete.  If clogged, the pipes should be cleaned prior to the concrete pour, and the concrete deposits should be removed from the area of pour.  The deposits should in no circumstances be place in the beam forms.

4.  Interior column (D5), under direction of R.C. (W&K), revised rebar location.  Drawings called for 12-#9's centered on column, modified to slide more of the rebar opposite the beam face.

5.  Column (B4), corrected from 9-#6's each way to 13-#6's and 18-#6's.  Drawings showed 18-#6's.

6.  Suggest that top rebar be supported by riser chairs to ensure that the top rebar is not deformed as it gets further away from the column.

7.  As discovered on Thursday's pour, when changing from 4000psi to 6000psi concrete, verify that operator cleans out the 4000psi concrete before placing 6000psi into beam-column joints.

8.  When using two pumps to pour concrete, suggest that there are two foremen assigned to each pump to monitor both crews. We caught some crew members just dumping left over concrete into the beam column joints.  This was done when moving pipes.   Also suggest that there be a pre-concrete pour educational meeting for the crew to establish better quality control. Items to be discussed should follow those suggested in this and previous memorandums.

**List Changes to Approved Plans Authorized by Architect or Engineer**:

**Comments:**       This was the second pour, however we did experience many of the same problems.  It seems that the contractor in some cases does not comprehend the structural importance of the 6000 strength concrete and the importance of avoiding cold joints. For the sole purpose of ease, the contractor has argued to pour all 6000 strength concrete at once. Although, pouring all 6000 strength at once would cut down the confusion, this is not a possible solution.  The formation of cold joints would definitely jeopardize the structural integrity of the beam-column joints and column capitals.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.                        Date:        3/27/98
Signed:  _Patrick A. Taitano_____                          I.D. Number: _____
Print Full Name:   PATRICK A. TAITANO_____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-005**

City of __TUMON, GUAM__                for (dated) ___4/1/98___

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                               [    ] Continuous           [ X ] Periodic

Time Beginning Inspection: ___11:00 AM___    Time Ending Inspection: __2:00 PM__

**Describe Inspections Made, Including Locations:**  Inspection of 4th level, zone-1 columns.

**List Tests Made:**      None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

1. It was apparent that the ductile column at grid (E2) was plastered over, possibly to fill voids that may have formed during the concrete pour. Since the ductile column is a very critical component in the structural system of the building, a portion of the plaster was chipped out, under the direction of Richard Chien. It was verified that there were voids. As directed by R.C. the voids are to be filled with non-shrinkage cement. This was told directly to the contractor.

2. In the event that this situation would occur again, the contractor should notify Winzler & Kelly prior to plastering the voids. W&K could then prescribe the necessary repairs.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____   Date: ___4/1/98___

Print Full Name: __PATRICK A. TAITANO__   I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-006**

City of TUMON, GUAM _____    for (dated)  __4/7/98__

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                               [   ] Continuous          [ X ] Periodic

Time Beginning Inspection:  12:30 PM          Time Ending Inspection:  3:00 PM

**Describe Inspections Made, Including Locations**:  Inspection of the reinforcing steel were made to the beams of special moment-resisting concrete frame supporting the fourth (5th) floor.  The beams that were inspected were limited to building lines 2 and 3. The extent of the inspection included the following:

- Size & quantity of continuous rebar.
- Size, length and quantity of additional rebar, both sides of beam.
- Spacing of shear ties.
- Quantity of closed ties at column-beam joints.
- Anchored length of rebar at end-columns.
- Length of top/bottom splices.

**List Tests Made:**  None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items**:

1)   Add diagonal reinforcing at the sleeve locations in the beam.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

In general, the workmanship for the beams inspected were much improved from the previous level beams.  At the time of inspection they were still placing the confinement steel at Col-23 (C2).

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____    Date:  __4/7/98__

Print Full Name:  __PATRICK P. TAITANO_____    I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-007**

City of TUMON, GUAM _____ for (dated) 4/10/98 _____

Project Name/Address:      Su Center Building
                              San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                [   ] Continuous                  [ X ] Periodic

Time Beginning Inspection:   3:00 PM _____ Time Ending Inspection:   7:00 PM _____

**Describe Inspections Made, Including Locations**:   A pre-concrete pouring inspection was made to Zone I, level 5. The extent of the inspection included the following:

- Location, quantity and height of post-tensioning tendons.
- Top and bottom rebar, as specified on VSL drawings for Level 5.
- Workmanship of rebar placing (i.e. chair risers, support)

**List Tests Made:**   None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1. Many bottom reinforcing steel was in contact with the plywood formwork.

2. Diagonal reinforcing was added around the pipe sleeves running through the beams as required from previous report.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

1. The VSL drawings showed live end anchors at the NE corner of the building for (6) tendons (no. 111 to 116). The contractor had placed dead end anchors.

2. Also the VSL drawings showed tendons (no. 182 and 1110) terminating with a dead end anchor somewhere at middle of the building. This was not the case in the field. The tendons were spanned across the full length of the building, with live end anchors on both sides.

3. The VSL drawings showed a shovel at tendon (no. 109). Instead it was replaces with a dead end anchor.

**Comments:**

This inspection, was made approximately 12 hours prior to the scheduled concrete pour. At the time of the inspection, the site was about 75% complete. There was a significant amount of work that still needed to be done before the concrete pour would be allowed. This included top and bottom rebar that was not placed, bottom rebar that was in contact with the concrete forms.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.    4/10/98

Signed: _____ Date: _____

Print Full Name: _____PATRICK TAITANO_____       I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-008**

# SPECIAL INSPECTOR DAILY REPORT

City of  TUMON. GUAM                                              for (dated)  4/11/98

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon. Guam
Inspection Type(s)/Coverage:

[    ] Continuous          [ X ] Periodic

Time Beginning Inspection:  7:00 AM          Time Ending Inspection:  6:00 PM

**Describe Inspections Made, Including Locations:**    A pre-concrete pouring inspection and the witnessing of the concrete pour was made to zone I, level 5.

**List Tests Made:**  None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1. Many bottom rebar were still touching the plywood formwork. The contractor was told to install concrete spacers at all locations discovered, immediately.
2. There was not adequate cover for the tendons (no. 119 to 150) at the beam crossings. This was discovered at the same time the concrete was being poured. This was brought to the attention of the contractor immediately. The contractor was instructed to place concrete spacers on the beams to raise the plywood level at least 1" above the tendon sheath.
3. Column-27, top rebar was corrected. The contractor was instructed to change the #8's to be the topmost bars as called out in the drawing. This was corrected immediately.
4. The plywood that the contractor was using to control the slab thickness was found to be shorter than what was called out for in the drawings. The northwest corner of the building was discovered to be about 1" short of the required 9-1/2 inches. The contractor was notified and made corrections.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

The concrete pour began at 7:15 AM. The condition of the workmanship seemed to be the biggest issue. There were many instances were the bottom steel was in contact with the plywood sheathing. The contractor should adequately support the bottom steel with concrete spacers.

Due to the delayed arrival of concrete from the supplier, there were a few locations that came questionably close to forming cold joints. As I monitored the arrival of concrete, there were several spans of elapsed time (30-50 minutes), where no concrete was being poured. I suggest that the Owner talk with the supplier prior to the concrete pour, to ensure that the supplier has an adequate supply of cement. Hopefully, this will eliminate this problem in the future.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____                Date: _4/11/98_
Print Full Name:  PATRICK  TAITANO                I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

# SPECIAL INSPECTOR DAILY REPORT

City of <u>TUMON. GUAM</u>      for (dated) <u>4/13/98</u>

Project Name/Address:      Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

Time Beginning Inspection: <u>3:45 PM</u>      Time Ending Inspection: <u>5:00 PM</u>

**Describe Inspections Made, Including Locations:**   Inspection of the columns located in zone I, level 5.

- Size & quantity of vertical rebar.
- Location and Spacing of closed/cross ties.
- Length splices.

**List Tests Made:** None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

At the time of the inspection, some columns already had the forms closed. Those that were checked all appeared to comply with the drawings. Columns (19,21 and 22) were not complete.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____    Date: <u>4/13/98</u>

Print Full Name: <u>PATRICK TAITANO</u>      I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-010**

City of TUMON, GUAM _____ for (dated) 4/17/98

Project Name/Address:     Su Center Building
                    San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

            [    ] Continuous                [ X ] Periodic

Time Beginning Inspection:   2:15 PM _____   Time Ending Inspection:   6:00 PM _____

**Describe Inspections Made, Including Locations:**   Inspection of the repair of column no. 16 (E2), level 4.

- Chipping and cleaning column voids.
- Application of Epoxy
- Non-shrinkage cement grout

**List Tests Made:** None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

The column voids were chipped and found to be mostly sand and very little cement. The column was cleaned with a vacuum and air compressor before the epoxy was applied. I witnessed the application of the epoxy and the placing of the forms around the column base. A total of 10 bags of non-shrinkage cement were used to grout into the column base. The contractor had difficulty operating the grouting machine. The 10 bags were not enough to fill up the column base. This posed a problem, as suppliers were already closed for business. Two additional bags were bought and grouted into the column base.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _Patrick J. Taitano_ _____ Date: _4/17/98_ _____
Print Full Name: _PATRICK  TAITANO_ _____ I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

# SPECIAL INSPECTOR DAILY REPORT

City of <u>TUMON, GUAM</u>                    for (dated) <u>4/18/98</u>

Project Name/Address:      Su Center Building
                            San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:
                            [   ] Continuous          [ X ] Periodic

Time Beginning Inspection: <u>10:45 AM</u>         Time Ending Inspection: <u>11:45 AM</u>

**Describe Inspections Made, Including Locations:** Inspection of the column 16 (E2), level 4.

- Opening forms.

**List Tests Made:** None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

At the time of the inspection, the form work for column 16, level 4 was removed. A (1" to 3") ridge had formed around the top of the grouted area. Mr. Li (Phoenix Foreman) was informed to apply epoxy before plastering with non-shrinkage cement.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____          Date: __4/18/98__
Print Full Name: __PATRICK TAITANO__               I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

REP-012

City of TUMON, GUAM

Project Name/Address:     Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous        [ X ] Periodic

**Describe Inspections Made, Including Locations:** Inspection of 4th level, zone 3 steel rebar and post-tensioning system and inspection of beams at 5th level.

**List Tests Made:** Concrete samples were taken of concrete on 4/25.

**Total Inspection Time Each Day:**

| Date | 4/20 | 4/21 | 4/22 | 4/23 | 4/24 | 4/25 | 4/26 |
|------|------|------|------|------|------|------|------|
| Hours | 2 | 2 | 2 | | 1.5 | 5 | |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
1. Missing rebar at column no. 54 (F6A).
2. Spacers at bottom rebar @ SE corner of building.
3. 5-#5's top reinforcing missing SE corner – edge of slab (see note on drawings 37-#'5s).

We required that epoxy be applied at the construction joint before concrete was poured. The epoxy had to be reapplied in some areas because the epoxy was already dried when the concrete pouring began in those areas.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
1. Changes as noted on fax received from Mark Geoghegan (VSL), dated April 20, 1998. See attached fax.
2. Additional tendons were added and modified as noted on attached drawing.

The post tensioning system had changed as directed by VSL. These changes were not shown on the drawing plans that I was using during my inspection. The changes were verified by Juan (VSL foreman).

**Comments:** 4/20: At the time of the inspection, many reinforcing were still missing. The contractor was also still placing a few of the post-tension tendons. Although there was still a fair amount of work to be done, it is reasonable that the site will be ready for concrete pouring Tuesday evening.

4/21: Much work has been completed. Aside from the few items that are listed above, the site is generally well prepared. I do not foresee a problem being able to pour concrete this evening. A general house-keeping sweep should be made prior to the placing of 2x4's to control slab height.

Again, we are having problems with the workmanship. There should be more concrete spacers to support the bottom rebar. Also, the epoxy should be applied in short segments and there should be only a short elapsed time from the time the epoxy is applied and the time the concrete is poured in that particular area. This would prevent the epoxy from drying up.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____ Date: 4/27/98
Print Full Name: PATRICK A. TAITANO    I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-013

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

          [   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**   Inspection of 5th level beams, confinement steel, post-tensioning system, reinforcing bars and workmanship were conducted.  The pre-concrete pouring inspection was made for 5th level, zone-2 and water tank slab.

**List Tests Made:**      Concrete samples were taken during the concrete pour on 5/2.  Three samples were taken of the 6000 psi concrete and four samples of the 4000 psi concrete.

**Total Inspection Time Each Day:**

| Date  | 4/27 | 4/28 | 4/29 | 4/30 | 5/1 | 5/2 | 5/3 |
|-------|------|------|------|------|-----|-----|-----|
| Hours | 4    | 4    | 2    | 6    | 8   | 6.5 |     |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**


**List Changes to Approved Plans Authorized by Architect or Engineer:**
There were many changes to the design of the water tank.  These changes were not reflected on the drawings, however they were noted on documents faxed to Manhattan Guam.

**Comments:**      The workmanship of the slab appeared to be better this time around.  There was additional bottom rebar that was being used.  This was at the owner's request.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _~Michael Fortune~_                                    Date: _5/4/98_
Print Full Name: _PATRICK TAITANO_                    I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-014

City of **TUMON, GUAM**

Project Name/Address:        Su Center Building
                            San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                          [   ] Continuous                 [  X  ] Periodic

**Describe Inspections Made, Including Locations:**   Inspection of 5th level. zone-2 columns prior to. during and after concrete pouring. Inspection of 6th level, zone-1 beams and forms were conducted. Inspection of water tank columns and walls.

**List Tests Made:**

**Total Inspection Time Each Day:**

| Date | 5/4 | 5/5 | 5/6 | 5/7 | 5/8 | 5/9 | 5/10 |
|------|-----|-----|-----|-----|-----|-----|------|
| Hours | | 6 | 4 | 2 | 8 | 2 | |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
Contractor was told to pour concrete grout (cement and water only) into the column forms prior to pouring concrete into the column forms.

**List Changes to Approved Plans Authorized by Architect or Engineer:**       None

**Comments:**     Contractor should not use concrete from the pump that was spilled on the deck as grout. On one occasion I witnessed the contractor shoveling concrete that was pump out into the same bucket that was used for grout. This was told to the contractor and should not happen again.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.    5/11/98

Signed: _____                     Date: _____

Print Full Name: _PATRICK TAITANO_            I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-015

SPECIAL INSPECTOR WEEKLY REPORT

City of TUMON, GUAM

Project Name/Address: Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[ ] Continuous [ X ] Periodic

**Describe Inspections Made, Including Locations**: Inspection of the 6th level, zone-1. Inspection included reinforcing of beams, bottom reinforcing, post-tensioning tendons and anchors, reinforcing at openings and beam-column joints, general workmanship and concrete pouring.

**List Tests Made**: Concrete samples were made during the pouring of the 6th level, zone-1.

**Total Inspection Time Each Day**:

| Date | 5/11 | 5/12 | 5/13 | 5/14 | 5/15 | 5/16 | 5/17 |
|---|---|---|---|---|---|---|---|
| Hours | 4 | 16 | 6 | 4 | | | |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items**:
There were some concrete spacers that still needed to be placed.

**List Changes to Approved Plans Authorized by Architect or Engineer**:
The reinforcing at the beams and beam column joints around the special moment resisting frame was changed. These changes were not shown on the latest drawings. For instance the #6's at 9" O.C. were changed to #5's at 6" O.C. and the #5's at 12" were changed to #5's at 8" O.C.

**Comments:** In general, the workmanship was better. However, a concern that seems to come up when pouring the slab is the clearance above the tendons. At places where the tendons cross above the beams there needs to be at least 1 inch of concrete cover above the tendon sleeves. This is important because when the tendons are stressed there could be damage to the slab if there is not sufficient cover.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: [signature] Date: 5/18/98

Print Full Name: PATRICK TAITANO I.D. Number: ____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-016

City of TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                               [   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**

Inspection of the rebar, workmanship and concrete pouring of the 6th level, zone 1 columns, 4th level ramp up, and 5th level swimming pool perimeter beams and slab were conducted.

**List Tests Made:**

**Total Inspection Time Each Day:**

| Date  | 5/18 | 5/19 | 5/20 | 5/21 | 5/22 | 5/23 | 5/24 |
|-------|------|------|------|------|------|------|------|
| Hours | 2    | 8    | 8    | 4    | 4    |      |      |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**
The ramp reinforcing design was changed, the owner ran out of #6 rebar and decided to use #5's at closer spacing. This was approved by R.C. (W&K).

**Comments:**   During the concrete pouring of the columns on the 6th level. The pump had broke down. There were no more available pumps from Perez Bros. This posed a problem because one of the Special Moment Resisting Columns (E3) was only 1/3 completed. I talked w/ R.C. (W&K) about this problem. It was decided that if the pumping resumed within several hours then the contractor would need to add grout before completing the remaining 2/3rds and maintain good vibrating throughout the pour.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _Patrick Taitano_                                    Date: _5/25/98_
Print Full Name: PATRICK TAITANO                             I.D. Number:
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-017

City of  TUMON, GUAM

Project Name/Address:        Su Center Building
                         San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

[   ] Continuous                  [ X ] Periodic

**Describe Inspections Made, Including Locations**:  Inspection of 4th level beams and columns, particularly looking at discovered cracks and chipped columns.  Also, inspected the reinforcing of beams at the construction joint at 4th level for concrete pouring scheduled for 5/28.
5/28: Inspection of concrete pouring for construction joint on 4th level.
5/29: Inspection of 1st level column chipping.
5/30: Inspection of 5th level, zone 3 reinforcing and post-tensioning tendons.
5/31: Inspection of 5th level, zone 3 concrete pouring.

**List Tests Made**:
3 sets of concrete samples were made for the 5th level, zone 3 pour on 5/31.  The last sample taken was of a particularly watery batch of concrete.

**Total Inspection Time Each Day:**

| Date | 5/25 | 5/26 | 5/27 | 5/28 | 5/29 | 5/30 | 5/31 |
|------|------|------|------|------|------|------|------|
| Hours |      |      | 3    | 6    | 4    | 2    | 8    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items**:
Column (F2) shows signs of sand and loose particles at the column base.  This situation is similar to the sand and loose particles found at column (E2).  The repair requirement is the same as that of (E2), chipping of all loose particle and sand, vacuum cleaning, epoxy applications and non-shrinkage grout.

Column (F4) has cracks at top of column at the corners.  This situation as described by Mr. Lee (Phoenix) is due to damages caused when removing nails and forms.  Richard requires repair with non-shrinkage grout.

Beam from D4 to E4 has exposed rebar.  The contractor thinks it is a #4 tie that accidentally fell in the beam and was not removed prior to pouring.

Crack at ramp from 3rd to 4th, on 4th level slab.  Richard requires repair with epoxy injection.

During the concrete pour (5/31), the last batch of concrete at PT-3 was very watery.   A sample was taken to ensure the strength.  The contractor  hand-tossed 2 bags of cement and manually mixed with the batch concrete manually with rakes.

**List Changes to Approved Plans Authorized by Architect or Engineer**:  Richard issued the drawings for the swimming pool gutter and concrete column retrofit details for the missing column ties on the first three levels.

**Comments:**      When looking at the workmanship at the construction joint at 4th level, there is some dried concrete at the beam column joints.  Richard has required that Phoenix apply epoxy on the exposed concrete surface and at areas where there is dried concrete prior to pouring new concrete.
      During the concrete pour on 5/28, the 14"x30" beam at SE corner of building had it's forms give way and a big section of concrete started to spill onto the lower level floor.  The contractor stopped the flow of concrete, provided extra shoring to keep the forms closed.  They re-vibrated the concrete and then poured more concrete into the beam.  When the forms are removed, the beam should be checked for voids, all loose cement should be chipped and plastered over.  Should check with Richard to see if non-shrink grout is necessary.
      Also, the contractor forgot to follow the instructions from Richard regarding the concrete column.  Contractor was told by Richard to apply epoxy onto the existing concrete surface of the 30"x30" column.  Contractor did not apply epoxy on the surface facing the east of the building.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____        Date: 6/1/98
Print Full Name:  PATRICK  TAITANO          I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-018

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                               [   ] Continuous               [ X ] Periodic

**Describe Inspections Made, Including Locations:**   Inspection of the columns 5th level, zone 3 columns, which included vertical rebar and horizontal ties was conducted.  Inspection of the beams on the 7th level was conducted.  Inspection of the 6th level, zone 2 beams was conducted.  Inspection of the forms, rebar, tendons, workmanship and the concrete pour for the 6th level, zone 2 was conducted.

**List Tests Made:**          Concrete samples were made of the concrete pouring of the 6th level, zone 2 on 6/6.

**Total Inspection Time Each Day:**

| Date  | 6/1 | 6/2 | 6/3 | 6/4 | 6/5 | 6/6 | 6/7 |
|-------|-----|-----|-----|-----|-----|-----|-----|
| Hours | 4   | 8   | 4   | 2   | 4   | 4   | 4   |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**         Richard had asked VSL to provide additional rebar for the cantilevered slab near the swimming pool prior to the concrete slab pouring of the 6th level, zone 2.

**Comments:**

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____     Date: __6/8/98__
Print Full Name: _Patrick Taitano_____     I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-019**

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                               [   ] Continuous            [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)    Inspection of the columns 6th level, zone 2 columns, which included vertical rebar and horizontal ties was
      conducted.
2)    Inspection of the beams on the 7th level was conducted.
3)    Inspection of the 6th level, zone 2 beams was conducted.
4)    Inspection of the forms, rebar, tendons, workmanship and the concrete pour for the 6th level, zone 3 was conducted.

**List Tests Made:**          Concrete samples were made of the concrete pouring of the 6th level, zone 3 on 6/13.

**Total Inspection Time Each Day:**

| Date  | 6/8 | 6/9 | 6/10 | 6/11 | 6/12 | 6/13 | 6/14 |
|-------|-----|-----|------|------|------|------|------|
| Hours | X   | X   | 2    | 2    | 4    | 8    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**     The chipping of the concrete columns on the ground floor are approximately 90% complete.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings,
specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____ Date: ___6/16/98___
Print Full Name:  _PATRICK TAITANO_____ I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-020**

SPECIAL INSPECTOR WEEKLY REPORT

City of  TUMON, GUAM
_____

Project Name/Address:  Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)      Inspection of beams on 7th level, zone 1.
2)      Inspection of columns at 6th level, zone 3.


**List Tests Made:**


**Total Inspection Time Each Day:**

| Date  | 6/15 | 6/16 | 6/17 | 6/18 | 6/19 | 6/20 | 6/21 |
|-------|------|------|------|------|------|------|------|
| Hours | X    | X    | 2    | 4    | X    | 4    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**


**List Changes to Approved Plans Authorized by Architect or Engineer:**      Manhattan Guam has commented that their supply of #9 rebar is running low, it has been discussed with R.C. of (W&K), that the use of an approximately equal area of #11 rebar is okay.


**Comments:**


To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____  Date: _6/23/98_
Print Full Name: _PATRICK TAITANO_  I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-021**

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous                    [ X ] Periodic

**Describe Inspections Made, Including Locations**:
1)    Inspection of 7th level zone-1 prior to and during concrete pouring.  Inspection included beam rebar size and
      number, slab reinforcing, column and beam joints and workmanship.
2)    Concrete pour of wall footing (6/23)

**List Tests Made**:          Concrete samples were taken on Wednesday (6/24) during the concrete pouring, the samples were
taken in accordance with Code per every 150 cubic yards.

**Total Inspection Time Each Day**:

| Date  | 6/22 | 6/23 | 6/24 | 6/25 | 6/26 | 6/27 | 6/28 |
|-------|------|------|------|------|------|------|------|
| Hours | 2    | 2    | 8    | X    | X    | X    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items**:

**List Changes to Approved Plans Authorized by Architect or Engineer**:
Under the approval of the engineer the equivalent area of #5's, #6's or #8's were substituted for #9's called out in the
drawings.  The substitution occurred at the perimeter slab rebar, the shallow beams from line 1 to line 2, and other various
areas.

**Comments**:     The concrete pouring ran fairly smoothly, the use of three pumps definitely was a plus.  However, the
supply of concrete to the site once again was the bottleneck in the process.  The approximate volume of the concrete pour
(6/24) was 800+ cubic yards.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings,
specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____                       Date: ___6/30/98___
Print Full Name:  _PATRICK TAITANO_                            I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

 **SPECIAL INSPECTOR WEEKLY REPORT**

City of  TUMON, GUAM

Project Name/Address:     Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)   Inspection of 2nd level deck rebar prior to and during concrete pouring on Thursday 7/2.
2)   Inspection of 7th level, zone 2 prior to and during concrete pouring on Friday 7/3.
3)   Inspection of 7th level, zone 1 column after forms were removed.

**List Tests Made:**     Concrete samples were taken (7/3) during the concrete pouring of the 7th level, zone 2 slab. These samples are for concrete strength tests to occur at the 7th and 28th day.

**Total Inspection Time Each Day:**

| Date  | 6/29 | 6/30 | 7/01 | 7/2 | 7/3 | 7/4 | 7/5 |
|-------|------|------|------|-----|-----|-----|-----|
| Hours | X    | X    | 4    | 4   | 6   | X   | X   |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
Inspection of the columns revealed that there was cement-aggregate separation at many of the column locations. The areas to be repaired should be chipped, cleaned with vacuum and/or air compressor, applied with epoxy and cemented with non-shrinkage grout.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
1)   Richard C. required additional rebar at the 2nd level deck at the cantilevered section near the staircase. (12-#5, 6'-6")
2)   In some areas where #9 rebar was called for in the drawings, 2-#8 bars were used instead.
3)   In areas where #6 rebar was called for in the drawings, an equivalent area of #5 rebar were used instead.

**Comments:**
1)   The 2nd level deck was approx. 120 cubic yards.
2)   The 7th level concrete pour was approx. 650 cubic yards.
3)   Other works ongoing at the time of inspections; excavation for column footing at rear ramp, welding and retrofit on ground floor.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____     Date: ___7/7/_____
Print Full Name: _____     I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-023

City of  TUMON, GUAM

Project Name/Address:       Su Center Building
                            San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                            [   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)      Inspection of 7th level.
2)      Inspection of 7th level, zone 2 column rebar and pouring.


**List Tests Made:**

**Total Inspection Time Each Day:**

| Date  | 7/6 | 7/7 | 7/8 | 7/9 | 7/10 | 7/11 | 7/12 |
|-------|-----|-----|-----|-----|------|------|------|
| Hours | X   | X   | 2   | 4   | 2    | X    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**


**List Changes to Approved Plans Authorized by Architect or Engineer:**


**Comments:**


To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____    Date: ____7/13/98____

Print Full Name: _PATRICK A. TAITANO___    I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-024

City of __TUMON, GUAM__

Project Name/Address:     Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous         [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)     Inspected beam rebar for the roof, only for zone-1.
2)     Inspected concrete slab rebar for the roof, only zone-1.
3)     Inspected column rebar at the roof level, only zone-1.
4)     Inspected location and placement of post-tensioning tendons.

**List Tests Made:**     Concrete samples were taken (7/18) during the concrete pouring of the Roof level, zone 1 slab.

**Total Inspection Time Each Day:**

| Date | 7/13 | 7/14 | 7/15 | 7/16 | 7/17 | 7/18 | 7/19 |
|------|------|------|------|------|------|------|------|
| Hours | X | X | 2 | 6 | 3 | 8 | X |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
1)     There was a conflict with the vertical stirrups and the post tensioning tendons at the beams on the roof from gridline 1 to gridline 2. Due to the tendons, the stirrups were not properly hooked around the supporting rebar. An additional stirrup was required at all these areas.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
1)     The drawings for the roof were only preliminary, hence there were some changes. There were additional concrete piers that were added at the both corners of the roof zone-1. The piers are for the tower supports.
2)     There was a cold joint formed extending from grid 1 to 3 close to gridline E, the solution was to apply epoxy to help with the bonding.
3)     In the beams where #9 rebar was called for in the drawings, an equivalent area of #8 bars were used instead.
4)     In the slab reinforcing where #6 rebar was called for in the drawings, an equivalent area of #5 rebar were used instead.

**Comments:**

The concrete pouring ran smoothly. The pouring began at around 6:00 am and ended around 6:00pm. The estimated volume of the pour was approximately 720-730 cubic yards. There were two pumps throughout the pour. The concrete batch supply evenly matched the rate of placement for the first 2/3rds of the time. However, the supply dropped considerably the last leg of the pour and once again, we had crews waiting around for concrete to be brought to the site.

Overall, the pour was relatively fast. There was a cold joint formed that extended from grid 1 to grid 3 this was due to the fast drying of the concrete. The cold joint was not even and very jagged and inconsistent. In the future, Robert D.R. suggested that there be a temporary construction joint to prevent this from occuring.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _~~Robert J. Tatano~~_     Date: _7/20/98_
Print Full Name: _PATRCK   A.   TAITANO_     I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-025**

<div align="center">

# SPECIAL INSPECTOR WEEKLY REPORT

</div>

City of  TUMON, GUAM

Project Name/Address:      Su Center Building
                          San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**  Inspection of PT-slab reinforcing and tendons.  Inspection of shallow beams and column rebar.  Pre-inspection for concrete pouring scheduled for Monday 7/27.

**List Tests Made:**      None

**Total Inspection Time Each Day:**

| Date  | 7/20 | 7/21 | 7/22 | 7/23 | 7/24 | 7/25 | 7/26 |
|-------|------|------|------|------|------|------|------|
| Hours | 1    | X    | 2    | 2    | 2    | X    | 2    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**     Overall the steelwork is satisfactory.  There are no major problems.  The tendons and beams are well supported and properly anchored.  The concrete pour is scheduled to start at 6:00 am.  There will be a pump stationed at the JFK field.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _Richard Chien_                                           Date: _7/26/90_
Print Full Name: _Richard Chien_                  I.D. Number:_____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-026

# SPECIAL INSPECTOR WEEKLY REPORT

City of  TUMON, GUAM

Project Name/Address:  Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**  Inspection of concrete pour for roof, zone 2.  Inspection of PT-slab reinforcing and tendons.  Inspection of shallow beams and column rebar.

**List Tests Made:**  Concrete samples were taken (7/27) during the concrete pouring of the Roof level, zone 2 slab.

**Total Inspection Time Each Day:**

| Date  | 7/27 | 7/28 | 7/29 | 7/30 | 7/31 | 8/1 | 8/2 |
|-------|------|------|------|------|------|-----|-----|
| Hours | 8    | 4    | X    | X    | X    | X   | X   |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**  Overall the concrete pouring went fairly well.  No major problems.  There was some heavy rain at several points throughout, however the rain showers did not last for long durations.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____ Richard Chien _____          Date: 5/3/98

Print Full Name: _____ Richard Chien _____          I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)



|   | 128'-0" | | 142'-0" |
| --- | --- | --- | --- |
| Roof | ZONE 1, 7/18 | | ZONE 2, 7/27 |
| 7th | ZONE 1, 6/24 | | ZONE 3, 7/3 |
| 6th | ZONE 1, 5/12 | ZONE 2, 6/6 | ZONE 3, 6/13 |
| 5th | ZONE 1, 4/11 | ZONE 2, 5/2 | ZONE 3, 5/31 |
| 4th | ZONE 1, 3/26 | ZONE 2, 3/27 | ZONE 3, 4/21 |

(MARCH 26th, TYP.)

88'-0"     80'-0"     102'-0"

3rd

EXISTING STRUCTURE

(SAN VITORES ROAD SIDE)

## SLAB CONCRETE POURING SCHEDULE

# B. PHOTOS

## PHOTO INDEX

| ID | Date | Location | Remarks |
|----|------|----------|---------|
| 1 | 3/26/98 | 4th Level – Zone 1 | Column vertical rebar bent due to post-tensioning tendons |
| 2 | 3/26/98 | 4th Level – Zone 1 | Column vertical rebar bent due to post-tensioning tendons |
| 3 | 3/26/98 | 4th Level – Zone 1 | 4000 psi concrete pouring into beam-column joint |
| 4 | 3/26/98 | 4th Level – Zone 1 | Concrete pouring |
| 5 | 3/26/98 | 4th Level – Zone 1 | Column H3 – 7#5 (top) rebar are not centered on column |
| 6 | 3/26/98 | 4th Level – Zone 1 | Column B3 |
| 7 | 3/26/98 | 4th Level – Zone 1 | Column G3 – not enough rebar |
| 8 | 3/27/98 | 4th Level - Zone 2 | Dried concrete on deck from previous pour |
| 9 | 3/27/98 | 4th Level - Zone 2 | Spillage of previous concrete pour into beam |
| 10 | 3/27/98 | 4th Level - Zone 2 | Concrete workers using plywood ramp to place concrete into beam-column joints |
| 11 | 3/27/98 | 4th Level - Zone 2 | Concrete workers using plywood ramp to place concrete into beam-column joints |
| 12 | 3/27/98 | 4th Level - Zone 2 | Samples of hardened concrete found in steel pipes, caused delay in pouring. |
| 13 | 3/27/98 | 4th Level - Zone 2 | Spillage of concrete into beams, concrete was particularly sandy. |
| 14 | 3/27/98 | 4th Level - Zone 2 | View of spillage from inside beam |
| 15 | 3/27/98 | 4th Level - Zone 2 | View of anchor end of post-tension tendon |
| 16 | 3/27/98 | 4th Level - Zone 2 | Staggered top rebar. |
| 17 | 3/27/98 | 4th Level - Zone 2 | Bad workmanship! Worker just dumped flexible pipe into beam-column joint with no regard to concrete strength. |
| 18 | 4/11/98 | 5th – zone 1 | Concrete pour at type (C-1) column |
| 19 | 4/11/98 | 5th – zone 1 | Concrete pour at beam-column joint |
| 20 | 4/11/98 | 5th – zone 1 | Concrete pour at beam-column joint |
| 21 | 4/11/98 | 5th – zone 1 | Concrete pour at type (C-1) column |
| 22 | 4/13/98 | 5th – zone 1 | Column rebar inspection – Slanted rebar |
| 23 | 4/13/98 | 5th – zone 1 | Column rebar inspection – forms |
| 24 | 4/13/98 | 5th – zone 1 | Column rebar inspection – forms |
| 25 | 4/13/98 | 5th – zone 1 | View of (C-1) column rebar |
| 26 | 4/13/98 | 5th – zone 1 | View of (C-3) column rebar |
| 27 | 4/13/98 | 5th – zone 1 | View of (C-1) column rebar (slightly slanted) |
| 28 | 4/13/98 | 5th – zone 1 | View of (DC-1) column |
| 29 | 4/13/98 | 5th – zone 1 | View of (DC-1) column |
| 30 | 4/13/98 | 5th – zone 1 | View of (DC-1) column – concrete spacers |
| 31 | 4/13/98 | 5th – zone 1 | View of (DC-1) column – workers prepare to place forms |
| 32 | 4/13/98 | Ramp (3rd to 4th) | View of support beam rebar |
| 33 | 4/13/98 | Ramp (3rd to 4th) | View of support beam rebar & beam-column joint |
| 34 | 4/13/98 | Ramp (3rd to 4th) | View of support beam rebar |
| 35 | 4/13/98 | Water tank –below grade | View of excavation for column footing |
| 36 | 4/13/98 | Water tank –below grade | View of excavation for water tank |
| 37 | 4/24/98 | 5th level –swimming pool | View of deep support beams for swimming pool |
| 38 | 4/24/98 | 5th level –swimming pool | View of deep support beams for swimming pool |
| 39 | 4/24/98 | 5th level –swimming pool | View of deep support beam-column joint for pool |
| 40 | 4/24/98 | 5th level –swimming pool | View of deep support beams for swimming pool |
| 41 | 4/24/98 | Water tank –below grade | Placement of rebar for bottom slab of water tank |
| 42 | 4/24/98 | Water tank –below grade | Placement of rebar for sump pit of water tank |
| 43 | 4/24/98 | Water tank –below grade | Placement of rebar for bottom slab of water tank |
| 44 | 4/25/98 | 4th level – zone 3 pour | Spillage of concrete into beam |
| 45 | 4/25/98 | 4th level – zone 3 pour | Spillage of concrete into beam |
| 46 | 4/25/98 | 4th level – zone 3 pour | Spillage of concrete into beam |
| 47 | 4/25/98 | 4th level – zone 3 pour | View of (2"x4") forms above tendons – insufficient clearance |
| 48 | 4/25/98 | 4th level – zone 3 pour | View of (2"x4") forms above tendons – insufficient clearance |
| 49 | 5/27/98 | Water tank –below grade | View of completed water tank walls (below grade) |
| 50 | 5/27/98 | Water tank –below grade | View of completed water tank walls (below grade) |
| 51 | 5/27/98 | 2nd level – shoring | View of shoring at 2nd level for 4th level construction joint |

| 52 | 5/27/98 | 4th level – cont. joint | View of support beam rebar |
|----|---------|-------------------------|----------------------------|
| 53 | 5/27/98 | 4th level – cont. joint | View of shoring support |
| 54 | 5/27/98 | 4th level –cont. joint | View of support beam rebar |
| 55 | 5/27/98 | 4th level – column F2 | View of chipped column base |
| 56 | 5/27/98 | 4th level – column F2 | Close up view of chipped column base |
| 57 | 5/27/98 | 4th level – column F2 | View of chipped column base (adjacent side) |
| 58 | 5/27/98 | 4th level –slab at ramp | View of small cracks at 4th level slab near ramp |
| 59 | 5/27/98 | 4th level – column F4 | View of crack at top corner of column |
| 60 | 5/27/98 | 4th level – column F4 | View of crack at (adjacent) top corner of column |
| 61 | 5/27/98 | 4th level – beam (D4-E4) | View of exposed rebar |
| 62 | 5/28/98 | 4th level –cont. joint | View of support beam rebar and penetrating elec. Ducts |
| 63 | 5/28/98 | 4th level –cont. joint | View of construction joint slab rebar |
| 64 | 6/23/98 | Water tank –below grade | View of completed water tank walls |
| 65 | 6/23/98 | 7th level – zone 1 | View of 72"x18" beam |
| 66 | 6/23/98 | 7th level – zone 1 | View of 72"x18" beam |
| 67 | 6/23/98 | 7th level – zone 1 | View of 72"x18" beam |
| 68 | 6/23/98 | 7th level – zone 1 | View of column rebar & 72"x18" beam |
| 69 | 6/23/98 | 7th level – zone 1 | Stirrup hooks that are not properly installed. |
| 70 | 6/23/98 | Wall footing–below grade | View of concrete pouring |
| 71 | 6/23/98 | Wall footing–below grade | View of concrete pouring |
| 72 | 6/23/98 | Wall footing–below grade | View of concrete pouring |
| 73 | 6/24/98 | 7th level – zone 1 pour | Concrete crew working at AES pump |
| 74 | 6/24/98 | 7th level – zone 1 pour | Completed middle section – concrete crew at PT-3 waiting |
| 75 | 6/24/98 | 7th level – zone 1 pour | Concrete crew at PT-1 waiting |
| 76 | 6/24/98 | 1st level – column retrofit | View of completed welding and wire mesh retrofit |
| 77 | 6/24/98 | 1st level – column retrofit | Close-up view of welded column tie |
| 78 | 7/16/98 | Roof level | Preparing roof level for concrete pouring |
| 79 | 7/17/98 | Roof level | Vertical stirrups not properly hooked, at 48"x18" beams, from grid 1 to 2 |
| 80 | 7/17/98 | Roof level | Close-up view of improper vertical stirrups, conflict w/ PT tendons |
| 81 | 7/17/98 | Roof level | View of preparation of pipes for concrete pour |
| 82 | 7/18/98 | Roof level | View of rebar for concrete piers for tower supports |
| 83 | 7/18/98 | Roof level | Additional stirrup at conflict w/ PT tendons |
| 84 | 5/28/98 | 1st level – column retrofit | View of laborer chipping concrete to expose vertical column ties |
| 85 | 5/28/98 | 1st level – column retrofit | View concrete chipping to expose vertical column ties |
| 86 | 5/28/98 | 1st level – column retrofit | Close-up view of exposed vertical column ties |
| 87 | 5/28/98 | 1st level – column retrofit | Close-up view of exposed vertical column ties |
| 88 | 5/28/98 | 6th level – column E3 | Noticeable line where cold joint formed due to pump breakdown |
| 89 | 5/28/98 | 4th level – construction joint | Vibrating 14"x30" beam at SE corner |
| 90 | 5/28/98 | 4th level – construction joint | Formwork failed at 14"x30" beam |
| 91 | 5/28/98 | 4th level – construction joint | Laborer applying epoxy to column with dried concrete on rebar. |
| 92 | 5/28/98 | 4th level – construction joint | Top view of failed formwork at 14"x30" beam |
| 93 | 5/28/98 | 4th level – construction joint | Bottom view of failed formwork at 14"x30" beam |
| 94 | 5/28/98 | 4th level – construction joint slab | Chair risers supporting top rebar failed |
| 95 | 5/28/98 | 3rd level – parking ramp | Top view of trench drain |
| 96 | 5/28/98 | 3rd level – parking ramp | Side view of trench drain |
| 97 | 5/28/98 | 3rd level – R.C. slab | View of slab reinforcing |
| 98 | 5/28/98 | 4th level – construction joint slab | Side of column applied with epoxy, however, other side where new concrete has been poured did not have epoxy applied. |
| 99 | 7/26/98 | Roof level | Vertical ties at columns |
| 100 | 7/26/98 | 1st level – column retrofit | Void in column face, need to apply epoxy and grout with non-shrink cement |

EXHIBIT 19



# 19

PLAINTIFF'S
EXHIBIT
19

BEAM SCHEDULE

SWIMMING POOL PLAN FOR 6TH FLR.
SCALE 1/4"=1'-0"

SWIMMING POOL PLAN FOR 5TH FLR.
SCALE 1/4"=1'-0"

DETAIL
SCALE 1/2"=1'-0"

SWIMMING POOL SECTION
SCALE 1/4"=1'-0"

MANHATTAN GUAM
SWIMMING POOL DETAIL
SU CENTER
EXPANSION

WINZLER & KELLY
CONSULTING ENGINEERS

EXHIBIT "A"

# EXHIBIT "A"



**HOME**

**INFORMATION BULLETIN**

**EXAM INFORMATION**

**LAW**

**CODE OF ETHICS**

**RULES AND REGULATIONS**

**BOARD MEMBERS**

**FORMS**

**EXAM SCHEDULE**

**MEETING NOTICES**

**ROSTER**

**LINKS**

**DISCLAIMER**

**DIMENSION SYSTEMS**
CREATING SOLUTIONS WITH TECHNOLOGY

HONORABLE FELIX P. CAMACHO
Governor of Guam

HONORABLE KALEO S. MOYLAN
Lt. Governor of Guam



# Guam Board of Registration

FOR PROFESSIONAL ENGINEERS, ARCHITECTS
AND LAND SURVEYORS

**Inetnon Rihestrasion Inheneron Prufisionat,
Atketekto yan, Agranensot Tano**

East-West Bu
Unit D - Suit
718 North M
Upper Tumc
TEL: (671) 6
FAX: (671) 6
EMAIL: INFC

Monda
8:00 am - 5:00 pm (C
Closed on Satu

The **Guam Board of Registration for Professional Engineers, Architects and Land Surveyors** was created under the Guam Law in August 1960 to protect the life, health, and property and to promote the public welfare.

All states, jurisdictions, and territories of the United States have established engineering, architecture and land surveying boards. Guam Board carries out this mission through the regulation of the practice of these professions by:

Ensuring that those entering the practice meet minimum standards of competency by way of education, experience and examination;

Requiring that any person or firms practicing or offering to practice engineering, architecture, land surveying and construction management services be licensed;

Establishing standards of practice for those licensed to practice; and

Enforcing the laws, codes, and standards governing engineering, architectural and land surveying practices in a fair and professional manner.

**OTHER L**





ula

**QUESTI**

For questi
correction
info@guar

or for que
write the :

# FOREWORD

Rules & Regulations presented herein was prepared by the Professional Engineers, Architects and Land Surveyors Board with the assistance of other professional individuals and associations. The main thrust of its task force committee is to provide all the necessary guidelines to professional undertakings as to applications, licensing, and the understanding of basic requirements, criteria, processes and procedures to ensure the proper performance of such professional duties.

The PEALS Board commends and highly endorses the invaluable efforts of these professional individuals and societies in formulating together the following rules and regulations, policies and procedures.

# INDEX OF CONTENTS

**SECTION I. INTRODUCTION**

    1.A. Purpose
    1.B. Requirements for Adoption
    1.C. Authority for Rules

**SECTION II. DEFINITIONS**

    2.A. General
    2.B. Engineering Terms
    2.C Architectural Terms
    2.D. Land Surveying Terms
    2.E. Other Terms

**SECTION III. ORGANIZATION OF THE BOARD**

    3.A. Officers
    3.B. Meetings
    3.C. Quorum
    3.D. Voting
    3.E. Rules of Order
    3.F. Compensation and Expenses
    3.G. Board Administrator
    3.H. Employment of Personnel
    3.I. Budget
    3.J. Accounting Procedures
    3.K. Publications of the Board
    3.L. Use of Forms
    3.M. Records

**SECTION IV. APPLICATIONS**

    4.A. Kinds of Applications
    4.B. Completing Applications
    4.C. Sequential Application
    4.D. Applications from Non-Residents
    4.E. Applications from Applicants with Degrees from Foreign Schools
    4.F. Disposal of Applications
    4.G. Reconsideration of Applications
    4.H. Retention of Records of Applications

**SECTION V. FEES**

5.A. Method of Payment
5.B. Changes in Amount of Fees
5.C. Renewal Fees

## SECTION VI. CURRICULA APPROVED BY THE BOARD

6.A. Engineering
6.B Architecture
6.C Land Surveying

## SECTION VII. EXPERIENCE

7.A. As a Professional Engineer
7.B. As a Professional Architect
7.C. As a Land Surveyor

## SECTION VIII. REFERENCES

## SECTION IX. EXAMINATIONS

9.A. General Provisions
9.B. Engineering Examinations
9.C. Architectural Examinations
9.D. Land Surveying Examinations
9.E. Structural Engineering Examinations
9.F. Examination Dates and Locations
9.G. Proctoring Examinations of Other Jurisdictions
9.H. Language of the Examination
9.I. Study Information
9.J. Instructions for Examinees
9.K. Failure to Attend an Examination
9.L. Examination Results
9.M. Review of Failed Examinations
9.N. Examination for Record Purposes

## SECTION X. CLASSIFICATION OF REGISTRATION

10.A. Engineering
10.B. Architecture
10.C. Land Surveying
10.D. Emeritus
10.E. Certificate of Authorization

## SECTION XI. REGISTRATIONS

11.A. Registration Number as a Professional Engineer, Registered Architect or Registered Land Surveyor
11.B. Certificates of Registration/Authorization
11.C. Reissuance of Certificate

## SECTION XII. SEALS

12.A. Seal of the Board
12.B. Seal of Registration
12.C. Seal on Documents

## SECTION XIII. MOONLIGHTING/PART TIME WORK

13.A. Moonlighting/Part Time Work

SECTION XIV. OTHER ITEMS

    14.A. Construction Management
    14.B. Responsible Managing Employee--Limits of Control
    14.C. Responsible Managing Employee-Full Time/Ownership

SECTION XV. TEMPORARY PERMITS

    15.A. Engineers and Architects
    15.B. Land Surveyors

SECTION XVI. EXPIRATIONS, RENEWALS AND REINSTATEMENTS

SECTION XVII. PROFESSIONAL CONDUCT

    17.A. Rules of Professional Conduct
    17.B. Knowledge of Rules
    17.C. Convictions
    17.D. Severability

SECTION XVIII. COMPLIANCE AND ENFORCEMENT

    18.A. Compliance
    18.B. Enforcement

SECTION XIX. DISCIPLINARY ACTION

    19.A. Complaints
    19.B. Summons and Complaint
    19.C. Evidentiary Matters
    19.D. Conduct of Hearing
    19.E. Order of the Board
    19.F. Discipline

SECTION XX. REINSTATEMENT OF REGISTRATION

    20.A. Petition for Reinstatement
    20.B. Board Action

SECTION XXI. CONFLICT AND BIAS

SECTION XXII. SEVERABILITY

SECTION XXIII. ADOPTION AND AMENDMENT OF RULES

    23.A. Adoption of Rules
    23.B. Petition for Adoption or Amendment of Rules
    23.C. Procedure for Adoption and Amendment of Rules

## SECTION I. INTRODUCTION

*1.A. PURPOSE*



The purpose of adopting rules of procedure is to ensure the proper performance of the duties of the Territorial Board of Registration for Professional Engineers, Architects and Land Surveyors (hereinafter known as the PEALS Board) by the regulation of registration procedures, meetings, records, examinations and the conduct thereof.

### 1.B. REQUIREMENTS FOR ADOPTION

The adopted rules of procedure must be consistent with the Organic Act and Laws of this Territory. The rules must be promulgated and approved by the Board and they must be adopted in accordance with Administrative Adjudication Act.

### 1.C. AUTHORITY OF RULES

Rules of procedure adopted by the Board shall be binding upon persons registered under Title XLIII of the Government Code of Guam (hereinafter known as the Act) and shall be applicable to corporations, partnerships, associations, and joint ventures holding a certificate of authorization issued by the Board.

## SECTION II. DEFINITIONS

### 2.A. GENERAL

Terms used in these rules and regulations, but not specifically defined herein, shall have the same definitions as in the Act or in general usage.

### 2.B. ENGINEERING TERMS

1. Engineer--The term "engineer" shall be as defined in the Act.

2. Professional Engineer--The term "professional engineer" shall be as defined in the Act.

3. Engineer Intern--The term "engineer intern" shall be as defined in the Act.

4. Practice of Engineering--The term "practice of engineering" shall be as defined in the Act.

5. Civil Engineering--The term "civil engineering" is that branch of engineering which embraces the following studies or activities in connection with fixed works for irrigation, drainage, waterpower, water supply, flood control, inland waterways, harbors, municipal improvements, railroads, highways, tunnels, airports and airways, purification of water, sewerage, refuse disposal, foundations, framed and homogenous structures, buildings, as subject to or limited by other provisions of the Act, or bridges:

- (a) The economics of, the use and design of, materials of construction and the determination of their physical qualities.
- (b) The supervision of the construction of engineering structures.
- (c) The investigation of the laws, phenomena and forces of nature.
- (d) Appraisals of valuations.
- (e) The preparation and/or submission of designs, plans and specification and engineering reports. Civil engineering also includes city and regional planning insofar as any of the above features are concerned therein.

6. Electrical Engineering--The term "electrical engineering" is that branch of professional engineering which embraces engineering studies or activities relating to the generation, transmission, and utilization of electrical energy, including the design of electrical, electronic and magnetic circuits and the control of their operation and the design of electrical gear. It is concerned with the research, operational, organizational, and economical aspects of the above.

7. Industrial Engineering--The term "industrial engineering" is that branch of professional engineering which requires such education and experience as is necessary to investigate, to design, and to evaluate systems of workers, materials and facilities for the purpose of economical and efficient production, use, and distribution. It requires the application of specialized engineering knowledge of the mathematical and physical sciences, together with the principles and methods of engineering

analysis and design to specify, predict, and to evaluate the results to be obtained from such systems. The above definition of industrial engineering shall not be construed to permit the practice of any of the other recognized branches of engineering.

8. Chemical Engineering--The term "chemical engineering" is that branch of professional engineering which embraces studies or activities relating to the development and application procedures in which chemical or physical changes of materials are involved. These process are usually resolved into a coordinated series of unit physical operations and unit chemical processes. It is concerned with the research, design, production, operational, organizational and economic aspects of the above. The definition of chemical engineering shall bot be construed to permit the practice of civil, electrical or mechanical engineering.

9. Mechanical Engineering--The term "mechanical engineering" is that branch of professional engineering which deals with engineering problems relating to generation, transmission, and utilization of energy in the thermal or mechanical form and also with engineering problems relating to the production of tools, machinery, and their products and to heating ventilation, refrigeration and plumbing. It is concerned with the research, design, operational, organizational, and aspects of the above.

10. Structural Engineering--The term "structural engineering" is that branch of professional engineering which deals with the investigation of, the design of, the selection of and construction supervision of the force resisting and load supporting members of structures such as foundations, walls, columns, slabs, beams, girders, trusses, and similar members where such investigation, design, selection, and supervision requires a knowledge of the physical properties of the materials used for such members, and a knowledge of the methods used their erection.

11. Consulting Engineer--The term "consulting engineer" shall be as defined in the Act.

*2.C. ARCHITECTURAL TERMS*

1. Architect--The term "architect" shall be as defined in the Act.

2. Practice of Architecture--The term "practice of architecture" shall be as defined in the Act.

*2.D. LAND SURVEYING TERMS*

1. Land Surveyor--The term "land surveyor" shall be as defined in the Act.

2. Land Surveyor Intern--The term "land surveyor intern" shall be as defined in the Act.

3. Practice of Land Surveying--The term "practice of land surveying" shall be as defined in the Act.

*2.E. OTHER TERMS*

1. Board--The term "Board" shall be as defined in the Act.

2. Responsible Charge--The term "responsible charge" shall be as defined in the Act.

3. Certificate of Registration--The term "certificate of registration" shall be as defined in the Act.

4. Certificate of Authorization--The term "certificate of authorization" shall be as defined in the Act.

5. Rules of Professional Conduct for Professional Engineers, Architects and Land Surveyors--The term "rules of professional conduct for professional engineers, architects and land surveyors" shall be as defined in the Act.

6. NCEES--The term "NCEES" shall mean the National Council of Examiners for Engineering and Surveying.

7. NCARB--The term "NCARB" shall mean the National Council of Architectural Registration Board.

8. WCARB--The term "WCARB" shall mean the Western Council of Architectural Registration Board.

9. CBPELS--The term "CBPELS" shall mean the California Board of Professional Engineers and Land Surveyors.

10. ABET--The term "ABET" shall mean the Accreditation Board for Engineering and Technology. The previous name for this organization as used in the Act is the "Engineers Council for Professional Development".

11. NAAB--The term "NAAB" shall mean the National Architectural Accrediting Board.

12. Temporary Permit--The term "temporary Permit" shall mean a permit issued as authorized by the Act for the temporary practice of professional engineering or architecture.

13. Principal--The term "principal" shall mean the person responsible for the management and professional activities of a firm engaged in the practice of engineering, architecture of land surveying.

14. Emeritus--The term "emeritus" shall be professional engineers, architects or land surveyors who are 65 years of older, who have met past registration and residency requirements as deemed appropriate by the Board, and who are not practicing withing their profession but wish to maintain their professional title.

15. Human Occupancy or Habitation--The term "human occupancy or habitation" shall refer to structures where people live, work, recreate, congregate or assemble. This is to differentiate from structures and buildings whose primary purpose is for storage or to house mechanical equipment.

16. Commercial Building--The term "commercial building" shall mean a single building, not a complex of or multiple buildings, used for commercial purposes.

17. Firm--The term "firm" shall mean any corporation, partnership, limited partnership, association, joint venture, joint stock association or other form of business other than a sole proprietorship.

## SECTION III. ORGANIZATION OF THE BOARD

### 3.A. OFFICERS

The Board shall have for its officers a Chairman, Vice-Chairman and Secretary/Treasurer. The Chairman, Vice-Chairman and Secretary/Treasurer shall be elected annually, as defined by the Act, by majority vote of the Board members at the first regular meeting of the Board after January 1 of each year. The duties of the officers of the Board shall be as follows.

(1) Chairman: The Chairman shall be the executive head of the Board and shall preside at all meetings, appoint special committees, co-sign all Certificates issued by the Board and sign all vouchers issued by the Board.

(2) Vice-Chairman: The Vice-Chairman shall perform all duties of the Chairman in case the latter is incapacitated, or absent from the meeting.

(3) Secretary/Treasurer: The Secretary/Treasurer shall serve as Chairman in the absence of both the Chairman and Vice-Chairman and shall perform such duties as may be assigned by the Chairman and shall conduct all financial transactions in accordance with the applicable procedures of the Government of Guam.

### 3.B MEETINGS

(1) Six (6) regular meetings shall be held commencing in January and every other month thereafter. The regular meeting shall be held at a time and place determined by the Board.

(2) The Chairman may call special meetings when he/she deems necessary and shall also call special meetings upon written request of two members. The members shall be notified by any expedient means at least two (2) days in advance of the purpose, date, time and place of each meeting.

(3) Notices of meeting dates and the times shall normally be given several months in advance for all the regular meetings of the year. The date, time, place, and agenda of all meetings must be published in accordance with the appropriate laws of the

Territory.

(4) All meetings shall be open to the public unless the meeting is closed for reasons defined by the laws of this Territory.

### 3.C. QUORUM

A quorum of the board shall be as stated in the Act.

### 3.D. VOTING

All members of the Board, including the Chairman, shall be entitled to vote and to make or to second motions. A majority vote of those present shall be required to pass a motion. The Chairman shall vote as a member of the Board.

### 3.E. RULES OF ORDER

Roberts Rules of Order shall govern the normal proceedings of the Board unless otherwise provided by these rules and regulations. Other exceptions shall include hearings which may be disciplinary in nature.

### 3.F COMPENSATION AND EXPENSES

Members of the Board shall receive compensation as authorized by the law and shall be reimbursed for reasonable and necessary expenses incurred in the course of official duties, when attending to the work of the Board or any of its committees, and when attending meetings and conferences of NCEES, NCARB, WCARB, or any other national organizations which impact on Board matters, and during time spent in necessary travel.

### 3.G. BOARD ADMINISTRATOR

The Board may employ and determine the compensation of a Board Administrator who shall be responsible for the administration of the policies of the Board and for the processing of its routine operations.

### 3.H. EMPLOYMENT OF PERSONNEL

The Board may employ those persons required and qualified, including full-or part-time, necessary to assist the performance of the administration of the laws of Guam and those rules regulating the practice of engineering, architecture and land surveying. Such employees may include the use of consultants and/or counsel, and clerical personnel when deemed necessary.

### 3.I. BUDGET

Prior to October 1st of each year, the Board shall prepare a budget for the ensuring fiscal year. Upon appropriation by the Legislature, the Board shall make expenditures from this budget for the purposes as stated. The Chairman shall be authorized to certify all necessary expenditures in accordance with the amount appropriated.

### 3.J. ACCOUNTING PROCEDURES

(1) Cash Receipts

A receipt shall be issued for all money received by the Board. The Chairman of the Board or Board Administrator of the Board shall receive all money paid to the Board and shall issue consecutively-numbered receipts thereof. Such money shall be turned over to the Cashier in the Building Permit Division acknowledging receipt of the money. The Chairman of the Board shall appoint a Certifying Officer who shall keep appropriate books on behalf of the Board and shall record in the Cash Receipt Book a record of all money received as stated in the law.

(2) Cash Disbursements

All cash disbursements shall be supported by invoices or purchase orders, and shall be approved by the Chairman of the

Board for payment. All cash disbursements shall be recorded in the cash disbursement book.

(3) Financial Reports

Monthly Financial Reports shall be prepared by the Certifying Officer as of the last day of each month and submitted to the Secretary/Treasurer of the Board. An Annual Financial Report shall be prepared by the Certifying Officer as of the last day of the fiscal year and submitted to the Secretary/Treasurer of the Board.

*3.K. PUBLICATIONS OF THE BOARD*

The publications of the Board shall include but not be limited to:

(1) A roster showing the name and last known address of each professional engineer, architect, land surveyor, engineer intern, land surveyor intern, and firm registered in this Territory. The roster shall be published annually and distributed to each registrant.

(2) The complete current text of the Act, regulations and rules of professional conduct of the Board shall be published or re-issued as deemed necessary by the Board and distributed to each registrant.

(3) The Annual Report of the Board which shall be published annually no later than ninety (90) days after end of the fiscal year and shall include, but not be limited to, the following:

(a) dates of examinations held;

(b) a summary of the law enforcement activities of the Board;

(c) a summary of all financial transactions of the previous year;

(d) the name, registration number, and address of each engineer, architects, land surveyor, engineer intern, land surveyor intern, corporation, partnership, and association registered during the report period; and
(e) a list of the names and addresses of all engineers, architects and firms which were issued temporary permits along with the date issued.

*3.1 USE OF FORMS*

All applications and requests for which the Board has prescribed a form must be presented in the prescribed form. Copies of forms in use and instruction for their completion shall be available from the Board.

*3.M. RECORDS*

Records shall be kept and secured at the Board's office with the Board staff responsible for the security of the records of the Board. The Freedom of Information Act requires that most records, papers and reports of the Board are public in nature and may be obtained through the Chairman of the Board upon written request and payment of costs of reproduction, handling and mailing. Other records, papers and reports, which are considered confidential, shall not be released except when required by court action. These include, but are not limited to, examination material for examinations not given, file records of examination problem solutions, letters of inquiry and reference concerning applicants, investigative files where investigation is pending and all other materials of a confidential nature.

## SECTION IV. APPLICATIONS

*4.A. KINDS OF APPLICATIONS*

Applications for registration as a Professional Engineer, Architect or Land Surveyor or certification as an EI or LSI shall require that an applicant present his/her qualifications on forms prescribed by this Board.

(1) Applications for registration as a professional engineer, architect or land surveyor shall be accepted from those who

believe that they shall be qualified by education and experience according to laws of this Territory, to be registered as a professional engineer, architect or land surveyor.

(2) Applications for certification as an Engineer Intern or Land Surveyor Intern are accepted from those who believe that they have the necessary qualifications for registration, according to the laws of this Territory, as a professional engineer or land surveyor except for that of experience.

(3) Those who are senior students in at least a four-year program leading to a baccalaureate degree in an engineering school may apply for certification as an Engineer Intern and may take the fundamentals examination during his or her senior year.

(4) The Board may accept records of licensure in other jurisdictions verified by NCARB in the case of architects and verified by NCEES in the case of engineers and land surveyors in lieu of requiring the same information that is requested on the form prescribed and furnished by this Board.

### 4.B. COMPLETING APPLICATIONS

(1) Approved application forms for registration as Professional Engineer, Architect, Land Surveyor, or certification as an Engineer Intern or Land Surveyor Intern may be obtained from the Board. All applications shall be attested before a Notary Public and accompanied by one passport-size photograph of the applicant. The photograph shall not be profile nor retouched and shall have been taken within thirty (30) days of submission of the application.

(2) Applications must be neatly written or typed. When space provided on the forms is inadequate, supplementary sheets of white paper, 8.5 inches by 11 inches in size shall be used.

(3) Completed application forms shall be accompanied by a photocopy of the applicant's undergraduate and graduate diplomas, official or certified transcripts of all college courses and degrees, a photocopy of the professional registration certificate and current registration card from the jurisdiction where registration was acquired by examination.

(4) In order to allow sufficient time for processing and for securing examinations, all applicants who may require examinations must file with the Board at least ninety (90) days before the date set for the appropriate examinations.

(5) Withholding information or providing statements which are untrue or misrepresent the facts shall be cause for denial of an application.

(6) It is the responsibility of the applicant to supply the complete and correct address of all references and to be sure that the references respond. If a reference fails to respond, this could delay the processing of an application either until a reply is obtained or another reference is given.

(7) In relating professional training experience, the applicant must account for all employment or work experience for the period of time which has elapsed since the beginning of the employment record. If not employed, or if employed in other kinds of work, this should be indicated in the experience record.

(8) References shall be submitted in accordance with Section VIII of these rules. The names of three or more registered practitioners of the profession and branch, in the case of engineers, in which registration is sought having knowledge of the professional qualifications of the applicant shall be submitted in the application form. All information received from references will be held in strict confidence by the Board. No member of the Board nor a relative either by blood or by marriage shall be included in the references. For the structural engineering exam applicants, the Board may waive the requirement for three (3) structural references and accept two (2) such references with a civil engineer for the third.

(9) Due to the confidential nature of information concerning verification of character and work experience of an applicant, the Board shall accept completed forms only when delivered through the normal postal service or hand-delivered to the Board by the person responsible for completing the form. All verification of character and experience must be properly signed and authenticated by the person completing the form. All verification of experience must be subscribed and sworn to by the individual completing the form before a Notary Public or other person qualified to administer oaths.

(10) In the absence of a Board-verified work experience, in instances where verification of experiences of an applicant is impossible due to the applicant supervisor's demise, a defunct company or undeliverable by postal service, the applicant shall

be required to submit evidence of employment with said organization.

*4.C. SEQUENTIAL APPLICATION*

(1) An applicant for registration as an engineer or land surveyor will not be assigned to the Fundamentals exam and the Professional exam simultaneously.

(2) The applicant must have passed the Fundamentals exam or been officially approved by the Board for EIT waiver before taking the Professional exam.

(3) An applicant for the Structural exam must first be registered as a Civil Engineer and have a specific record of two (2) years of work experience in the discipline of structural engineering after first attaining registration as a civil engineer before being allowed to the Structural exam.

*4.D. APPLICATIONS FROM NON-RESIDENTS*

Except for military personnel assigned to duty in this Territory, applications will not be accepted for assignment to the Fundamentals of Engineering exam, the Professional Engineering exam or the Architectural exam from persons who are not residents of this Territory. Such persons are expected to secure registration or certification by examination in their home state or state in which they resided before applying for registration or certification in this Territory by comity.

*4.E. APPLICATIONS FROM APPLICANTS WITH DEGREES FROM FOREIGN SCHOOLS*

(1) All foreign language documentation submitted with the completed application must be accompanied with translation certified to be accurate by competent authority.

(2) Those applicants who for political or other valid reasons are unable to obtain their transcripts of their college courses shall be required to complete a supplementary application form as approved by NCEES or NCARB.

*4.F. DISPOSAL OF APPLICATIONS*

Applications may be approved; deferred for further information, more experience, questionable references, or other reasons; or may be denied.

(1) Approved Applications for assignment to examinations: When an application is approved by the Board for assignment to an exam, the applicant will be assigned to the next scheduled exam.

(2) Approved Applications for registration or certification by Comity: When an application is approved by the Board, the applicant shall be granted registration or certification by the Board.

(3) Deferred Applications: Applications deferred for any reason shall be retained on file pending later disposition when proper remedy as requested is presented. Applications which have been in deferred status for two years shall revert to denied status.

(4) Denied Applications: When application is denied, it shall be kept on file for a minimum of one year and then destroyed.

*4.G. RECONSIDERATION OF APPLICATIONS*

Reconsideration may be requested of an application which has been denied when the request is based on additional information and/or evidence which could affect the original decision. A reconsideration request must be made within one (1) year after the decision was made to reject the original application. Those not requesting a reconsideration within the one (1) year period following rejection must file a new application in order to be considered.

*4.H. RETENTION OF RECORDS OF APPLICATIONS*

All approved applications shall be maintained and stored by the Board staff. Applications which are disapproved or denied



after processing shall be destroyed after a minimum of one (1) year and the completed application form, exclusive of letters or forms of references and other assembled information, will be returned to the applicant if requested. In accordance with a retention schedule of applications by the Board, the following retention time will be observed after which the applications may be destroyed:

(1) Examination Inactive File: 5 years

(2) Deceased: 3 years after death

(3) Inactive/Deferred: 2 years after last response to request for additional information

(4) Denied: 1 year

The application from a person who has been judged to be in violation of the Act will be retained in a file by the Board permanently even if the individual has his/her license revoked, suspended or if the person voluntarily withdraws his/her registration once a violation is under review or consideration.

## SECTION V. FEES

*5.A. METHOD OF PAYMENT*

Fees shall be payable to the Treasurer of Guam in care of the Territorial Board of Registration for Professional Engineers, Architects and Land Surveyors, East-West Business Center, Unit D-Suite 308, 718 No. Marine Dr., Upper Tumon, Guam 96911. Payment of fees must be made by check or money order whether delivered personally or by mail. Applications received without the proper fee will be returned to the applicant. All fees paid are non-refundable. Applicants who fail to appear for examination to which they have been assigned shall forfeit the examination fee and shall be required to pay a new fee for subsequent examination assignments.

*5.B. CHANGES IN AMOUNT OF FEES*

The amount of a fee to be charged shall be established or changed by the Board regulation in accordance with Public Law 13-40.

*5.C. RENEWAL FEE*

(1) Renewal fees are payable before the last day of the month of September of each year.

(2) Each registrant will be notified by the Board of the expiration date of his/her certificate of registration and the amount of the renewal fee at least one (1) month before the expiration date.

(3) Renewal Fee Charges for Late Renewals in excess of one month shall be subject to a $25 per month fee for a maximum of six (6) months without submission of Reinstatement Application. If the licensee fails to pay, the license would lapse and that the license must comply with Section XVIII (A) for reinstatement.

(4) After a license has lapsed, the Board shall notify the Head of Building Permits of those individuals no longer holding current licenses. Such notice shall be issued in a reasonably prudent time frame after the date expiration.

## SECTION VI. CURRICULA APPROVED BY THE BOARD

*6.A. ENGINEERING*

(1) Engineering Curricula Approved by the Board:

The term "a graduate of an engineering curriculum of four (4) years or more approved by the Board as being of satisfactory standing" used in Section 47011 (b) (1) (i) of the Government Code is interpreted by this Board to mean a baccalaureate degree in engineering accredited by the Engineering Accreditation Commission (EAC) of the Accreditation Board for

Engineering and Technology (ABET) at the time of the awarding of the degree.

(2) Engineering Curricula Other than the Ones Approved by the Board:

The term "a graduate of an engineering curriculum other than the ones approved by the Board as being satisfactory standing" used in Section 47011 (b) (1) (ii) of the Government Code is interpreted by this Board to mean a baccalaureate degree in engineering not accredited by the Engineering Accreditation Commission (EAC) of the Accreditation Board for Engineering and Technology (ABET) such as those curricula recently developed or curricula offered by foreign schools evaluated by the Board as being of high quality essentially equal to those curricula which are accredited.

*6.B. ARCHITECTURE*

The term "a graduate of an architectural curricula approved by the Board as being satisfactory standing" used in Section 47011 (b) (3) (i) of the Government Code is interpreted by this Board to mean at least a baccalaureate degree in architecture accredited by the National Architectural Accrediting Board (NAAB) at the time of the awarding of the degree. Architectural curricula from a non-NAAB school may be accepted on an individual basis upon review by an evaluation consultant recommended by NCARB.

*6.C. LAND SURVEYING*

(1) Land Surveying Curricula Approved by the Board:

The term "a graduate of land surveying curriculum of four (4) years or more approved by the Board as being of satisfactory standing" used Section 47011 (b) (4) (i) of the Government Code shall be interpreted by the Board to mean a baccalaureate degree in land surveying which has been evaluated and approved by the Board as being of high quality.

(2) Land Surveying or Related Science Curricula Other than the Ones Approved by the Board:

The term "a graduate of a surveying or related science curriculum of four (4) years or more, other than the ones approved by the Board as being of satisfactory standing" used in Section 47011 (b) (4) (i) of the Government Code is interpreted to mean a baccalaureate degree in areas in which land surveying courses may be taught along with mathematics and the physical sciences.

**SECTION VII. EXPERIENCE**

*7.A. AS A PROFESSIONAL ENGINEER*

In evaluating experience which indicates to the Board that the applicant may be competent to practice engineering, the following will be considered:

(1) Experience must be progressive on engineering projects to indicate that it is increasing quality and complexity and requiring responsibility.

(2) Only work of an engineering nature which following graduation is creditable.

(3) Experience must not be obtained in violation of the Act.

(4) Experience gained in government service including the Armed Services, to be creditable, must be of character equivalent to that which would have been gained in the private sector doing similar work. Normally, it would be expected that the applicant while in the Government Service or Armed Services, shall have served in an engineering or engineering related group.

(5) Experience should be gained under the supervision of a registered Professional Engineer or if not, an explanation showing why the experience is considered acceptable should be made by the applicant.

(6) For sales experience to be creditable , it must be demonstrated that engineering principles were required and used in

gaining the experience.

(7) For teaching experience to be creditable it must be at an advanced level in an engineering curriculum approved by the Board. Employment must be at a teaching grade of at least Assistant Professor.

(8) Experience gained in the design of an engineering curriculum at the rank of Assistant Professor or higher and where the curriculum is approved by the Board shall be creditable.

(9) Successful completion of graduate study leading to the Master's degree in engineering which has followed a baccalaureate degree in engineering may be used for credit for one year's experience. If the Ph.D. in engineering is completed under the same conditions, an additional year of experience may be credited. If the Ph.D. is obtained without the Master's degree, the credit for experience may be up to two years.

(10) Experience may not be anticipated. The experience must have been received at the time the application is submitted.

(11) Experience as a contractor in the construction of a project designed by a Professional Engineer or in employment considered as that of supervising construction of such work may be considered as creditable experience but will not fulfill 100% of the design experience required.

(12) Part time experiences must be accompanied by timecards and payroll documents. Working in a project with someone registered in another firm shall not constitute acceptable experience required.

*7.B. AS A PROFESSIONAL ARCHITECT*

In evaluating experience which indicates to the Board that the applicant may be competent to practice architecture, the following will be considered:

(1) The Intern-Architect Development Program (IDP) shall be recognized as an alternative to achieving total acceptable practice. Such approval shall coincide with IDP standards and requirements.

(2) The IDP emphasizes a broad range of experience with emphasis in construction document preparation. In totalling the experiences listed in items 3 through 8 below, the maximum are listed, but even then the total acceptable time will require a broad base experience generally paralleling that of IDP.

(3) Diversified experience in architecture as an employee in the office of an architect. An organization will be considered to be an "office of an architect" if one of the two following conditions is met: (a) the principal business of the organization in which the applicant works is the practice of architecture and the applicant works under the direct supervision of an individual licensed architect practicing as a principal; or (b) the principal business of the organization (or affiliates) is construction and the incidental practice of architecture has had a substantial economic impact upon the registered architects employed by the organization, and the applicant works under the direct supervision of an individual licensed architect practicing as a principal. Provided, however, that in the case of (b) above, the Board will evaluate the time on an individual basis recognizing the need for overall design time and that the well-rounded experience needed requires more than direct construction-related time.

CREDIT ALLOWED: 100% MAXIMUM: No Limit

(4) Diversified experience in architecture as an employee of an organization (other than offices of architects) when the experience is under the direct supervision of an architect.

CREDIT ALLOWED: 50% MAXIMUM: 2 Years

(5) Experience directly related to architecture, when under the direct supervision of an architect, but not qualifying as diversified experience or when under the direct supervision of a professional engineer, landscape architect, planner or interior designer.

CREDIT ALLOWED: 50% MAXIMUM: 1 Year

(6) Experience, other than (3), (4) or (5) above, directly related to on-site building construction operations or experiences

involving physical analysis of existing buildings.

CREDIT ALLOWED: 50% MAXIMUM: 6 Months

(7) A Master's or Doctorate degree in architecture (except where the degree is the first professional degree).

CREDIT ALLOWED: 100% MAXIMUM: 1 Year

(8) Teaching or research in an NAAB-accredited architectural program.

CREDIT ALLOWED: 100% MAXIMUM: 1 Year

(9) For those applicants applying under the category "Experience and Examination", the quality of experience is more important than for those applicants who possess a degree. The 8 years of experience, at least 3 years of which shall have been under a registered architect, will be the absolute minimum quality time. Design experience and a broad background approximating that of the 5 years educational qualification shall be required. It is quite possible that to achieve said experience, the Board may deem that more total years than eight (8) may be required.

(10) Part time experience must be accompanied by timecards and payroll documentation. Working on a project with someone registered in another firm does not constitute acceptable experience required.

(11) Experience may not be anticipated. The experience must have been received at the time the application is submitted.

*7.C AL LAND SURVEYOR*

In evaluating experience which indicates to the Board that the applicant may be competent to practice land surveying, the following will be considered:

(1) Experience must be progressive on land surveying projects to indicate that it is of increasing quality and complexity and requiring greater responsibility.

(2) Experience must not be obtained in violation of the Act.

(3) Experience gained in the government service including the Armed Services, to be creditable, must be of character equivalent to that which would have been gained in the civilian sector doing similar work. Normally, it would be expected that the applicant while in the government service or Armed Services, shall have served in a land surveying or land surveying related group.

(4) Experience should be gained under the supervision of a registered Professional Land Surveyor or if not, an explanation showing why the experience is considered acceptable should be made by the applicant.

(5) For teaching experience to be creditable it must be at an advanced level in a land surveying curriculum approved by the Board.

(6) Experience may not be anticipated. The experience must have been received at the time application is submitted.

## SECTION VIII. REFERENCES

8.A. References are those individuals who should have personal knowledge of an applicant and who are able to issue judgements concerning an applicant's experience, ability, character or reputation.

8.B. For registration as a professional engineer, architect, or land surveyor, an applicant must submit five (5) references, three (3) of whom shall be professional engineers, professional architects or professional land surveyors having personal knowledge of the applicant's engineering, architecture or land surveying experience. For professional engineer applicants, the engineer references named shall be licensed in the discipline in which licensure is sought by the applicant.

http://www.guam-peals.org/rules.htm

8.C. For certification as an engineer intern or land surveyor intern, at least three (3) character references must be given.

8.D. Each reference will be contacted for verification of character and experience. Verification will be made by the Board by sending reference request form to each reference given. It is the responsibility of the applicant to give the present and complete mailing address of each reference. Failure to do so may delay action on the application.

8.E. Relative by either blood or marriage may not be used as references.

8.F. No current Board member shall be used as a reference.

8.G. Each applicant should inform the person being used as references.

8.H. It is the responsibility of the applicant to assure the return of completed reference forms, educational transcripts, verification of work experience and verification of registration in other states to the Board within a reasonable time. All references, transcripts and registration verifications must be complete before any Board action may be taken on an application.

8.I. Replies received from references regarding the qualifications of an applicant shall be placed in files which are considered non-public records. The source and character of the information will be divulged without approval of the reference or, as in special cases, when required by law.

## SECTION IX. EXAMINATIONS

### 9.A. GENERAL PROVISIONS

(1) The application and experience record as filled out and submitted by an applicant for registration is an important document. The Board analysis of the applicant's experience record is based not only on the duration of the time spent in professional work of a responsible character, but also on the importance and nature of the work. The applicant is encouraged to provide a complete and accurate record as possible.

(2) The Board shall notify the applicant of the date, place and time of the examination along with any information available for the distribution to the examinees received by the Board from NCEES, NCARB and/or CBPELS at least thirty (30) days from the date of examination.

(3) The applicant shall notify the Board of whether or not he/she will appear for the examination within ten (10) days after receipt of notification of assignment to an exam.

(4) The Board shall rely on the pass point grading criteria as developed and used by the NCARB, NCEES and CBPELS in evaluating examination scores.

### 9.B. ENGINEERING EXAMINATIONS

(1) CLASSIFICATION: The Board will use the following current form of examinations, prepared and furnished by the National Council of Examiners for Engineering and Surveying, for registration as an Engineer.

- (a) An examination known as the Fundamentals of Engineering (FE) examination of eight (8) hours duration for certification as an Engineer Intern.
- (b) An examination known as the Principles and Practice of Engineering (PPE) examination of eight (8) hours duration for registration as a Professional Engineer.
- (c) An examination known as the California Special Civil Seismic (CSCS) examination, of two and one-half (2-1/2) hours duration for registration as a Professional Engineer in the case of Civil Engineer.

(2) PASSING SCORE: Each applicant must secure a minimum grade of seventy based on the pass point criteria conforming to current practices of NCEES.

- (a) An applicant for registration as a Professional Engineer will not be assigned to the PPE examination until the FE examination has been passed or waived by the Board.
- (b) No applicant may be assigned to the FE or the PE examination until the Board has established that the applicant is eligible for the examination.
- (c) An applicant for certification as an Engineer Intern becomes eligible for assignment to the FE examination during the last semester of the senior year of enrollment in a Board approved engineering program leading to a baccalaureate degree in engineering. The enrollment of the applicant must be verified by the school being attended by the applicant.

(4) EXAMINATION OFFERINGS: An applicant who fails to pass either the FE or PPE examinations may be assigned to offerings of the examination upon repayment of the examination fees.

- (a) An approved applicant shall be given tow consecutive opportunities to take the examination. In the event he does not avail himself of these opportunities, his application shall be permanently filed and he will then have the status of a new applicant. The first opportunity shall be the next available examination schedule following approval of the application.

(5) RE-EXAMINATION: Applications for re-examination must be received by the PEALS Board at least thirty (30) days prior to the examination period, and shall be accompanied by the applicable re-examination fee.

*9.C. ARCHITECTURAL EXAMINATIONS*

(1) CLASSIFICATION: The Board will use the current form of examination prepared and furnished by the National Council of Architectural Registration Boards (NCARB) known as the Architect Registration Examination (ARE) for registration as an Architect.

(2) PASSING SCORE: Each applicant must secure a minimum grade of seventy-five or a "PASS" based on the pass point criteria conforming to current practice of NCARB for each part of the examination.

(3) ELIGIBILITY REQUIREMENT: No applicant may be assigned to any part of the Architect Registration Examination until the Board has established that the applicant is eligible for the examinations.

(4) EXAMINATION OFFERINGS:

- (a) An applicant who fails to pass part or parts of the Architect Registration Examination shall be permitted to sit for subsequent offerings of the examination upon payment of the examination fee.
- (b) NCARB may require retaking of other parts if registration is not attained after a certain period of time and the Board will review NCARB's recommendation on such matters.

(5) RE-EXAMINATION: Applications for re-examination must be received by the PEALS Board at least thirty (30) days prior to the examination period, and shall be accompanied by the applicable re-examination fee.

*9.D. LAND SURVEYING EXAMINATIONS*

(1) CLASSIFICATION: The Board will use the following current form of examination, prepared and furnished by the National Council of Examiners for Engineering and Surveying or locally prepared for registration as a Land Surveyor:

- (a) An examination known as the Fundamentals of Land Surveying (FLS) examination of eight (8) hours duration for certification as a Land Surveyor Intern (LSI).
- (b) An examination known as the Principles and Practice of Land Surveying (PPLS) examination, of six (6) hours duration.
- (c) An examination known as the Guam Land Matters (GLM) examination on territorial laws and procedures for the practice of land surveying on Guam, of four (4) hours duration for registration as a Land Surveyor.



(2) PASSING SCORE: Each applicant must secure a minimum grade of seventy for each part of the examination based on the pass point criteria conforming to current practices of NCEES.

(3) ELIGIBILITY REQUIREMENT:

- (a) An applicant for registration as a Professional Land Surveyor will not be assigned to the PLS examination until the LSI examination has been passed.
- (b) No applicant may be assigned to the FLS examination or the PPLS examination until the Board has established that the applicant is eligible for the examinations.

(4) EXAMINATION OFFERINGS: An applicant who fails to pass either the FLS and PPLS examination may be assigned to additional offerings of the examination upon repayment of the examination fees.

- (a) An approved applicant shall be given two consecutive opportunities to take the examination. In the event he does not avail himself of these opportunities, his application shall be permanently filed and he will then have the status of new applicant. The first opportunity shall be the first examination schedule following approval of the application.

(5) RE-EXAMINATION: Applications for re-examination must be received by the PEALS Board at least thirty (30) days prior to the examination period, and shall be accompanied by the applicable re-examination fee.

*9.E. STRUCTURAL ENGINEERING EXAMINATION*

(1) CLASSIFICATION: The Board will use the following current form of examinations, prepared and furnished by NCEES, for registration as a Structural Engineer: An examination known as the Principles and Practice of Structural Engineering Examination of sixteen (16) hours duration for registration as a Professional Structural Engineer.

(2) PASSING SCORE: Each applicant must secure a minimum grade of seventy based on the pass point criteria conforming to current practices of NCEES.

(3) ELIGIBILITY REQUIREMENT:

An applicant for registration as a Professional Structural Engineer will not be assigned to the Principles and Practice of Structural Engineering Examination until registration as a Professional Civil Engineer in the Territory has been obtained. In addition to prior registration as a Civil Engineer, the applicant must present evidence that he or she has practiced in the branch of structural engineering for a minimum of two (2) years after obtaining registration as a civil engineer before the Board will consider allowing the applicant to the Principles and Practice of Structural Engineering Examination.

(4) EXAMINATION OFFERINGS:

- (a) An applicant who fails to pass either portion of the Structural Engineering Examination may be assigned to additional offerings of the examination upon repayment of the examination fees.
- (b) An approved applicant shall be given two consecutive opportunities to take the examination. In the event he does not avail himself of these opportunities, his application shall be permanently filed and he will then have the status of anew applicant. The first opportunity shall be the first examination schedule following approval of the application.
- (c) The Board will accept "Pass" rating of an applicant to either morning or afternoon session of Part II of the Structural Engineering examination and only that session failed by an applicant need be retaken.

(5) RE-EXAMINATION: Applications for re-examination must be received by the PEALS Board at least 30 days prior to the examination period, and shall be accompanied by the applicable re-examination fee.

*9.F. EXAMINATION DATES AND LOCATIONS*

(1) Written examinations shall be offered on dates set by NCEES, CBPELS and NCARB. Normally, these shall be in the spring and fall of the year. Dates are generally available from the office of the Board a few months in advance of the exams.



(2) Locations at which the examinations are given are designated by the Board and this information shall be available at least one (1) month in advance of the examinations.

## 9.G. PROCTORING EXAMINATIONS OF OTHER JURISDICTIONS

Proctoring examinations for other jurisdictions is at the discretion of the Board. A fee for proctoring an examination will be charged based on the fee established by the Board.

## 9.H. LANGUAGE OF THE EXAMINATION

The language of the examination shall be English.

## 9.I. STUDY INFORMATION

The Board will not distribute copies of questions used on prior examinations. NCEES, NCARB and CBPELS offer for sale copies of questions asked on prior examinations they may be purchased directly from them. Applicants are also encouraged to contact local professional societies and individual registrants for study assistance that may be available.

## 9.J. INSTRUCTIONS FOR EXAMINEES

Instructions provided prior to each examination will declare an examination to be open book or open book with limitations or closed book. When an applicant sits for an open book examination, any books, bound materials of any sort, calculators which are battery-operated and non-printing may be used. None of this material may be loaned or exchanged between or among examinees. The Board will take into consideration the specific examination policies of the NCEES, NCARB or CBPELS when administering examinations prepared and made available through those organizations and will make appropriate notification to examinees of those policies.

## 9.K. FAILURE TO ATTEND AN EXAMINATION

(1) An applicant who fails to attend an examination for which he or she has been scheduled will forfeit the fee paid for the examination. The examination fee will not be forfeited in case of illness, death in the immediate family, or other unavoidable causes for absence for which the applicant can certify under oath, witnessed by a Notary Public, or other official designated to witness oaths.

(2) Failure of an applicant to attend an examination for which he or she has been scheduled to attend does not count as a failure of the examination.

## 9.L. EXAMINATION RESULTS

Examination results, after review and approval of passing scores by the Board, will be supplied in writing to each examinee. An applicant who receives a failing score shall be advised of his/her score in writing. A person receiving a passing score shall be informed in writing of the individual's successfully passing the exam without the score being released. The examinee may be informed verbally of the passing score (where a numerical score is applicable) provided that the examinee signs a written statement that such information is for personal knowledge and shall not be for merit or personal gain and shall never be publicized.

## 9.M. REVIEW OF FAILED EXAMINATIONS

An applicant who fails to make a passing score on an examination may review the examination paper within thirty (30) days after receiving the result. The review must be done in the office of the Board under the supervision of a staff member. Review of failed examinations shall be in accordance with the policies of the organizations responsible for preparation and distribution of them.

## 9.N. EXAMINATION FOR RECORD PURPOSES

(1) Any engineer, architect or land surveyor registered by this Board without examination may take, for record purposes, the

examinations offered by NCEES, NCARB and CBPELS upon approval of the Board and payment of the examination fee.

(2) Failure to pass any examination for record purposes will in no way affect current certification or registration.

## SECTION X. CLASSIFICATION OF REGISTRATION

### 10.A. ENGINEERING

(1) CLASSIFICATION OF REGISTRATION: Successful applicants shall be registered or certified under one of the classifications as prescribed by the laws of this Territory:

- (a) Professional Engineer
- (b) Engineer Intern

(2) BRANCHES OF ENGINEERING

- (a) Civil
- (b) Structural
- (c) Mechanical
- (d) Electrical
- (e) Chemical
- (f) Industrial
- (g) Other disciplines for which NCEES prepares standard examination may be recognized by the Board as the need arises. The rules shall be amended as required to include those disciplines not previously listed.

### 10.B. ARCHITECTURE

Successful applicants shall be registered as Architects as prescribed by the laws of this Territory.

### 10.C. LAND SURVEYING

CLASSIFICATION OF REGISTRATION: Successful applicants shall be registered or certified under on the classifications as prescribed by the laws of this Territory:

- (a) Registered Land Surveyor
- (b) Land Surveyor Intern

### 10.D. EMERITUS

Professional Engineers, Architects or Land Surveyors who are sixty-five (65) years of age or older, who have been registered in Guam for at least five (5) years and who have been residents of Guam for at least five (5) years may be eligible for Emeritus status and corresponding registration fees as determined by the Board.

(1) A Professional Engineer, Architect or Land Surveyor to qualify as Emeritus must be "retired" and must not participate in the preparation of construction documents, calculations, reports, expert testimony, and other aspects of professional services, with the exception of teaching or authoring of publications or articles.

The intent is to permit a reduced fee for such individuals as a show of respect for their accomplishments, so they may maintain their professional title but without formal practice.

### 10.E. CERTIFICATE OF AUTHORIZATION

(1) Practice of Corporations, Partnerships or Associations

http://www.guam-peals.org/rules.htm                                   3/15/2006

Any corporation, partnership, joint venture or any other association of two (2) or more firms, whether organized under the laws of Guam or any other jurisdiction, may not offer to engage in the practice of engineering, architecture, land surveying or construction management services involving the practices thereof in Guam until such corporation, partnership, joint venture or association has obtained a certificate of authorization issued by the Board.

(2) Application for a Certificate of Authorization

Applications for a Certificate of Authorization of partnerships, corporations, joint ventures or associations to engage in engineering, architecture, land surveying or construction management services shall be on the form prescribed by the Board and may be obtained from the Board at their office. The application shall contain the following information:

- (a) The name, registration number and signature of the Engineer, Architect or Land Surveyor registered on Guam who will be responsible for all engineering, architecture, land surveying or construction management services of the corporation or association; in the case of partnership, the name, registration number and residential addresses of each general partner engaging in the practice of engineering, architecture, land surveying or construction management in Guam;
- (b) The name, address, registration number (if applicable) and signature of all the officers and/or partners of the corporation, partnership or association including each officer or partner's percentage of ownership and/or share. (Amended by P.L. 24-263)

(3) The name, address and signature of acceptance of the corporation, partnership or association's agent, or representative on Guam. (Deleted by P.L. 24-263)

(4) Accompanying Documents

All Applications for a Certificate of Authorization shall be accompanied by the following documents:

- (a) In the case of a corporation or association, a copy of the corporation's articles of incorporation, by-laws and similar charter document certified by the Secretary of State of the jurisdiction in which the corporation is organized and filed with Guam Department of Revenue and Taxation; and, a copy of certificate as a foreign or domestic corporation issued by the Department of Revenue and Taxation.
- (b) In the case of a partnership, a copy of the partnership agreement signed by the general partners.
- (c) In the case of sole proprietor operating under a fictitious name, a "certificate of transacting business under a fictitious name" from Guam Department of Revenue and Taxation.
- (d) A fee as set forth in the Fee Schedule of the Board.
- (e) Any government employee or official, whether federal or of the Government of Guam, or for a Government of Guam semi-autonomous agency, who is a part owner or member of the Board of Directors of a firm receiving a Certificate of Authorization, shall specifically make such involvement known to the PEALS Board.

The PEALS Board shall publish such information for the general public once a year and, at the Board's discretion, may notify the agency involved. Failure to receive such disclosure may be grounds for revocation of the Certificate of Authorization.

(4) Expirations and Renewals

- (a) A Certificate of Authorization shall issued as of the date it is approved by the Board and shall be valid until the last day of the month of September of each year.
- (b) A Renewal Notice shall be mailed annually by the Board, not later than the last day of August, to the last known address of the corporation, partnership or association showing the expiration date of their certificate and the amount of the fee for renewal. The annual fee shall be as set forth in the Fee Schedule of the Board.
- (c) Application to renew the Certificate of Authorization shall be on the form prescribed by the Board and shall be submitted to the Board no later than the last day of the month of September of each year. If any change occurs in any of the information provided to the Board, corporate documents reflecting the change(s) shall accompany the renewal application.
- (d) The Board shall consider the application for Certificate of Authorization a renewal application if there are no change(s) made from the original application or if there are deletion(s) of service or engineering discipline(s)



provided or offered by the corporation, partnership or association.
- (e) The Board shall consider the application for a Certificate of Authorization a new application if there are changes (s) made from the original application or when there are additions to the type(s) or services or engineering discipline (s) being provided or offered by the corporation, partnership or association.

(5) Amendments of Certificate of Authorization

Changes in the corporation, partnership or association's organization and responsible engineer, architect or land surveyor during the year shall be reported on the same application for Certificate of Authorization form and shall be filed with the Board within thirty (30) days after the effective date of such change.

## SECTION XI. REGISTRATIONS

### 11.A. REGISTRATION NUMBER AS A PROFESSIONAL ENGINEER, REGISTERED ARCHITECT OR REGISTERED LAND SURVEYOR

Each registrant shall be assigned a registration number at the time registration is granted by the Board. Numbers shall be issued consecutively and separately for professional engineers, registered architects and registered land surveyors and in the order in which applicants are granted registration. The registrant will be advised of his/her number by the Board.

### 11.B. CERTIFICATES OF REGISTRATION/AUTHORIZATION

The Board shall issue a Certificate of Registration or Certificate of Authorization to an applicants who has met the requirements of this Territory and who has paid the registration fee. The certificate will be signed by the Chairman and Secretary of the Board and will show the registrant's registration number and seal of the Board.

### 11.C. REISSUANCE OF CERTIFICATE

When a Certificate of Registration or Authorization is lost, destroyed or mutilated, it will be replaced upon request by a registrant in good standing, upon approval of the Board and upon payment of the prescribed fee.

## SECTION XII. SEALS

### 12.A. SEAL OF THE BOARD

The official seal of the Board shall consist of the seal of the Territory of Guam, surrounded by the words, "Territorial Board of Registration for Professional Engineers, Architects, and Land Surveyors".

### 12.B. SEAL OF REGISTRATION

(1) When an applicant is granted registration, he/she shall obtains a seal of a design authorized by the Board. The seal shall be an image or imprint from a rubber stamp or other medium as approved by the Board and shall bear the following information:

- (a) Registrant's Name
- (b) Registrant's Registration Number and discipline (in the case of professional engineers only).
- (c) Contain the words "Professional Engineer (Civil, Structural, Mechanical or Electrical), Registered Architect or Professional Land Surveyor".

(2) Seals must be a permanent mark on the document being sealed. The standard seal must be used on all original tracings, blue prints, drawings, specifications, reports and other documents prepared by professional engineers, registered architects or registered land surveyors.

(3) Whenever the seal is applied, the registrant's written signature shall be signed across or adjacent to the seal with the statement "This work was prepared by me or under my direct supervision".

http://www.guam-peals.org/rules.htm                    3/15/2006



*12.C. SEAL ON DOCUMENTS*

(1) The seal and signature of the registrant shall be placed in all specifications, reports, drawings, plans, design information and calculations or land surveys, plats, and calculations whenever presented to a client or any public or government agency to certify that the work thereon was done by the registrant or under the direct supervision of the registrant.

(2) The seal and signature shall be placed on all original copies, tracings or other reproducible documents so that the seal and signature will be reproduced when copies are made.

(3) For residential projects the seal will be placed when the documents contain more than one sheet. The first or title page shall be sealed and signed by all involved in the work or those who directly supervised the work and are responsible for it. In addition, each sheet shall be sealed and signed by the registrant or registrants responsible for each sheet. When a firm performs the work, each sheet shall be signed by the registrant or registrants who actually did the work. The principal person in charge shall sign and seal the title or first sheet.

(4) The seal and signature shall be placed on work only when it was under the registrant's direct supervision, provided that if the work was performed at an office outside the locale in which the registrant permanently resides, the seal may be used only if the registrant supervised the work on a full-time basis.

(5) When a registrant of another state has a temporary permit to practice in this Territory, he/shall use his/her state's registration seal and affix his/her signature and a copy of the temporary permit to work done in this Territory.

(6) Seals of Engineers: Refer to Section 32116 of P.L. 24-263

(7) Seals of Architects: Refer to Section 32116 of P.L. 24-263

(8) Seals of Land Surveyors: Refer to Section 32116 of P.L. 24-263

## SECTION XIII. MOONLIGHTING/PART TIME WORK

*13.A. MOONLIGHTING/PART TIME WORK*

Registrants who are working on projects part time while still at another job working full time, are cautioned that all work must be done under their direct supervision. The Board may at its discretion, review monthly project applications from the Building Permits Section of the Department of Public Works and Survey Division of the Department of Land Management. If the quantity or size of projects being sealed by a registrant working on a part time basis exceeds what the Board considers consistent with proper professional work, the registrant may be requested by the Board to appear for further review of the matter. Further disciplinary actions including suspension or revocation of license may be initiated.

The registrant may be required to submit timecards and payroll records documenting that documents were prepared under his or her complete direction and control.

## SECTION XIV. OTHER ITEMS

*14.A. CONSTRUCTION MANAGEMENT*

(1) The purpose and intent of the PEALS Board is not to necessarily define or limit the bounds of Construction Management, but to regulate those aspects of construction management that are clearly the elements within the professional practice of engineering, architecture and land surveying as regulated by the PEALS Board, as per the general provisions of the Act.

(2) Any person, corporation, partnership or association providing services under the heading of 'Construction Management' shall be required to have the following services performed by engineers, architects, or land surveyors duly registered in this Territory. Such services shall fall under the broad definition of engineering, architecture, and land surveying and shall include but not limited to:

- (a) Professional construction inspection or observation.

- (b) Certifications
- (c) Shop drawing review and approval
- (d) Engineering calculations
- (e) Revising construction details
- (f) Documents interpretation

## 14.B. *RESPONSIBLE MANAGING EMPLOYEE - LIMITS OF CONTROL*

In order to qualify and maintain a Certificate of Authorization, the Responsible Management Employee's (RME) limits of responsible professional control will be considered:

(1) The work and tasks under the RME shall be in proportion to what would constitute reasonable control on a project in accordance with Section 47014.d.4. The sealing and stamping of documents without full time supervision of the work is contrary to the Law. In addition, all firms and RMEs, by the representation and acceptance of the Certificate of Authorization, shall acknowledge and accept the Board's authority to review the limits of control of the RME at the Board's discretion.

## 14.C. *RESPONSIBLE MANAGING EMPLOYEE - FULL TIME*

(1) The Responsible Management Employees (RME) shall be employed on a full time basis with seventy five (75%) percent physical presence in full control of the operations of the firm in order for the organization to qualify for and maintain a Certificate of Authorization.

(2) The Responsible Management Employee (RME) may still conduct registered endeavors on his/her own, but to a very limited extent, commensurate with the very limited work time.

## SECTION XV. TEMPORARY PERMITS

### 15.A. *ENGINEERS AND ARCHITECTS*

(1) GENERAL PROVISIONS: This Board may grant a temporary permit to a person who is not a resident of this Territory or who has no established place of business and desire to practice or offer to practice engineering or architecture in this Territory provided such person is legally qualified by registration in his/her home jurisdiction and that his/her qualifications for obtaining the permit meet those required for registration under the Act. For an Architect, this requires, as a minimum, an NCARB certificate. To obtain a temporary permit, an applicant must apply to this Board on forms provided by it, receive approval from the Board, and pay a fee as established by the Board.

(2) LENGTH OF SCOPE OF PERMIT: The permit shall be granted for a definite length of time not to exceed one (1) year to do a specific job and shall provide that there is no right to practice engineering or architecture with respect to any other works not set forth in the permit.

(3) MULTIPLE TEMPORARY PERMITS or consecutive Temporary Permits shall not be issued. A minimum period of five years shall be required between Temporary Permits and all applicants shall be encouraged to apply for regular registration.

### 15.B. *LAND SURVEYORS*

The practice of land surveying under a temporary permit by a person recognized as a professional land surveyor in another jurisdiction is not considered to be in the best interest of the public and therefore, shall not be granted.

## SECTION XVI. EXPIRATIONS, RENEWALS AND REINSTATEMENTS

16.A. A renewal notice shall be mailed annually by the Secretary of the Board, not later than the last day of August, to the last known address of every person holding a certificate of registration under the Act and to every firm holding a certificate of authorization showing the expiration date of their certificate and the amount of the fee for renewal.

16.B. The annual renewal fee shall be established by regulation of the Board.



16.C. Renewal fees may be paid any time prior to the expiration date but must be paid on or prior to the expiration date in order to avoid penalty for late renewal.

16.D. Any renewal fee received after the expiration date shall be assessed $25 per month for each month delayed for a maximum of six (6) months without submitting the reinstatement application.

16.E. After six (6) months of failure to renew a certificate of registration, a registrant shall be required to file a Request for Reinstatement of Registration with the Board and may be required to appear for an interview with the Board, and shall be required to pay all penalty and past registration fees.

16.F. The responsibility for the timely renewal of a registrant's license rests solely with the individual licensee.

16.G. After ten (10) years of lapse, the registrant shall be required to retake the all applicable current exams prior to being eligible for registration. In cases of Comity where the applicant has maintained their base state registration, a new application for Comity will be required.

# SECTION XVII. PROFESSIONAL CONDUCT

## 17.A. RULES OF PROFESSIONAL CONDUCT

The Board has prepared and adopted Rules of Professional Conduct for Professional Engineers, Architects and Land Surveyors.

## 17.B. KNOWLEDGE OF RULES

All persons registered under the provisions of the Act are charged with having knowledge of the existence of the Rules of Professional Conduct as well as amendments from time to time which are made known in writing to every registrant and applicant for registration. The Rules and amendments are also published in the Roster of Professional Engineers, Architects and Land Surveyors and are binding on all registrants.

## 17.C. CONVICTIONS

A registrant of this Board who has been fined, received a reprimand, or had a license revoked, suspended or denied in another jurisdiction for reasons or causes which this Board finds would constitute a violation of the law governing the practice of engineering, architecture or land surveying in this Territory or any rule or regulation promulgated by this Board shall be sufficient cause for levying a fine, reprimanding the registrant, denying, revoking, or suspending a license to practice engineering, architecture or land surveying by the registrant in this Territory.

## 17.D. SEVERABILITY

In the case of court action which declares for any reason any of the above Rules and Professional Conduct invalid, the remainder shall continue in full force and each of the Rules of Professional Conduct and/or parts thereof are severable.

# SECTION XVIII. COMPLIANCE AND ENFORCEMENT

## 18.A. COMPLIANCE

(1) The statutes of this Territory provide that person must be registered to practice or offer to practice engineering, architecture or land surveying in this Territory. Any person, firm, partnership, organization, association, corporation or other entity using the words "engineer", "engineering", "architect", "architecture", "land surveyor", or "land surveying" or any modification or derivative thereof in its name of form of business activity except as authorized in the Act, or any person presenting or attempting to use the certificate of registration or the seal of another, or any person who shall give any false or forged evidence of any kind to the Board or any member thereof in obtaining or attempting to obtain a certificate of registration, or any person who shall falsely impersonate any other registrant of like or different name, or any person who shall attempt to use an expired or revoked or non-existent certificate of registration, or who shall practice or offer to practice when not qualified, or any person who falsely claims that he or she is registered under the Act, or any person who shall violate any of the provisions of the Act shall be guilty of a petty misdemeanor.



(2) Any individual or corporation registered with this Board to perform land surveying services shall comply with the minimum standards modified for land surveyors in this Territory.

*18.B. ENFORCEMENT*

This Board may initiate action in cases where a person's actions might reasonably be judged to be in non-compliance with the provisions of the Act.

## SECTION XIX. DISCIPLINARY ACTION

*19.A. COMPLAINTS*

Proceedings to reprimand, suspend, refuse to renew or to revoke an individual's certificate of registration or a firm's certificate of authorization may be initiated by any person who may prefer charges of fraud, deceit, gross negligence, incompetence, misconduct, or violation of the Rules of Professional Conduct.

(1) Any and all charges presented against any individual registrant, or against any corporation, partnership or association holding a certificate of authorization must be made in writing, sworn to by the person or persons making them before a Notary Public and shall be filed with the Secretary of the Board.

(2) All charges made should include the following: the name and address of the complaint and respondent, a concise statement of the complaint with facts supporting the allegation that a violation has occurred and a statement of the relief sought. The complainant shall sign the complaint witnessed by a Notary Public.

(3) Complaints may also be initiated by any member of the Board, procedures available at office, where only submittal of facts or documents are concerned i.e. false advertising, inappropriate phone listing, business card, etc. Such submittals shall be without opinion. The submitting Board member may participate in actions pertaining to the matter without prejudice provided opinions were not included with the submittals.

(4) Prior to any disciplinary action being taken, the Board may negotiate a Settlement of the charges.

(5) If no response is received by the Board by the due date, the Board may proceed on the Accusation without a hearing.

*19.B. SUMMONS AND COMPLAINT*

(1) In the event the Board determines that a probable cause exists, the Legal Counsel of the Board shall be requested to prepare a summons and complaint.

(2) The summons and complaint shall be personally served or mailed to the last known address of the individual registrant(s) charged or firm holding a certificate of authorization at least thirty (30) days before the date fixed for hearing. If mailed, a return receipt shall be requested.

(3) The summons and complaint shall show the time, place and nature of the hearing, a statement of legal authority and jurisdiction under which the hearing is to be held, reference to the particular section of statutes and/or rules involved, and a short and plain statement of the matters asserted. The notice of the summons and complaint shall indicate that at any hearing the accused individual registrant or firm holding a certificate shall have the right to appear in person or be represented by counsel or both to cross-examine witnesses in his or her or its defense and to produce evidence and witnesses of his or her or its defense. If the accused person or corporation fails or refuses to appear, the Board may proceed to hear and determine the validity of the charges. The notice shall be in substantial compliance with the requirements of the laws of this Territory.

*19.C. EVIDENTIARY MATTERS*

The Board shall follow the Administrative Adjudication Act on this matter.

*19.D. CONDUCT OF HEARING*

http://www.guam-peals.org/rules.htm

The Board shall follow the Administrative Adjudication Act wherein either the Legal Counsel shall hear the case and make recommendations to the Board, or where the Board hears the case, the hearing officer shall act as the judge.

*19.E. ORDER OF THE BOARD*

The Board shall issue an order as soon as possible from the date of the final hearing.

*19.F. DISCIPLINE*

Upon order by the Board in which the respondent is found guilty of the charges preferred, the Board may issue a reprimand, suspend, refuse to renew or revoke the individual's certificate of registration or the firm's certificate of authorization.

At its discretion, the Board may stay, permanently or temporarily, the execution of its order conditioned on any provision that the Board believes appropriate under the circumstances for the case.

## SECTION XX. REINSTATEMENT OF REGISTRATION OR CERTIFICATION AFTER SUSPENSION

*20.A. PETITION FOR REINSTATEMENT*

Upon petition of an individual registrant or firm formerly holding a certificate of registration or authorization, which has since been suspended, the Board may reissue a certificate of registration or authorization provided that a majority of the members of the Board vote in favor of such issuance.

*20.B. BOARD ACTION*

The Board, for reasons it may deem sufficient, may reissue a certificate of registration to any person or a certificate of authorization to any corporation whose certificate has been suspended. Such reissuance shall bot supersede prior Board decisions and recommendations as to penalty etc. taken for disciplinary action.

## SECTION XXI. CONFLICT AND BIAS

A Board Member shall be excused and shall not vote in any action, disciplinary or otherwise, if the Board Member may be biased for or against a Respondent or their may exist a potential conflict of interest. If a potential conflict of interest or bias exist, such determination shall be made by a majority vote of the remaining Board members.

If the Board member has a potential conflict, that Board member is obligated to disclose such a potential conflict.

## SECTION XXII. SEVERABILITY

If any of the Rules and Regulations, or any part thereof, of this Board promulgated under the provisions of the rule making authority for Territory agencies are found by the courts to be invalid for any reason, the remainder shall continue in full force and effect. Each Rule and/or any portion thereof shall be severable.

## SECTION XXIII. ADOPTION AND AMENDMENT OF RULES

*23.A. ADOPTION OF RULES*

Rules or regulations are adopted by this Board, under the provision of the Code of Laws governing the practice of engineering, architecture or land surveying which may be reasonably necessary for the proper performance of its duties and the regulations of the proceedings before it. They must not be inconsistent with the Constitution and the laws of this Territory.

*23.B. PETITION FOR ADOPTION OR AMENDMENT OF RULES*

An interested person may petition the Board requesting the promulgation amendment or repeal of a regulation. The petition shall be submitted in the following form:

PETITION TO ADOPT, AMEND OR REPEAL A REGULATION

(1) Name of Petitioner

Address of Petitioner

Phone No. Of Petitioner

(2) Description of the change which is proposed or requested. (Clearly and concisely describe the changes which are proposed showing either the new proposal or an amendment with deletions and additions or a statement to repeal a quoted regulation).

(3) Purpose of proposed change. (Describe what effect the proposed change will have and why your believe it should be made).

(4) Signature of petitioner and date.

Signature Date

The Board, within thirty (30) days, shall either deny the petition in writing with reasons for the denial or initiate regulation-making procedures for further consideration of the change.

*23.C. PROCEDURE FOR ADOPTION AND AMENDMENT OF RULES*

Procedures for adoption and amendment of rules and regulations of this Board shall be in compliance with the Administrative Adjudication Act of this Territory.

-----end----

Should you have any questions, comments or corrections, please e-mail: info@guam-peals.org
Questions or comments about this site? Email the Webmaster.

# EXHIBIT "B"

# NATIONAL PRACTICE GUIDELINES FOR THE STRUCTURAL ENGINEER OF RECORD ©
### *Fourth Edition*



**COUNCIL OF AMERICAN STRUCTURAL ENGINEERS**



C A S E

**Fourth Edition**
**2000**

Prepared by
**CASE National Guidelines Committee**

Thomas D. Wosser, Chairman
Tim Barnard
Ned M. Cleland
W. Gray Hodge
Michael A. Matthews
Keith A. Smith
Wesley R. Segawa
Douglas F. Suess
Bob Piro, NCSEA Representative
Stuart K. Jacobson, SERMC Representative
David I. Ruby, National Officer

Published by the Council of American Structural Engineers (CASE)
©2000, All Rights Reserved

This publication is endorsed by:
S • E • R • M • C Structural Engineers Risk Managment Council

# CASE

**Council of American Structural Engineers**

1015 15th Street, N.W.
Washington, DC 20005
(202) 347-7474;   Fax (202) 898-0068
http://www.acec.org/programs/case.htm

♦ A part of the American Consulting Engineers Council ♦

# TABLE OF CONTENTS

**PAGE**

PURPOSE AND GOALS ............................................................................................................... 1

SERVICES WHICH MAY BE PROVIDED
    I.    Introduction
        A.    General.................................................................................................. 2
        B.    Allocation of Responsibility
               1. General............................................................................. 2
               2. Primary Structural System ......................................... 2
               3. Information Furnished By Others ............................... 2
               4. Construction Observation ........................................... 3
               5. Submittals .................................................................... 3
               6. Special Inspections .................................................... 4

    II.    Basic Services
        A.    Project Development Phase ................................................... 5
        B.    Schematic Design Phase ....................................................... 5
        C.    Design Development Phase .................................................. 5
        D.    Contract Documents Phase .................................................. 6
        E.    Bidding or Negotiation Phase .............................................. 6
        F.    Construction Administration Phase ..................................... 6

    III.    Additional Services
        A.    Special Services .................................................................... 8
        B.    Extra Services ....................................................................... 9

    IV.    Obligations of the Client ................................................................. 9

INSTRUMENTS OF SERVICE ............................................................................................. 10
    I.    Schematic Design Phase ............................................................... 10
    II.    Design Development Phase ........................................................... 10
    III.    Contract Documents Phase ........................................................... 10
        A.    Structural Calculations......................................................... 10
        B.    Structural Drawings ............................................................. 11
        C.    Structural Specifications ...................................................... 11
    IV.    Bidding or Negotiation Phase ...................................................... 12
    V.    Construction Administration Phase ............................................. 12
        A.    Submittal Review ................................................................ 12
        B.    Site Visits ............................................................................ 12
        C.    Other Construction Administration Services ...................... 12
    VI.    Special Services ............................................................................ 12

DEFINITIONS .......................................................................................................................... 13

> *Note: All words defined in <u>Definitions</u> are capitalized when used.*

# NATIONAL PRACTICE GUIDELINES FOR THE STRUCTURAL ENGINEER OF RECORD

# PURPOSE AND GOALS

The purpose of these Guidelines is to give firms and their employees a guide for establishing Consulting Structural Engineering Services and to provide a basis for dealing with Clients generally, and negotiating Contracts in particular. Since the Structural Engineer of Record (SER) is normally a member of a multi-discipline design team, these Guidelines describe the relationships that customarily exist between the SER and the other team members, especially the team leader. Further, these Guidelines promote an enhanced Quality of Professional Consulting Structural Engineering Services while also providing a basis for negotiating a fair and reasonable compensation.

Additionally, they provide a better opportunity for Clients to understand and determine the Scope of Services that the Structural Engineer should be retained to provide.

With the publication of this fourth edition of the National Practice Guidelines, it is important to recognize that the Guidelines were developed originally on the basis of the traditional Design/Bid/Build system of project delivery. That traditional system continues to be the basis for the current edition. It is recognized that other project delivery systems such as Design/Build and Fast Track projects will have significant impact on the processes and procedures that are presented herein. It is CASE's position that this document should not attempt to cover all of the nuances and differences brought about by other delivery systems, but rather, the intent of the Guidelines should be made very clear to the CASE membership and others who may be referring to these Guidelines.

The Guidelines are divided into several sections which discuss the traditional activities of the SER in the practice of Consulting Structural Engineering. They are oriented primarily toward Building-related projects but can be tailored for other types of projects as appropriate. They also provide a description of typical Instruments of Services or work products and include a definition of terms used in the Guidelines and/or in Structural Engineering practice in general.

The Guidelines reflect the services provided by the SER on a normal construction project, in which the corresponding duties of the Owner, the Prime Design Professional, his consultants and the Contractor are set forth in standard American Institute of Architects (AIA) or Engineers Joint Contract Documents Committee (EJCDC) Contract Forms, such as the General Conditions of the Contract for Construction, AIA Document A201, the Standard Form of Agreement Between Owner and Architect, AIA Document B141, the Standard Form of Agreement Between Architect and Engineer, AIA Document C141, and the Standard Form of Agreement Between Owner and Engineer, EJCDC 1910-1. Consequently, unless the other members of the construction team bind themselves to perform the duties set forth in these types of documents, the proposed Structural Engineering Services set forth in the Guidelines may be inappropriate.

Moreover, the owner or the Prime Design Professional may expand or limit by separate Contract or Agreement the services to be provided by the SER. The parties' specific Agreement takes precedence over these Guidelines. Therefore, these Guidelines should not be used to establish legal responsibilities which are more appropriately defined in the relevant Contract or Agreement governing each particular project. Nor should these Guidelines be used to establish the Standard Of Care to be met by the SER in performing his services, since the appropriate Standard Of Care is predicated solely upon the specific facts and circumstances of each project and the Contract Documents related thereto.

1

Case 1:04-cv-00027    Document 107-6    Filed 03/31/2006    Page 5 of 20

# SERVICES WHICH MAY BE PROVIDED

## I. INTRODUCTION

### A. GENERAL

The purpose of this section is to identify or describe the range and nature of services to be considered for inclusion in the SER's Scope of Services in the Design/Bid/Build environment so that a clear understanding is reached as to those services which are included as well as those which are not included in the service Agreement.

This Guideline includes many services which may be provided by the SER during the course of his practice. However, it is not contemplated that every project will require the entire list of services. In fact, most projects will include only some of the tasks enumerated herein. Again, it is recognized that the list of services and procedures probably will not be appropriate for project delivery systems other than Design/Bid/Build.

### B. ALLOCATION OF RESPONSIBILITY

#### 1. General

The various aspects of design and construction administration are defined in the standard EJCDC and AIA General Conditions and Supplemental Conditions of the Contract in terms of Owner, Contractor and the design team. However, the division of responsibilities within the design team is not clearly defined. This must be done in a detailed "Scope of Service" section in the Design Agreement between the SER and the Client. This part of the Guidelines is intended to facilitate the development of such a detailed "Scope of Service" section.

A detailed "Scope of Service" must be developed on the basis that the services provided will meet the Client's needs and the community's Standard of Care. To meet those needs, the SER should have in place a program of Quality Assurance Procedures that can be adapted to different project types and

sizes. To assist in the development of a Quality Assurance Program, reference is made to:

- CASE Document "Checklist for the Development of Contract Documents and Submittal Review."
- Structural Engineers Risk Management Council (SERMC) Document "Prescriptions for Success."

#### 2. Primary Structural System

The SER should be responsible for the design of the Primary Structural System. There may be times when some element of the Primary Structural System is to be designed and sealed by someone other than the SER. Nevertheless, such elements, including connections designed by others, should be reviewed by the SER. He should review such designs and details, accept or reject them and be responsible for their effects on the Primary Structural System. For Pre-engineered Structural Elements designed and sealed by a Specialty Structural Engineer (SSE) or otherwise certified by a qualified agency other than the SER, responsibility of the SER is limited to Specifications, review of Submittals, integration of the elements into the Primary Structural System, and determination that Structural Elements needed to create a stable Structural System have been incorporated into the work. The results of the review should be communicated to the appropriate parties.

The allocation of responsibility for any Secondary Structural and Non-structural Elements should be discussed with the prime or coordinating design professional and, where appropriate, included in the SER's Contract as a special service. If the SER has no contractual obligation or design control for an element, then responsibility logically rests with the prime or coordinating design professional.

#### 3. Information Furnished By Others

In preparation of Contract Documents, the SER relies upon the accuracy and completeness of information furnished by the owner, the Prime Design Professional, and by other consultants; topographic and boundary surveys, weights and locations of non-structural components and equipment, mechanical openings, Building dimensions, and geotechnical reports and

2

recommendations. Recommendations given in the geotechnical report are the responsibility of the Geotechnical Consultant, not of the SER.

## 4. Construction Observation

a. Construction Observation should be provided for all systems for which the SER is responsible. Even though Construction Documents are carefully prepared, construction errors, misinterpretations, and unacceptable adjustment of construction materials or details are likely to occur if the Contractor is permitted to proceed unobserved. Construction Observation should be performed under the direction of the SER since he/she is best qualified to recognize and deal with those situations that by definition require his professional judgment and interpretations.

b. The purpose of Construction Observation by the SER is to ascertain whether the work observed is generally in accordance with the Structural Contract Documents, on the basis of the SER's professional judgment and experience. While such observations are not to be construed as exhaustive or continuous inspection of the work, they should be made at the appropriate stages of construction, and of such frequency to enable the SER to support that judgement.

c. The SER is not responsible for, nor does the SER have control of construction means, methods, techniques, sequences and procedures, or for safety precautions and programs in connection with the construction work. The SER is not responsible for the Contractor's failure to carry out the construction work in accordance with the Contract Documents. The SER is not responsible for, and does not have control or charge over the acts or omissions of the Contractor, subcontractors, suppliers nor any of their agents or employees, or any other persons performing any of the construction work.

d. Construction Observation by the SER does not relieve the Contractor of his/her responsibility for building the project, controlling the progress, providing safe working conditions and correcting any deviations from project requirements. However, if the SER observes an unsafe condition, that condition should be brought to the attention of the Controlling Contractor, as defined by OSHA. CASE recommends that the SER develop and maintain a written office policy for coping with observed unsafe conditions, including appropriate reporting procedures.

e. The issuance of Construction Observation Reports describing unacceptable or incomplete construction does not require the SER to thereafter determine whether such conditions have been rectified. Rather, the purpose of the Report is to inform the SER's Client of the observed condition.

f. **Structural Observation.** Note that the preceding paragraphs a through e refer to "Construction Observation" in general and use permissive terms. CASE recommends that it should always be provided. Structural Observation is often mandated by Building Code requirements, stipulating a written report to the Building Official from the structural observer identifying any reported deficiencies that, to the best of the structural observer's knowledge, have not been resolved.

## 5. Submittals

a. The SER is responsible for the review of submittals that pertain to structural work and that have been identified in the Contract Documents as requiring the review of the SER.

b. The SER's review of submittals should be for general conformance with the information and design concept expressed in the Structural Contract Documents, and is not for the purpose of determining the accuracy and completeness of dimensions and quantities or general coordination, which remain the responsibility of the Contractor.

c. The SER should maintain a structural submittal log to enhance knowledge of status of submittals and track review turn-around time.

d. Shop Drawings

   1. Shop Drawings are required by the Contract Documents and are prepared by the Contractor to facilitate fabrication, erection

3

and installation of various elements of the project.

2. The SER should review items that are part of the Primary Structural System and those other items that may be specifically identified in the Contract Documents.

3. The Contract Documents should clearly identify the responsible parties for the design of structural and non-structural elements not part of the Primary Structural System and outside the scope of service of the SER, such as Pre-Engineered Structural Elements. The scope of the SER's review of such shop drawings or other required submittals, should be identified in the Contract Documents and should be limited to:
   - Verification of required signature and professional seal of responsible party.
   - Conformance to criteria and loads specified in the Contract Documents.
   - Effects on Primary Structural System

4. Shop drawings and other documents that depict means and methods of construction should be returned to the Contractor unreviewed, unless specifically required as a structural submittal by the Contract Documents.

e. Contractor submitted design alternatives and proposed substitutions should be reviewed by the SER only if requested by the Client, and as an Additional Service.

**6. Special Inspections**

Frequency and extent of special inspections are generally mandated by code or laws. However, the SER should identify specific special inspection and testing requirements for inclusion in Project Specifications. The Building Code or state law, in general, make the special inspector responsible to the enforcing agency. Special inspections are best provided by the SER under an Agreement with the oOwner. On certain occasions, special inspections may be performed by agencies or individuals other than the SER. When such other inspectors are not under the direct supervision and control of the SER, the SER shall have no responsibility or liability for

the quality of performance of such other individuals. Reference is made to the CASE "National Practice Guidelines for Special Inspections."

## II. BASIC SERVICES

The Basic Services of the SER normally include the analysis, design, preparation of Drawings and Specifications, services associated with Agency review and bidding, and Construction Administration Services. The Basic Services should be detailed in the Contract executed with the client. Reference is made to the CASE "Contracts for Structural Engineers," a family of sample Contracts for a variety of Structural Engineering services. Services beyond those outlined under Basic Services are considered Additional Services that are categorized as Special Services or Extra Services in Sections III.A. and III.B.

The Basic Services are listed in the sequential design phases of a typical design project. Each phase contains those items which pertain most typically to that phase; nevertheless, certain activities may be done out of sequence or in different phases than indicated. This is considered normal practice because required services are tailored to each project.

"Attention is called to "D. Contract Documents Phase,....Item 5. Assist in coordination with Building Code Officials as required," as well as Items 14 and 15. In some geographic areas, there are jurisdictions or agencies that require a very substantial plan review, correction and back check process which can affect a large portion of the structural fee. The effect is significant enough that some firms have included a separate phase, "Agency Review and Back Check," following Construction Document Phase and Preceding Bidding and Award Phase. The SER is cautioned to identify the extent of the required coordination and review."

### A. PROJECT DEVELOPMENT PHASE

1. Define Scope of Structural Services for the project.

   a. List Basic Services.

4

b. Determine Additional Services which the SER will be required to perform including services relative to Non-structural Elements.

c. Discuss responsibility for Additional Services which might be required, but will not be performed by the SER.

d. Define services relative to a preliminary construction cost; e.g., opinion of probable furnishing approximate quantities of structural items or providing approximate cost figures.

2. Assist in the development or review of the project schedule with milestone dates.

3. Assist in determination of channels of communication.

4. Assist in determination of responsibility for providing dimensions on the Drawings.

5. Assist in determination of drawing and drafting standards and specifications format.

6. Assist in determination of number and location of project team meetings during each phase and number of site visits during construction.

7. Negotiate fees and payment schedule.

## B. SCHEMATIC DESIGN PHASE

1. Attend meetings, as agreed.

2. Establish structural design criteria, including special criteria furnished by the Client; e.g., deflections, lateral movements or vibrations.

3. Considering the project requirements, perform a Structural Systems study establishing comparative information to be used in the selection of vertical and lateral load carrying systems, giving due consideration to fire resistive requirements, determined by others. The number of alternate systems studied may be limited by the terms of the SER-Client Contract.

4. Participate in the selection of the Structural System for the project. Other participants might include owner, architect, Contractor, cost estimator, SSEs and other consultants.

5. Provide structural criteria for use by Geotechnical Consultant.

6. Assist in determination of need for special studies such as wind tunnel tests, dynamic analysis, etc.

7. Consult with Public Agencies.

8. Assist with preparation of preliminary opinion of probable construction costs.

9. Suggest possible changes to effect savings.

## C. DESIGN DEVELOPMENT PHASE

1. Attend meetings, as agreed.

2. Prepare design development documents.

a. Prepare preliminary structural design calculations for typical elements.

b. Prepare preliminary foundation Drawings.

c. Prepare preliminary framing layout Drawings.

d. Prepare typical detail sheets.

3. Prepare or edit Outline Specifications for structural items.

4. Identify Pre-engineered Structural Elements.

5. Review results of special studies.

6. Coordinate structural design with special design criteria. See B.2.

7. Submit design development documentation for approval.

8. Assist with preparation of revised preliminary opinion of probable construction costs. See A.1.d.

## D. CONTRACT DOCUMENTS PHASE

1. Prepare the structural design of the Primary Structural System.

2. Designate elements to be designed by SSEs. Specify the type of element, position within the

5

structure and connection to the Primary Structural System. Specify the structural criteria for the SSE's design of the Pre-engineered Structural Elements. Specify required Submittals from the SSE for review.

3. Review the effect of Secondary or Non-structural Elements not included in the Primary Structural System, but which are attached thereto, and design the structure to accept and support such items. Provide information regarding the supporting capability and physical attachment limitations of the structural framing systems.

4. Attend periodic coordination meetings, as agreed.

5. Assist in coordination with Building Code Officials as required.

6. Finalize preparation of structural calculations.

7. Finalize preparation of structural Drawings.

8. Prepare or edit Specifications for the Primary Structural System.

9. Assist in establishing testing and inspection requirements, including Special Inspection.

10. Perform checking and coordination of the Structural Documents.

11. Participate in coordination of the Structural Documents with those of other disciplines within the overall coordination led by the Prime Design Professional.

12. Assist in determining which, if any, construction procedures and techniques shall be submitted for review.

13 Assist with preparation of revised opinion of probable construction costs.

14. Assist in filing construction documents for approval by Building Official.

15. Make Revisions to construction documents as required by Building Official.

## E. BIDDING OR NEGOTIATION PHASE

1. Bidding and Award

   a. Assist in evaluating bidder's qualifications.
   b. Provide structural Addenda and structural clarifications as required.
   c. Attend Pre-Bid Conference, if required.
   d. Assist in bid evaluation, if required.

## F. CONSTRUCTION ADMINISTRATION PHASE

1. Pre-Construction Services

   a. Attend pre-construction meetings, as agreed.
   b. Assist in establishing communications procedures.
   c. Assist in confirming, reporting and scheduling procedures for testing and inspections and Construction Observation.
   d. Assist in confirming Submittal procedures for shop Drawings, etc.
   e. Assist in the selection of a materials testing and inspection agency.
   f. Review statement and schedule of Special Inspections.

2. Submittal Review

   a. Determine that Contractor has provided submittal schedules required by Contract Documents and recognize and adhere to agreed-upon submittal procedures, including turn-around time.
   b. Review specified Submittals pertaining to items designed by the SER. Determine whether Submittals have received prior approvals as required by the Contract Documents.
   c. Perform limited review of submittals pertaining to elements not part of the Primary Structural System, including Pre-engineered Structural Elements specified by the SER and designed by SSEs or others. Determine whether Submittals have received prior approvals as required by the Contract Documents. For standard manufactured elements such as open web steel joists, joists hangers, etc., certification of structural capacity by a qualified agency (such as the Steel Joist Institute, the product evaluation

6

[ ] service of the ICBO, or the Underwriters' Laboratory) may be acceptable if allowed in the Contract Documents. *Also, see I.B.5 above*

3. Construction Observation

   a. Visit the site at intervals appropriate to the stage of construction and as defined by the *SER's* Contract to observe and become generally familiar with the quality and the progress of the construction work relative to the Primary Structural System.
   b. Prepare Construction Observation reports.
   c. *Also, see I.B.4 above*

4. Materials Testing and Inspection

   a. Review reports from the testing and inspection agencies to determine if the agency has verified conformance of the reported item of work with Structural Contract Documents.
   b. Initiate appropriate action in response to those reports, if required.

5. Provide interpretations of Structural Construction Documents by responding to Contractor's requests for information.

6. Assist in reviewing Change Orders relating to the structural work.

7. Assist in determining whether non-conforming structural work shall be rejected.

8. Initiate Statement of Special Inspections and Schedule of Special Inspections and review same after completion by the Special Inspector (See CASE National Guidelines for Special Inspections).

9. Assist in conducting observations to determine substantial completion of the structural work.

*(Note: Sub paragraphs 5 through 10 are presented in revised order)*

## III. ADDITIONAL SERVICES

Services beyond those outlined under Basic Services are frequently necessary or requested. They are categorized as Special and Extra Services. These services may be provided by the SER under terms mutually agreed upon by the Client and the SER.

### A. SPECIAL SERVICES

These are services which may or may not be foreseen at the beginning of design stages and are not normally included as Basic Services. Examples include, but are not limited to:

1. Optional Additional Services listed in AIA C141.

2. Services related to Non-structural Elements and their attachments, such as:

   a. Exterior cladding systems.
   b. Interior architectural systems.
   c. Window washing systems and tie downs.
   d. Antennas and flagpoles.
   e. Elevators and escalators.
   f. Mechanical, electrical and plumbing equipment, storage tanks, cooling towers and underground vaults.
   g. Mechanisms and guide systems for elevators, escalators, other conveyor systems and associated operating equipment.

3. Services related to Secondary Structural Elements and their attachments, such as:

   a. Site-work elements not part of the Building Structural System, such as retaining walls, culverts, bridges, etc. Support for landscape furnishing such as flagpoles, lighting poles, benches, fountains, pools, signs, etc.
   b. Stairs.

4. Tenant-related design services.

5. Services related to special seismic analyses, such as non linear "pushover" analyses or spectrum or time-history dynamic analyses.

7

6. Services related to special dynamic analyses such as blast effects or floor-response analysis for foot-fall or vibratory equipment.

7. Services related to special wind analyses, such as wind-tunnel tests, etc.

8. Services related to "seismic risk" analysis.

9. Preparation of demolition documents.

10. Field Investigations of existing Buildings and structures or condition surveys of existing construction.

11. Studies of various schemes to accommodate special energy requirements.

12. Services connected with the preparation of documents for alternate bids or for segregated Contracts for phased or Fast Track construction.

13. Services connected with a Project Peer Review.

14. Services connected with Value Engineering.

15. Special Inspections which are continuous and/or detailed inspections of construction.

16. Design or field observations of shoring and bracing for excavations and Buildings, or design or field observations of under-pinning of adjacent structures.

17. Design or review related to Contractor's construction related equipment, e.g., cranes, hoists, etc.

18. Design of swimming pools.

19. Design for future expansion.

20. Filing application for and obtaining a Building Permit.

21. Preparation of record set of Drawings. Note that record drawings are not to be considered "as-built" drawings. Should the SER prepare "record drawings", the scope of this service should be clearly identified in the Agreement for this effort.

22. Preparation of shop or fabrication Drawings, for example, tilt-up wall panel Drawings, reinforcing and structural steel detailing, etc.

23. Review and determination of structural fire-resistance requirements.

*(Note: Sub paragraphs 5 through 23 are presented in revised order)*

## B. EXTRA SERVICES

These are services which arise as a result of unforeseen circumstances during the design or construction process. Examples include, but are not limited to:

1. Contingent Additional Services listed in AIA C141.

2. Services resulting from changes in scope or magnitude of the project as described and agreed to under the Basic Services Agreement.

3. Services resulting from changes necessary because of a construction cost over-run which is outside the control of the SER.

4. Services resulting from revisions which are inconsistent with approvals or instructions previously given by the Client.

5. Services resulting from revisions due to the enactment or revision of codes, laws, or regulations subsequent to the execution of Contract for Structural Engineering Services.

6. Services resulting from Change Orders.

7. Services resulting from corrections or revisions required because of errors or omissions in construction by the Building Contractor or in design by consultants other than the SER.

8. Provide recommendations regarding claims, disputes and other matters relating to execution or progress of the structural work.

9. Services resulting from construction procedures over which the SER has no control.

8

10. Services due to extended design or construction time schedules.

11. Services, including assisting in preparation for litigation or arbitration as witnesses or consultants, in connection with any public hearing, arbitration, or legal proceedings with respect to the project.

12. Services resulting from damage as the result of fires, man-made disasters, or acts of God.

13. Review and design of alternate or substitute systems.

14. Review of Additional Shop Drawing Submittals when occasioned by improper or incomplete Submittals.

15. Attend construction progress meetings.

16. Overtime work required by the Client.

17. Services required to make changes resulting from value-engineering review or Project Peer Review.

18. Services rendered for special foundations when the discovery of poor or unexpected soil conditions is made after execution of the Agreement. Examples include, but are not limited to, deep foundations, mat footings, structural grade slabs, and grade beams.

## IV. OBLIGATIONS OF THE CLIENT

A. In order to promote equity in their professional relations and in order to allow the SER to perform in accordance with the foregoing Guidelines, the Client who has engaged the SER should adhere to the following obligations:

1. Verify that the contemplated project will be financed adequately, including provisions for contingencies, and professional service fees, to accomplish the stated and desired goals and commitments.

2. Define the project in writing. Define the owner's intended functions and needs and enumerate any special design criteria such as heavy equipment loads, clear span requirements and any other special loading criteria.

3. Execute a written Agreement with the SER prior to commencement of the services to be furnished.

4. Authorize in writing any Additional Services that may be required beyond the scope of the original Agreement prior to the commencement of the services to be performed.

5. Provide adequate compensation for the SER's agreed services.

6. Render prompt payment for services rendered according to the terms of the Contract.

7. Establish a realistic and mutually agreed-upon schedule for furnishing of professional services, allowing for unforeseen contingencies as a likely potential condition of the design and construction process.

8. Coordinate or arrange for the coordination of the services of all design consultants in order that conflicts or misunderstandings are minimized or eliminated.

9. Disclose fully and promptly any and all information that may affect the SER's performance, scheduling, design or payment for services.

10. Maintain open lines of communication between all parties participating in the project.

11. Recommend that the owner establish a contingency fund for correcting errors and omissions in the design. No design team, nor its design, is perfect; errors or omissions will occur.

12. Recognize that the Drawings, Specifications and other documents prepared by the SER are for use for a specific project. The SER shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights including the copyright. The SER's Drawings, Specifications and other instruments of service shall not be used by the Client nor others for completion of the project

9

by others nor for use on other projects except by Agreement in writing and with appropriate compensation and indemnification for the SER.

13. Keep the SER informed of construction progress and advise the SER when previously identified elements of the structure are ready for Construction Observation.

14. Require that the owner establish the testing and inspection program specified in the Contract Documents.

15. Assure that the Owner properly manages construction with experienced personnel.

# INSTRUMENTS OF SERVICE

General Comment: The SER will produce Instruments of Service as required for the project. Many items listed below as Instruments of Service will not be required for a specific project. A written checklist may be used by the SER to emphasize that all items listed as Instruments of Service are not required for a specific project. Geographic variations in standard practice and specific project requirements could either add to or subtract from this list.

I. SCHEMATIC DESIGN PHASE
   A. Calculations
   B. Sketches as Appropriate
   C. Structural Systems Studies

II. DESIGN DEVELOPMENT PHASE
   A. Preliminary Structural Design Calculations
   B. Preliminary Framing Drawings
   C. Typical Detail Sheets
   D. Outline Specification for Structural Items

III. CONTRACT DOCUMENTS PHASE

   A. STRUCTURAL CALCULATIONS

   Structural calculations should be prepared as a guide and support for the Structural Design, but shall not be considered as elements of the Contract Documents. The calculations should be consistent with the requirements of the structural design. Information and description for any computer analysis should be included.

In general, structural calculations include *the* following:

1. Design Criteria
   a. Basis of design including assumptions.
   b. Building Codes used.
   c. List of live loads, snow loads, and similar design loads.
   d. Seismic factors.
   e. Wind load criteria.
   f. Soils report information and design criteria —, *i.e.,* allowable loads.
   g. List of structural material properties, *i.e.,* concrete, reinforcing steel, masonry, structural steel, wood.
   h. List special inspection requirements.
   i. Name of design engineer, name of the supervising Structural Engineer, name of the SER.

2. Member Location Plans for Roof, Floors, etc.

3. Vertical Load Analysis and Design
   a. Roof Structure
   b. Floor Structure
   c. Framing Structure
   d. Columns
   e. Walls

4. Lateral Load Analysis and Design for Seismic/Wind Forces

5. Foundation Analysis and Design

B. STRUCTURAL DRAWINGS

Drawings should show the structural member locations, sizes, reinforcing, and connections in sufficient scale and detail to enable the construction of the Building in a reasonable sequence by a competent Contractor experienced in the techniques of construction for the specified materials. Framing plans may refer to architectural Drawings for dimensions where appropriate. Elevations, sections, and details should be of appropriate scale, number, and extent to portray clearly the relationship of members to each other and their interconnection(s). Care should be taken to

10

ascertain and determine that details noted "typical" are applicable to the project or condition being portrayed.

In general, structural Drawings include the following, but may vary depending on the complexity of the job and the materials:

1. Typical Details and Structural Notes
2. Foundation Plans
3. Floor Framing Plans
4. Roof Framing Plans
5. Foundation Schedules and Details
6. Column Schedules and Details
7. Slab, Beam and Girder Schedules and Details
8. Structural Wall Schedules, Elevations and Details
9. Frame Elevations and Details
10. Floor Framing Details
11. Roof Framing Details
12. Connection Details
13. Miscellaneous Details

## C. STRUCTURAL SPECIFICATIONS

Specifications include specific project requirements for all structural materials, fabrication, installation and connections including testing, certifications, tolerances and Submittals. The Specifications may include performance criteria for design and detailing by other than the SER. Where appropriate, the Specifications may be abbreviated and become part of the Drawings. The following Construction Specifications Institute (CSI) Divisions may include sections defining Structural Elements.

1. Division 2 - Sitework
2. Division 3 - Concrete
3. Division 4 - Masonry
4. Division 5 - Metals
5. Division 6 - Wood & Plastics
6. Division 13 - Special Construction

## IV. BIDDING OR NEGOTIATION PHASE

1. Structural Addenda
2. Clarification Letters and Sketches

## V. CONSTRUCTION ADMINISTRATION PHASE

Construction Administration is an extremely important phase of the project. It calls for a complete understanding of all of the Contract Documents, for careful consideration of changed conditions and requested substitutions, prompt response to all inquiries, management of appropriate testing and inspection procedures, and thorough and clear documentation of communications. To meet the project goals for Quality, schedule, and cost, there must be a spirit of cooperation throughout the entire construction team, from owner to smallest subcontractor.

The SER must be very alert in this area of service. No matter how well the project has been designed, its overall success may be compromised, including the confidence and respect of the Client, if the Construction Administration Phase is not conducted with care. The following instruments of service are pertinent to that performance.

## A. SUBMITTAL REVIEW

1. Reviewed Shop Drawings (elements designed by the SER)
2. Reviewed Shop Drawings (elements designed by others)
3. Clarification Sketches
4. *Proposed substitutions and design alternatives*
5. Other Specified Structural Submittals.

## B. SITE VISITS

1. Site Visit Reports
2. Clarification Sketches

## C. OTHER CONSTRUCTION ADMINISTRATION SERVICES

1. Clarification Sketches
2. Change Order Evaluation
3. Letters of Compliance, if required
4. Formwork Stripping Letters, if required
5. Response to Requests for Information (RFIs)

11

**VI. SPECIAL SERVICES** (See section III of A of
Services Which May Be Provided)

   A.  REPORTS
   B.  LETTERS
   C.  SKETCHES

# DEFINITIONS

## ADDENDA

Written or graphic instruments issued prior to the opening of bids which clarify, correct or change the Contract Documents.

## ADDITIONAL SERVICES

The services of the SER that are not ordinarily included as "Basic Services" and are further separated into "Special Services" and "Extra Services."

## AGREEMENT

See definition of "Contract."

## BASIC SERVICES

The services of the SER necessary to provide construction documents and construction administration services for use in the construction of the Primary Structural System, and as defined in the Agreement.

## BUILDING

A structure used or intended for supporting or sheltering a specific use or occupancy.

## CHANGE ORDER

Any authorized change in the Contract Documents resulting in a change in the scope, price, or time of completion of the construction Contract, which occurs after the Contract for Construction has been executed.

## CLARIFICATION DRAWINGS

Drawings prepared and issued by the SER as if they were part of the original construction documents for the sole purpose of "clarifying", adding new information or changing old information to assist the construction team in their work without changing the intent of the information on the original construction documents. No changes in scope, price or time for completion of the construction Contract occurs as a result of these Drawings.

## CLIENT

The individual, agency, corporation or other legally recognized entity which engages for hire the services of the Structural Engineering firm *that* is legally authorized to provide professional Structural Engineering Services.

## CONSTRUCTION OBSERVATION

Site visits during project construction for the purpose of observing or reviewing construction for general conformance with the approved structural Contract Documents.

## CONTRACT

The legally recognized document providing definitions of service requirements, payment terms, time of service and other items deemed appropriate by the Client and professional engineering firm. This is sometimes also called the "Agreement."

## CONTRACT DOCUMENTS

The owner-contractor agreement, the conditions of the contract (general, supplementary, and other conditions), drawings, specifications, clarification drawings and all addenda issued prior to and all modifications issued after execution of the contract, and any other items that may be specially stipulated as being included.

13

## CONTRACTOR

The individual or other entity responsible for performing and completing the construction (or portion thereof) of a project required by the Contract Documents.

## DRAWINGS

Design documents that descriptively illustrate and graphically show the requirements and intent for construction of the Building Project. The structural Drawings are only a part of the total documents for the project.

## EXPERT

An individual, who through training, education, experience and knowledge is recognized by his peers to possess specialized information on a given subject matter.

## EXTRA SERVICES

Services *that* are required as a result of unforeseen circumstances during the design or construction phases of a project and are not included in Basic Services.

## FINAL DESIGN

The work effort that occurs during the preparation of Construction Document phase, either confirming Design Development design decisions or evaluating and analyzing current considerations.

## FORMWORK STRIPPING LETTER

A letter signed by the SER allowing the stripping of formwork *that* is required in some jurisdictions.

## GUIDELINES

The principles for use in making a judgment or determining policy or course of action.

## INVESTIGATION

A detailed examination or search in a formal manner to uncover and determine the cause or causes for conditions which by their nature are not readily apparent.

## LETTER OF COMPLIANCE

A letter stating, as an example, the following: The structural design for _____ has been prepared by the undersigned. The undersigned assumes responsibility for said design being in compliance with reliable structural data and the structural requirements of _____ code to the best of my knowledge and belief.

## NON-STRUCTURAL ELEMENTS

Elements of a Building that are not Primary or Secondary Structural Elements. Items in this category could be exterior curtain walls and cladding, non-bearing partitions, stair railings, etc.

## OPINIONS OF PROBABLE COST

Opinions of Probable construction costs are to be made on the basis of the SER's qualifications and experience. However since the SER has no control over costs or the price of labor, equipment or materials, or over the Contractor's method of pricing, the SER makes no warranty, expressed or implied, as to the accuracy of such opinions as compared to bid or actual costs.

## OWNER

The individual or entity who has legal possession or equitable interest in the structure.

## PRE-ENGINEERED STRUCTURAL ELEMENTS

Structural Elements which are specified by the SER but may be designed by a SSE. These elements are normally fabricated off-site, require specialized equipment not usually available at the job site or could require a proprietary process.

Examples of Pre-engineered Elements may include but are not limited to:

a. Open web steel joists and joist girders.
b. Wood trusses.
c. Combination wood and metal, and plywood joists.
d. Pre-cast concrete elements.
e. Prefabricated wood or metal Buildings.

14

f. Tilt-up concrete panel reinforcement and hardware required for lifting to position.

## PRIMARY STRUCTURAL SYSTEM

The completed combination of elements which serve to support the Building's self weight, the applicable live load which is based upon the occupancy and use of the spaces, the environmental loads such as wind, *seismic* and thermal. Curtain wall members, non-load-bearing walls or exterior facade, to name a few items, are not part of the Primary Structural System.

## PRIME DESIGN PROFESSIONAL

The leader of the design team charged with the design of a new or remodeled facility, either an architect or an engineer. The Prime Design Professional is responsible for determining and interpreting the needs of the Client and for coordinating the work of the other members of the design team.

## PROJECT PEER REVIEW

An independent and objective technical review of ~~the~~ a project design, by a design professional or professionals experienced in the design of projects similar to the one being reviewed, to examine the basic design concepts, objectives, and criteria proposed for the project.

## REQUESTS FOR INFORMATION (RFIs)

Written requests for information or clarification generated by the contractor during the construction phase of a project.

## SCOPE OF SERVICES

A detailed description and list of tasks that are required to provide the Structural Engineering on a given project.

## SECONDARY STRUCTURAL ELEMENTS

Structural Elements that are structurally significant for the function they serve but do not contribute to the strength or stability of the primary structure. Examples may include but not be limited to: support beams above the primary roof structure which carry a chiller, *stairs*, elevator support rails and beams,

retaining walls independent of the primary Building, and flagpole or light pole foundations.

## SPECIAL INSPECTION

Inspection performed by the special inspector for the types of work required by the governing code and the contract documents.

## SPECIAL INSPECTOR

A qualified person who shall demonstrate competence, to the satisfaction of the building official, for inspection of the particular type of construction or operation requiring special inspection.

## SPECIAL SERVICES

Services which may or may not be foreseen at the beginning of the design stages but are not necessary to the Primary Structural System.

## SPECIALTY STRUCTURAL ENGINEER (SSE)

A licensed professional engineer, not the Structural Engineer of Record, who performs Structural Engineering functions necessary for the structure to be completed and who has shown experience and/or training in the specific specialty.

The Specialty Structural Engineer is usually retained by a supplier or subcontractor who is responsible for the design, fabrication and (sometimes) installation of engineered elements or by the general Contractor or subcontractor(s) responsible for construction related services.

## SPECIFICATIONS

A written description of the material and construction requirements for the items included in a Project.

## STRUCTURAL CONTRACT DOCUMENTS

The SER sealed Drawings and Specifications issued for construction purposes, plus the Clarification Drawings, Addenda and Change Orders issued in accordance with the Contract Documents.

## STANDARD OF CARE

15

That level of skill and competence ordinarily and contemporaneously demonstrated by professionals of the same discipline practicing in the same locale and faced with the same or similar facts and circumstances.

## STRUCTURAL ELEMENT

A single beam, column or other structural member which when combined with others form the Structural System.

## STRUCTURAL ENGINEER

An engineer with specialized knowledge, training and experience in the sciences and mathematics relating to analyzing and designing of force-resisting systems for Buildings.

## STRUCTURAL ENGINEER OF RECORD (SER)

The Structural Engineer who is legally eligible to seal the Structural Documents for a Building Project. This seal acknowledges that he has performed or supervised the analysis, design and document preparation for the Building Structure and has knowledge of the requirements for the load carrying Structural System. The SER is responsible for the design of the Primary Structural System.

## STRUCTURAL OBSERVATION

Code-mandated Construction Observation.

## STRUCTURAL SYSTEM

That portion of a Building which carries and transmits loads, both self-weight and externally applied.

## SUBMITTALS

Items required by the Contract Documents to be submitted by the Contractor. These might be fabricator Drawings (shop Drawings), manufacturer's literature on equipment, concrete mix designs, aggregate gradation reports, schedules, etc. Submittals are usually not a part of the Contract Documents but are a work effort requirement of the documents. Submittals may not contain reproductions of Contract Documents without the written approval of the SER. If the SER has responsibility for Contract Administration, other Submittals may include requests for payment, progress reports, etc.

## VALUE ENGINEERING

The process of suggesting alternative systems, materials, and methods to reduce the cost and/or enhance the value of the project.

16

# EXHIBIT "C"

# D. STRUCTURAL DRAWINGS

Case 1:04-cv-00027    Document 107-7    Filed 03/31/2006    Page 3 of 24

ABBREVIATION LIST

## GENERAL STRUCTURAL NOTES

### DIVISION I: GENERAL REQUIREMENTS

**DESIGN DATA**

Code: Uniform Building Code, 1994 Edition

Dead Load:  Weight of concrete 150 psf
Live Load:  Roofing 20 psf; floor 40 psf, Stair 100 psf
Wind Load:  Basic wind speed (per UBC) exposure C
Seismic Zone 4, Z=0.40, I=1.0

Soil Pressure: Per soils report No. 3818 by Geo-
Engineering & Testing Inc. dated 00 April 1996
Allowable Bearing: 3000 psf at 2'-0" below lowest
adjacent finished grade.

**NOTES TO CONTRACTOR**

Existing construction shown was obtained from
existing drawings. Contractor shall verify all
existing conditions, dimensions, and elevations at
the work.

Remove, cutting, sliding, etc. of existing work
shall be performed so as not to jeopardize
structural integrity.

Contractor shall provide all measures necessary to
protect new and existing construction. Such
measures shall include, but not be limited to,
bracing and shoring for loads imposed during
construction.

Observation visits to the site by Engineer shall
not include inspection of the above items nor will
Engineer be responsible for the means, methods,
techniques, or sequences.

Unless noted otherwise, all details are typical as
indicated by reference of similar item to Architectural,
Mechanical, Electrical, and Civil drawings for location and
dimensions not shown on structural drawings.

General Structural Notes (GSN) any and space
of any controls.

Options and "approved equal" specifications are
to Contractor. Contractor shall be
responsible for all changes necessary to implement
on approval of substitutions of such.

Contractor shall be responsible for the cost of
additional work by Engineer due to selection of an
approved equal, including, but not limited to, the
errors or omissions in construction by Contractor.

**SUBMITTALS**

A   SHOP DRAWINGS (submit 1 repro and 1 blueline)
1. Concrete and Masonry Reinforcing Steel
2. Steel Shapes, Plate and Railing
3. Precast Concrete members

Shop drawings shall be stamped to indicate that
they have been reviewed by the General Contractor
prior to submittal.

B   MIX DESIGNS (submit 2 copies)
Concrete, Masonry Mortar and Grout

Mix design shall be submitted to the Engineer a
minimum of ten work days prior to placement.

C   MILL REPORTS (submit 2 copies 2 copies)
Structural Steel and Reinforcing Steel

D   DESIGN CALCULATIONS (submit 2 copies)
1. Precast Concrete members
2. Any other requirement duty provided by
others.

Calculations shall include loads area for
design and shall be sealed by a Structural
Engineer currently registered in Guam.

**MATERIAL TESTING SERVICES**

A   CONCRETE TESTS

These services to the cost of concrete placed
paid for each (first) psi in each 50-cubic
yards or fraction thereof, whichever is less concrete
used for testing shall be selected one concrete
actually placed. Test one cylinder at 7 days, two
at 28 days.

### DRAWING LIST

| SHT. NO. | DESCRIPTION | SHT. NO. | DESCRIPTION |
|---|---|---|---|
| S-1 | GENERAL NOTES | S-4 | COLUMN SCHEDULE |
| S-2 | GENERAL NOTES | S-5 | PANEL DETAILS |
| | | S-6 | MISCELLANEOUS DETAILS |
| S-1 | FOUNDATION PLAN | S-6 | MISCELLANEOUS DETAILS |
| S-2 | 2ND FLR. FRAMING PLAN | S-6 | MISCELLANEOUS DETAILS |
| S-2 | 3RD FLR. FRAMING PLAN | S-7 | MISCELLANEOUS DETAILS |
| S-2 | 4TH FLR. FRAMING PLAN | S-7 | FRAME ELEVATIONS |
| S-3 | 5TH FLR. FRAMING PLAN | S-7 | FRAME ELEVATIONS |
| S-3 | 6TH FLR. FRAMING PLAN | S-7 | FRAME ELEVATIONS |
| S-3 | 7TH FLR. FRAMING PLAN | S-8 | MOMENT FRAME DETAIL |
| S-3 | ROOF FRAMING PLAN | S-9 | |
| | MISCELLANEOUS DETAILS | | MISCELLANEOUS DETAILS |

WINZLER & KELLY
CONSULTING ENGINEERS

SU CENTER





Case 1:04-cv-00027    Document 107-7    Filed 03/31/2006    Page 6 of 24







ELEVATED SLAB NOTES

FLOOR PLAN – LEVEL 5
SCALE: 1/16" = 1'-0"

LEGEND

WINZLER & KELLY
CONSULTING ENGINEERS







ELEVATED SLAB NOTES

FLOOR PLAN – ROOF LEVEL





COLUMN SCHEDULE

RETROFIT DETAIL FOR MISSING COLUMN TIES (4)

RETROFIT DETAIL FOR MISSING COLUMN TIES (3)

EXISTING 1ST & 2ND F.R. COLUMN RETROFIT (2)

REBAR DOWELS FOR PUMPS, CHILLER AND AHU EQUIPMENT (1)









SECTION B-B
SCALE 1/2"=1'-0"

(N) CONCRETE TOPPING ON (E) FOOTING
SCALE 1/2"=1'-0"

SF-5 PLAN
SCALE 1/2"=1'-0"

SECTION A-A
SCALE 1/2"=1'-0"











