RANDALL TODD THOMPSON
MAIR, MAIR, SPADE & THOMPSON
Suite 801, Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910
Phone: (671) 472-2089
Fax: (671) 477-5206

ROBERT J. O'CONNOR
O'CONNOR BERMAN DOTTS & BANES
Second Floor, Nauru Building
Susupe, Saipan, CNMI
Mail: PO Box 50-1969 Saipan MP 96950
Phone: (670) 234-5684
Fax: (670) 234-5683

Attorneys for Defendant
Winzler & Kelly Consulting Engineers

FILED
DISTRICT COURT OF GUAM
APR - 4 2006 *gp*
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HUN SANG LEE, | Civ. No. CIV 04-00027 |
| Plaintiff, | |
| vs. | AMENDED MEMORANDUM IN SUPPORT OF WINZLER & KELLY'S MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE |
| MANHATTAN GUAM, INC., dba ROYAL ORCHID HOTEL, ANTHONY ROBINS AND ASSOCIATES, O.A. COLOMA, P.C., WINZLER & KELLY CONSULTING ENGINEERS, and DOE DEFENDANTS One through Ten, | |
| Defendants. | |

ORIGINAL

## TABLE OF AUTHORITIES

**Cases:**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)........................................................2

Block v. Lohan Associates, Inc., 645 N.E.2d 207, 209 (Ill. App. 1993)................3, 18, 21

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ....................................................................2

Davis v. Lenox School, 541 N.Y.S.2d 814 (App. Div. 1989)...........................................17

Dueñas v. Outrigger Guam Limited Partnership,

      Guam Super. Ct. No. CV 1067-03, Decision and Order (Dec. 9, 2005) ...........3, 23

Erie R. Co. v. Tompkins, 304 U.S. 64 (1938) ....................................................................2

Herczeg v. Hampton Township Municipal Authority,

      766 A.2d 866 (Pa. Super. 2001) ....................................................................19, 20

Leon Guerrero v. DLB Construction, 1999 Guam 9 ...........................................................3

Reber v. Chandler High School District 202,

      474 P.2d 852 (Ariz. App. 1970) ....................................................................18, 19

Zamudio v. City and County of San Francisco,

      82 Cal.Rptr.2d 664 (App. 1999) ..........................................................................17

**Statutes:**

Guam Public Law 22-83 ..................................................................................................9, 10

**Rules:**

Fed.R.Civ.P. 56....................................................................................................................2

**Other:**

Guam Board of Registration for Professional Engineers,

　　Architects and Land Surveyors, Rules and Regulations...........................................4

Council of American Structural Engineers,

　　National Practice Guidelines For the

　　Structural Engineer Of Record (4th ed. 2000)...............................4, 5, 6, 11, 12, 16

1994 Uniform Building Code § 1701 ..........................................................................9, 10

1991 Uniform Building Code § 306 ..................................................................................9

# I. INTRODUCTION

Plaintiff Lee, who was injured upon diving into a swimming pool at the Royal Orchid Hotel, has sued Winzler & Kelly Consulting Engineers (W&K) for negligence. W&K was the structural engineer for an expansion project in which the part of the Hotel containing the pool (the sixth floor) was constructed.

Summary judgment should be entered in this matter in favor of W&K, because W&K was not involved in any relevant way in the construction of the pool in which Plaintiff was injured. W&K's sole connection with the pool, and sole obligation with respect to it, was in designing and inspecting the installation of the structural support (concrete beams and columns, walls, etc.) for the floor in which the pool would eventually be placed, and the supporting slab of concrete under the pool, upon which the pool basin would rest. The internal details of the pool itself, including all those characteristics of it that Plaintiff alleges caused his injury, were not, and were never intended by anyone to be, designed, constructed, or inspected by W&K. Indeed, the pool was not constructed, or even finally designed, by *anyone* until long after W&K's involvement in the design and inspection of the structural system had concluded. W&K thus owed no duty of care to the Plaintiff, and did not cause any of the injuries that he has incurred, and a claim of negligence against W&K therefore cannot be sustained.

# II. THE COMPLAINT AGAINST WINZLER & KELLY

Plaintiff Lee alleges that W&K "participated in the design, construction and/or inspection of the subject pool," First Amended Complaint at ¶ 19, and that it owed a duty to "exercise reasonable care in [its] decisions, recommendations and activities relating to

the design, construction and/or inspection of the subject pool." Id. at ¶ 20. He further claims that W&K breached its duty to him by:

> Allowing the subject pool to be designed, construct[ed] and/or maintained with dangerous concrete steps protruding into the swimming pool instead of recessed steps, in violation of Guam's Rules and Regulations relating to public swimming pools; and

> Allowing the subject pool to be designed, constructed and/or maintained without the protruding steps being painted a contrasting color, or otherwise containing warnings of the recessed steps' existence, to users of the subject pool.

Id. at ¶ 21. The danger is thus alleged to have derived from two particular characteristics of the steps that Plaintiff claims to have struck -- they protruded into the pool, and they were not painted a contrasting color. Elsewhere, Plaintiff also complains of inadequate signage warning against the danger of diving into the pool.

## III. ARGUMENT

### A. Applicable Legal Standards.

Summary judgment is available when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. See generally Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The sole cause of action asserted against W&K is for negligence, and, in this diversity action, the Guam law of negligence applies. See generally Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Guam recognizes the ordinary common law elements of negligence:

> Under a cause of action for negligence, an injured party must prove the following elements to prevail: a) that the tortfeasor had a duty to act in a manner that does not place others in an unreasonable risk of harm; b) that duty was breached; c) as a result of that breach it is the cause; d) of harm or damages suffered by a party.

Case 1:04-cv-00027    Document 112    Filed 04/04/2006    Page 5 of 28

Leon Guerrero v. DLB Construction, 1999 Guam 9 ¶ 14.  Thus, if the undisputed facts demonstrate that W&K, as a matter of law, owed no duty of care to Plaintiff Lee, and/or could not have caused harm or damages to him, W&K is entitled to summary judgment in its favor in this matter.  That is precisely the situation, for the reasons set forth herein.

### B. W&K Had No Duty To Plaintiff

"The question of 'duty' is decided by the court, not the jury."  Dueñas v. Outrigger Guam Limited Partnership, Guam Super. Ct. No. CV 1067-03, Decision and Order (Dec. 9, 2005), slip op. at 6 (quoting Ballard v. Uribe, 41 Cal.3d 564, 572 fn.6 (1986)).  "When negligence is based upon a contractual obligation, the scope of duty is determined by the terms of the contract."  Block v. Lohan Associates, Inc., 645 N.E.2d 207, 209 (Ill. App. 1993).  W&K's involvement with the Hotel was by contract with its owner, Manhattan Guam, Inc, and can be divided into two distinct but related phases, each the subject of its own contract -- structural design and structural inspection.  The scope of any duty owed by W&K is therefore defined by the scope of those contracts, and does not reach Plaintiff, whose injuries are unrelated to the structural system, and instead were caused (according to his own allegation) by non-structural, architectural features which W&K did not design and did not inspect, and over the construction of which it had no control.

*1. W&K's Duty Under Its Design Contracts Was Limited To Structural Work.*

W&K first contracted with the Hotel for "completion of the construction documents *for the structural system* of the proposed expansion." See Exhibits 13 and 14, attached to Affidavit of John F. Jones, filed herewith (emphasis added).[1]  In order to

---

[1]     Exhibits 13 and 14 are parallel contracts entered into on the same day between W&K and the Hotel.  Both call for structural design work.  Exhibit 13 was the contract for the design work on the first part of the expansion, and also entailed review work preliminary to the design work ("reviewing the design

understand the scope of W&K's duty under these contracts, it is therefore first necessary to understand the meaning of the term "structural."

"Structural" has a commonly understood meaning in the construction industry:

> In the construction industry, the term "structural" refers to the load-bearing, force-resisting members of a building, i.e., those elements (columns, beam, rebar and the like) that provide support for the weight of the building. Such terms as "structural design," "structural analysis, " "structural system," etc., all refer to these elements of a building.

Affidavit of John F. Jones at ¶ 5. The Guam Board of Registration for Professional Engineers, Architects and Land Surveyors (PEALS) similarly defines "structural engineering" as:

> that branch of professional engineering which deals with the investigation of, the design of, the selection of and construction supervision of *the force resisting and load supporting members of structures such as foundations, walls, columns, slabs, beams, girders, trusses, and similar members*[.]

Guam-PEALS Rules and Regulations § 2.B(10) (emphasis added) (attached as Exhibit A to the Jones Affidavit, filed herewith). See also Council of American Structural Engineers, National Practice Guidelines For the Structural Engineer Of Record (4th ed. 2000) (hereinafter "Guidelines") (attached as Exhibit B to the Jones Affidavit) at 16 (defining "structural system" as "[t]hat portion of a Building which carries and transmits loads, both self-weight and externally applied").

W&K's design contracts, moreover, call for the design of the structural system "*of the proposed expansion.*" See Exhibits 13 and 14. This limits the scope of any structural design work to the structural system *of the building itself* -- i.e., to what is referred to in the Guidelines as the "Primary Structural System," i.e.:

---

of the existing building structure and determining any limitations for the proposed structure"). Exhibit 14 was the contract for the structural design work for an additional story to the Hotel.

> The completed combination of elements which serve to support the Building's self weight, the applicable live load which is based upon the occupancy and use of the spaces, the environmental loads such as wind, seismic and thermal.

Guidelines (Jones Exhibit B) at 15.[2] The structural system of the building would not include what are called "Secondary Structural Elements," defined as follows:

> Structural Elements that are structurally significant for the function they serve *but do not contribute to the strength or stability of the primary structure.*

Id. (emphasis added).[3] Likewise excluded are "Non-Structural Elements," which are defined simply as "[e]lements of a Building that are not Primary or Secondary Structural Elements." Id. at 14.[4] The limitation of W&K's scope of work, and thus scope of duty, to the primary structural system of the building is consistent with ordinary industry practice on Guam, which is as follows:

> When a Structural Engineer is retained to design the "structural system" (or "structural elements") of a building, this is generally understood on Guam to mean *the primary load-bearing, force-resisting parts of the building, such as the floors, walls, columns and beams*, which support the weight of the building and resist lateral forces such as wind and seismic forces.

Affidavit of Harold Dean Gillham, filed herewith, at ¶ 14 (emphasis added). Likewise, the Guidelines themselves provide that the structural engineer of record ("SER") "should be responsible for the design of the Primary Structural System," Guidelines at 2, but that:

> The allocation of responsibility for any Secondary Structural or Non-structural Elements should be discussed with the prime or coordinating

---

[2]    The Guidelines illustrate: "Curtain wall members, non-load-bearing walls or exterior façade, to name a few items, are not part of the Primary Structural System." Id.

[3]    "Examples may include but not be limited to: support beams above the primary roof structure which carry a chiller, *stairs*, elevator support rails and beams, retaining walls independent of the primary Building, and flagpole or light pole foundations." Id. (emphasis added).

[4]    "Items in this category could be exterior curtain walls and cladding, non-bearing partitions, stair railings, etc." Id.

- 5 -

design professional and, where appropriate, included in the SER's contract as a special service. *If the SER has no contractual obligation or design control for an element, then responsibility logically rests with the prime or coordinating design professional.*

Id. (emphasis added). In sum, therefore, W&K's scope of duty under its design contracts was limited to the primary structural system of the building. It thus had no contractual obligation with respect to the design of secondary and non-structural elements, and no duty of care can be imputed to W&K with respect to such elements.

## 2. *The Pool and Its Steps Are Not Primary Structural Elements.*

The swimming pool and its steps *were not part of the primary structural system of the building* that W&K contracted to design. The pool itself was at most a secondary structural element, and the steps of the pool -- the asserted cause of Plaintiffs injury -- were not a structural element at all:

> A swimming pool . . . would be considered a secondary structural element [because] the elimination of the swimming pool would not adversely affect the structural stability of the building. Remove the swimming pool and the building remains intake, with no adverse structural effects on the structural system.

Gillham Affidavit at ¶ 15. See also id. at ¶ 17 ("The placement of pool steps (e.g., recessed or on-recessed) and their color are not structural issues.").

> The pool steps are not part of the primary structural system of a building as defined in the Guidelines, and their design was not within the scope of Winzler & Kelly's contracts. They are not a load-bearing element, and do not contribute to the strength or stability of the structure. The color of the steps and the signs are entirely non-structural. The design of pool steps is an issue exclusively for the discipline of an architect, not a structural engineer.

Jones Affidavit at ¶ 8. Accordingly, the pool and its steps were beyond the scope of W&K's contract, and thus of its duty. The condition of the pool steps, whatever that may have been, cannot be imputed to any breach of duty on the part of W&K.

- 6 -

Plaintiff may object that a pool appears in some of W&K's structural drawings. See, e.g., Exhibit 19 (attached to Jones Affidavit). The pool is there, however, solely to provide a frame of reference for the structural design work, such as placement of columns and beams, the depiction of which is the actual purpose of the drawing. The pool as such is *not* part of the structural design. On the contrary, the size, shape and location of the pool were simply adopted from pre-existing architectural drawings not prepared by W&K. See Gillham Affidavit at ¶ 12 ("Step 4") ("The Structural Engineer uses the architectural drawings for structural design purposes, and typically uses an electronic copy of the Architect's CAD drawings as backgrounds for the structural design drawings for facilitation[.]"). See also Manhattan Guam's Response to W&K Interrogatory No. 2(a) ("The architects, Oscar Coloma and Anthony Robbins designed the pool in terms of shape and appearance. Winzler & Kelly used the design by Coloma and Robbins to prepare the structural design of the pool.").[5]

It should also be noted that Exhibit 19 shows no steps in the pool, although in fact W&K not have noticed, or regarded it as relevant to its work, if the architectural drawings it worked from *had* shown steps leading into the pool. W&K's role was not to design or evaluate either the pool or its steps, but rather to determine how a pool of a pre-determined size, shape and location should best be structurally supported with beams, columns and slab. As already noted, the pool is not a load-bearing member of the building; on the contrary, it is a part of the load that is borne by the structural elements.

---

[5]    See also David Su Deposition Transcript at 83:
       Q: Okay. Now you testified earlier that it was your understanding that Winzler & Kelly was hired to review all drawings. By that, I assume you meant Winzler & Kelly was hired to review drawings in order -- so that it could then make structural designs from those drawings; is that what you meant?
       A: Uh, I will agree, yes.
David Su was deposed as a representative of the owner, Manhattan Guam.

To a structural engineer, therefore, the existence of a pool of a particular size and shape, at a particular location in the building, is a pre-ordained fact, which the structural system has to take into account for structural purposes, but for no others.[6]

Further details of the pool, beyond its mere size, shape and location -- for example, the presence or absence of steps, the color of the paint on the steps or anywhere else in the pool, and the signs posted or not posted around the edges of the pool -- are not relevant to the structural work at all, even as guideposts for the placement of the structural supporting system. There is no difference in the structural work that would need to be done for a pool with steps as opposed to a pool with ladders or a pool with neither steps nor ladders;[7] or a pool with steps painted in contrasting colors as opposed to steps painted all a single color or unpainted steps; or a pool with "No Diving" signs as opposed to a pool with no such signs, or even signs reading "Dive Here!" W&K's structural design work for the Hotel therefore had no relation to the injuries sustained by Plaintiff Lee, and W&K owed no duty to him in its performance of its design contracts.[8]

### 3. W&K's Inspection Work Is Also Limited To Structural Issues.

Since W&K owed no duty to Plaintiff with respect to its design work, it also owed him none with respect to the second phase of its work, namely its special inspection

---

[6]     Similarly, the electrical contractor's job was to determine where to place electrical wires in the building as designed by the architect. The pool appears in his drawings as well -- and in the drawings of the sprinkler system for fire prevention, etc. -- but that does not make the pool a part of the electrical system, or a part of the sprinkler system.

[7]     Plaintiff may object that the weight of the steps would potentially affect the necessary structural support, but that is not the case, as demonstrated in the Gillham Affidavit at ¶ 16.

[8]     See also Gillham Affidavit at ¶ 23:
    The practice of structural or civil engineer does not include selecting the colors or configuration of steps for swimming pools and therefore Winzler & Kelly had no professional duty of care relative to the configuration of the pool, the geometry and location of the pool steps, or to the pool colors including the color of the pool steps.

work. This work was the subject of a second, separate contract,[9] but the scope of that contract derives from, and does not exceed, the scope of the original design work -- viz., the primary structural system of the building. The inspection contract arose as follows:

On March 12, 1998, W&K wrote Manhattan Guam proposing to conduct special inspections. See Exhibit 16 (attached to Jones Affidavit). Manhattan Guam accepted this proposal. See Jones Affidavit at ¶ 10. The letter states in pertinent part as follows:

> Winzler & Kelly is pleased to present this proposal for the Special Inspection on Su Center Hotel Building. The special inspection will follow the requirements of Guam Public Law 22-83 and the Special Inspection Provisions of The 1994 UBC Section 1701. The relevant sections of the code are attached and highlighted for your reference.

Exhibit 16. The reference to both Guam PL 22-83 and Section 1701 of the 1994 Uniform Building Code (UBC) is actually a redundancy, since PL 22-83 simply incorporated into Guam law the requirements of UBC §1701.[10] In substance, therefore, a UBC §1701 special inspection was proposed.

Section 1701 provides that a special inspector shall provide inspections during specific enumerated types of construction -- specifically on "the types of work listed under Section 1701.5" 1994 UBC §1701.1. Section 1701.5 lists fifteen types different of

---

[9]   In fact, it was the fourth separate contract. The design contract, as already noted, was in two parts. W&K also had a third contract to do some civil engineering work at the Hotel, including such work as "site grading," "storm water drainage and disposal," and "sanitary sewer service." See Exhibit 15 (attached to Jones Affidavit). This work, however, did not involve the swimming pool area.

[10]   PL 22-83 used the section numbers of the previous (1991) edition of the UBC as follows:
   [C]ertain types of construction shall have continuous inspection as specified in Sections 305, 306 and 307 of the 1991 edition of the Uniform Building Code promulgated by the International Conference of Building Officials (the "UBC"), which sections are hereby incorporated by reference in the Building Law of Guam.
P.L. 22-83:2 (codified at 21 G.C.A. 66403(d)). Section 306 of the 1991 UBC dealt with special inspections, and was recodified as Section 1701 in the 1994 UBC.
   The numbering and internal order of the sections was rearranged in the course of the recodification, the most noticeable change being that the list of types of work requiring special inspections is moved from the introductory section (306(a)) to a later section of its own (1701.5). However, there are

- 9 -

work, but since W&K, in its attachment, only highlighted the first four of these as being relevant to its proposal, only these four became a part of the contract. See Jones Affidavit at ¶ 10 ("Winzler & Kelly's inspection contract was limited to inspection of the types of work described in those sections of UBC §1701.5 that are circled in the attachment to Exhibit '16' -- i.e., subsections 1 through 4."). The relevant subsections are: 1) Concrete (the taking of test specimens and placing of reinforced concrete); 2) bolts installed in concrete; 3) special moment-resisting concrete frame; and 4) reinforcing steel and prestressing steel tendons. See Exhibit 16 (attachment from UBC). During these four types of work, therefore, W&K would be performing the duties and responsibilities of a special inspector, which, according to the UBC, are as follows:

> The special inspector shall observe the work assigned for conformance with the approved design drawings and specifications.

> The special inspector shall furnish inspection reports to the building official, the engineer or architect of record, and other designated persons. All discrepancies shall be brought to the immediate attention of the contractor for correction, then, if uncorrected, to the proper design authority and to the building official.

> The special inspector shall submit a final signed report stating whether the work requiring special inspection was, to the best of the inspector's knowledge, in conformance with the approved plans and specifications and the applicable workmanship of this code.

1994 UBC §1701.3.

In the context of W&K's role as structural engineer, and its designation of relevant sections of the UBC, W&K's duty to "observe *the work assigned* for conformance with the approved design drawings and specifications" (emphasis added) means a duty to observe the *structural work* for conformance with the approved

---

only minor changes to the substance, none of which is relevant to the issues in this case. (The 1994 code, for example, adds "smoke control system" to the list of types of work requiring special inspection.)

- 10 -

*structural* drawings and specifications -- i.e., the very drawings that W&K had already prepared in the course of its design work. The inspection contract granted W&K no roving brief to observe the electrical work, plumbing work, carpentry work, painting, window and door installation, cleaning, etc., for conformance with the various drawings relevant to such types of work. On the contrary:

> In performing §1701 special inspections ... Winzler & Kelly would not be responsible for ensuring the Royal Orchid Hotel was built in accordance with any approved plans or drawings -- even structural drawings -- other than the structural drawings that Winzler & Kelly themselves had prepared, unless Winzler & Kelly had explicitly agreed otherwise.

Gillham Affidavit at ¶ 19. In particular, W&K was not required to, and did not, observe the pool work for conformance with the pool drawings.[11] This division of responsibility with respect to inspections (as with design) is clearly recognized in the industry. The Guidelines distinguish between the "basic services" of the structural engineer of record (those that ordinarily are part of the structural engineer's duties) and "special services" (those that are not), and "basic services" include observation of "the quality and the progress of the construction work *relative to the Primary Structural System*." Guidelines (Jones Exhibit B) at 7 (emphasis added).[12] Services "related to Secondary Structural Elements and their attachments," by contrast, are called "special services," and include:

---

[11]     Likewise, the duty to prepare a report as to "whether the work requiring special inspection was . . . in conformance with the approved plans and specifications and the applicable workmanship of this code" is a duty to report whether the *structural* work was in conformance with the *structural* plans and specifications, and the code's standard of workmanship as to the construction thereof. It is not a duty to report whether the pool work was in conformance with the pool plans and specifications. Still less is it a duty to report whether the pool work was in conformance with the Guam pool regulations, an issue that relates neither to the plans and specifications, or to the workmanship.

[12]     "Construction Observation" is defined as:
        Site visits during project construction for the purpose of observing or reviewing construction for general conformance with the approved *structural* Contract Documents.

Id. at 13 (emphasis added).

a. Site-work elements not part of the Building Structural System, such as retaining walls, culverts, bridges, etc. Support for landscape furnishing such as flagpoles, lighting poles, benches, fountains, *pools, signs,* etc.

b. *Stairs*.

Id. at 7 (emphasis added). See also Gillham Affidavit at ¶ 9 ("With respect to inspection, each professional inspects his/her work, i.e. ... The Structural Engineer inspects structural elements (size of structural elements, placement of rebar and placement and quality of concrete.").[13] Accordingly, W&K owed no contractual duty to Manhattan Guam to inspect the installation or construction of the pool or its steps, and thus no duty of care to Plaintiff with respect thereto.

## 3. The Parties' Mutual Understanding of Their Contracts Confirms the Limitation To Structural Work.

This definition of the nature and scope of W&K's contractual duties as limited to the primary structural system of the building is confirmed by the fact that it was shared by both parties to the design contracts -- W&K itself and Manhattan Guam. John Jones -- leader of W&K's team on the project -- states:

> Winzler & Kelly's understanding of its contractual duties under Exhibits "13" and "14" was in accord with the meaning of "structural" discussed above, particularly with what the Guidelines term the "primary structural system."

Jones Affidavit at ¶ 6.

> In this contract [Exhibit 16], Winzler & Kelly did not agree to inspect the swimming pool. Winzler & Kelly agreed to inspect the installation of the structural elements of the building for their conformance with the structural drawings that Winzler & Kelly had already prepared (which did not include a design for the pool or its steps), and for workmanship.

---

[13]     See also id. at ¶ 18:
[W]hen a Structural Engineer is commissioned to provide "inspection, observance or special inspection" it is explicitly understood that the Structural Engineer will be inspecting structural elements, not electrical equipment, not mechanical equipment, not plumbing systems and not architectural elements associated with swimming pools or any other part of the building[.]

- 12 -

Id. at ¶ 10. Manhattan Guam's understanding of the specifically *structural* scope of W&K's design and inspection duties was the same as W&K's own. Ronald Su -- who, together with his brother David, directed the expansion project for Manhattan Guam -- described W&K's design work in these terms:

> Q: What design are you referring to when you say that they [W&K] reviewed and approved the design?[14]
>
> A: The structural design.
>
> Q: And when you say structural design with reference to the swimming pool, what are you referring to?
>
> A: How to support the swimming pool, steel, how much steel, how much concrete, the thickness, this and that, but not the shape. The shape is done by the archie, the architect.

Ronald Su Deposition Transcript at 66.[15] He described the inspection work similarly:

> Q: And were the inspections to be in order to make sure that the construction actually went according to those [structural engineering] designs?
>
> A: Yes.
>
> Q: And that's through the entirety of the design that they did not for some isolated portion of that?
>
> A: Minimum structure part only.
>
> Q: I'm sorry?
>
> A: On the structure part of the hotel.
>
> Q: Right.

---

[14] Manhattan Guam had previously answered "Yes" to the interrogatory question, "Did Winzler & Kelly Consulting Engineers [r]eview or approve the design of the Royal Orchid Hotel Swimming Pool?" See Interrogatory Responses, attached to Declaration of Joseph E. Horey, at Interrogatory No. 2(b).

[15] Copies of all deposition transcript pages quoted from herein are attached to the Affidavit of Joseph E. Horey, filed herewith.

A: Not interior part. The Winzler & Kelly is not involved in the interior.

Q: When you say the interior part, what are you referring to?

A: The structure is relating to the concrete and not relating to like the partition of wall, putting up the toilet, putting the flooring tiles, painting the wall, no, they are not doing the inspection of that part but they do an inspection of whatever is involved in pouring the concrete.

Id. at 30-31.

Q: You testified earlier that Winzler & Kelly's job was to make sure the pool was constructed according to the structural designs that were created; is this [Exhibit 19] the design that you had in mind when you made that statement?

A: Yes.

Id. at 142. [16] The parties were thus in agreement that the purpose of these inspections was to determine whether the *structural* work was being accomplished by the contractor in accordance with the *structural* drawings that W&K itself had prepared during the first phase of its involvement in the Hotel project, and in accordance with proper standards of workmanship. They did not extend to non-structural features such as pool steps.

The course of W&K's actual performance of its design contracts further illustrates and confirms their limitation to structural work:

In performing these contracts, we took the architectural plans and did a computerized structural analysis for seismic loads, dead load and critical stresses. We then did a structural design for the columns, beams and rebar to make sure the building as constructed could support and resist those forces and loads.

---

[16]    See also David Su Deposition Transcript at 92:
Q: So Winzler & Kelly then was hired to make sure that the structural components of this project worked?
A: Right.
Q: And that it had structural integrity and wouldn't fall apart?
A: Yes.
Q: And that's what you meant when you testified earlier that your understanding was the Winzler & Kelly was hired to make sure everything was up to Code?
A: Yes.

Jones Affidavit at ¶ 7. The drawings constituting W&K's completed performance of its structural design contracts are attached as Exhibit C to the Jones Affidavit, and also plainly illustrate the structural character of the work.[17] And the performance of the inspection contract likewise bears out the same limited scope. On April 24, 1998, for example, W&K conducted an "inspection of beams at 5th level," and took photos of "deep support beams for swimming pool." See Exhibit 18 (Final Report), attached to Jones Affidavit. On May 18-22, "[i]nspection of the rebar, workmanship and concrete pouring of the 6th level, zone 1 columns, 4th level ramp up, and 5th level swimming pool perimeter beams and slab were conducted." See id. And W&K conducted its inspection of the "5th level swimming pool perimeter beams and slab" on May 25. See id. The descriptions in the final report itself of each day's inspection activities indicate that the scope of the inspections was limited to structural issues.

Finally, the Guidelines' allocation of responsibility for secondary structural elements to the "prime or coordinating design professional" was likewise borne out in practice. Manhattan Guam -- the owner of the project -- identifies "[t]he person or persons who designed The Royal Orchid Hotel Swimming Pool," as the architects, Oscar Coloma and Anthony Robins. Response to W&K Interrogatory No. 1(b).[18] Manhattan Guam further stated that "[t]he stairs in the pool were designed by Oscar Coloma and Anthony Robbins." Interrogatory No. 4, and that Coloma and Robbins "designed how The Royal Orchid Hotel Swimming Pool steps were to be painted," Response to W&K

---

[17] These drawings include the page marked Exhibit 19 (also attached separately to the Jones Affidavit), which is the structural drawing of the pool area.

[18] All Interrogatory responses cited to herein are attached as an exhibit to the Declaration of Joseph E. Horey, filed herewith.

- 15 -

Interrogatory No. 5. It was therefore manifestly the intention of both parties to both contracts that W&K's contractual duties as structural engineer did *not* extend to either the design or the inspection of such design details as the steps of the swimming pool.

### 4. W&K Did Not Control Construction Means or Methods.

Finally, it should be noted that W&K, either as designer or as inspector, had no authority over the means and methods of construction. On the contrary, the structural design contracts explicitly provide that "[c]onstruction phase services are not included," see Exhibits 13 and 14 at Attachment A of each, and that:

> Construction methods, means, techniques, sequences and procedures necessary for coordinating and completing all portions of the PROJECT in accordance with the Contract Documents, and any health or safety precautions required by such construction work, are not the ENGINEER's responsibility.

Exhibit 13 and 14 at paragraph 6 of each. The "General Structural Notes" for the project similarly provide that the engineer will not "be responsible for the Contractor's means, methods, techniques, or sequences." See Document S1.1 (Jones Exhibit C, page 1) (under heading "Notes to Contractor"). Nor was W&K authorized to stop work in the performance of its inspection contract:

> The Structural Construction Observer is not authorized to direct or approve any changes from the contract documents or stop or delay work.

Id. (under heading "Structural Construction Observation"). See also Jones Affidavit at ¶ 13 ("At no time during the construction of the Royal Orchid Hotel expansion project did Winzler & Kelly have the power to stop work in the project.").[19]

---

[19] Ronald Su also testified that he did not recall giving W&K or the architects the power to stop work. Ronald Su Deposition Transcript at 159.

## 5. W&K Owed No Duty Of Care To Plaintiff.

Under these facts, W&K had no duty of care to Plaintiff Lee involving the internal conditions of the pool. A duty of care exists when the defendant "retains control over the operative details of the hired work." Zamudio v. City and County of San Francisco, 82 Cal.Rptr.2d 664, 669 (App. 1999) (internal quotation marks omitted).

> In the absence of direct management over the means and methods of the independent contractor's work or the provision of the equipment which caused the injury, no legal duty is created.

Id. W&K, however, as we have seen, had no control over the contractors' "means and methods" of construction. This lack of duty in the absence of control over the contractor's work exists notwithstanding that the defendant may have the right or even the duty to *inspect* the work. In Zamudio, the plaintiff argued that the defendants inspected the concrete work daily, and thus should have detected the defect in that work that caused his injury. The court disagreed, on the ground that the inspections were (as in this case) for the limited purpose of determining compliance with plans and specifications. Indeed, W&K is even further removed from a duty of care than the defendants in Zamudio, because not only were W&K's inspections for the limited purpose of determining compliance, they were for the even *more* limited purpose of determining compliance with *structural* plans and specifications, which did not include the internal design of the pool.

The limited scope of the duty to inspect was again found determinative in Davis v. Lenox School, 541 N.Y.S.2d 814 (App. Div. 1989), where the court wrote:

> Petrarca [the architect]'s contract with Lenox [the owner] clearly limits his responsibilities to supervision of the construction, and compliance with plans and specifications. He was not to have any control or responsibility "for construction means, methods * * * or for safety precautions and programs in connection with the work, for acts or omissions of the contractor, subcontractor, or any other persons performing any of the work

- 17 -

> \* \* \*." Thus, Petrarca lacked authority to halt the work for unsafe
> conditions or to control or determine on-the-site working conditions,
> which, under Petrarca's contract with R&R, were specifically and
> exclusively the responsibility of R&R. . . . In the absence of any
> contractual right to supervise and control the construction work, as well as
> site safety, Petrarca, as the architect, cannot be held liable in negligence
> for plaintiff's injuries.

Id. at 815 (asterisk ellipses in original). And in Block v. Lohan Associates, Inc., 645

N.E.2d 207 (Ill. App. 1993), the court found the architect to have owed no duty to the

plaintiff, when "[t]he contract documents uniformly and clearly limit Lohan's

responsibility to design and determination as to design conformance[.]" Id. at 222. The

court noted that summary judgment is appropriate "as to a structural engineer retained to

observe the construction site for compliance with plans and specifications and without

authority to direct the manner in which the work was done." Id. at 223 (citing Sasser v.

Alfred Benesch & Co., 576 N.E.2d 303 (Ill. App. 1991)). Again, W&K was even further

from a duty of care with respect to its inspections, which were limited to conformance

with the structural plans, not the pool plans.

Similarly, in Reber v. Chandler High School District 202, 474 P.2d 852 (Ariz.

App. 1970), the court held that "liability for negligent exercise of retained supervisory

powers can attach only where there is a showing that a Duty has been created by the

reservation of the right to exercise day-to-day control over the manner in which the

details of the work are performed." Id. at 854. In order to give rise to a duty, "the

retained supervisory controls must give the defendant control over the Method or manner

of doing the details of the work over and above the supervision and inspection rights

generally reserved to make certain that the Result obtained conform to the specifications

and requirements of the construction contract." Id. (internal punctuation omitted).

- 18 -

Contractual provisions indicating "an intention that the architect have such supervisory controls as are necessary to assure that the results of the contractor's work comply in technical detail with the plans and specifications prepared by the architect" -- which provisions, moreover, are so construed by the parties -- are not only "insufficient to support," but "in fact negate" a "finding that the parties intended that the architect have the obligation or duty to control the contractor or his employees in the method and manner of doing the details of the work." Id. at 855.[20]

Finally, in Herczeg v. Hampton Township Municipal Authority, 766 A.2d 866 (Pa. Super. 2001), a worker was killed when the unshored trench in which he was working collapsed, and the inspecting engineer was sued for negligence. The court upheld the dismissal of the engineer from the case on the ground that he owed no duty to the deceased worker, *even if* the engineer had had *actual knowledge* of the dangerous condition of the trench. It cited with approval the rule:

> that an engineer does not, by reason of his supervisory authority over construction, assume responsibility for the day-to-day methods utilized by the contractor to complete the construction. The engineer's basic duty is to see that his employer gets a finished product which is structurally sound and which conforms to the specifications and standards. Any duty that the engineer may have involving safety procedures of the contractor must have been specifically assumed by the contract or must have arisen by actions outside the contract.

Id. at 872 (quoting Balagna v. Shawnee County, 668 P.2d 157, 163 (Kan. 1983)) (internal punctuation omitted). It found that the engineer did not acquire a duty to conduct safety oversight either under its contract or otherwise:

---

[20] The court noted that the definition of "architect" in another statute, while it did not strictly control, nevertheless was "helpful in determining the originally intended scope of the supervision function." Id. at 857. Likewise, the PEALS and Guidelines' definitions of "structural," and the practice of a structural engineer, are helpful in recognizing the limited scope of W&K's duty in this case.

> To the contrary, under the contract documents, the control of the work . . . fell squarely upon the contractor. Moreover, Bankson [the engineer] was not given the authority to stop the work upon discovery of a safety violation.

Id. at 874. Knowledge, the court found, relates more to the question of whether a defendant's duty of care to the plaintiff was breached -- a question that is never even reached until it is determined that a duty of care existed in the first place. "If someone is under no legal duty to act, it matter not whether that person is actually aware of a dangerous condition." Id. at 874 (citing Restatement (Second) of Torts § 314). Since control of the work in this case was also with the contractor, W&K could not be liable for negligence *even if* it could be shown to have had actual knowledge of the position and color of the pool steps -- which, as demonstrated below, it did not.

## 6. Conclusion

Neither phase of W&K's work, and neither of its contracts, related to the internal design of the pool. W&K thus had no duty of care to Plaintiff or any other user of the pool, except insofar as to ensure that the pool had adequate structural support. If, for example, the supporting concrete slab under the pool had collapsed, causing the pool basin to suddenly drop from the sixth floor to the fifth, injuring Plaintiff in the process, then, in such a case, he could have a viable claim against W&K. That, however, is not what happened. The slab, beams, columns, and all the rest of the supporting structure of the pool remained intact, and, for that matter, are still intact today. W&K's duty did not extend to the entirely different aspects of the pool that Plaintiff claims caused his injury -- the location of the steps, their color, their maintenance, and the lack of signs.

## C. W&K Did Not Cause Plaintiff's Injuries.

"Unless a duty is owed, there is no negligence; therefore there need be no determination of proximate cause unless there is a prior determination of duty." <u>Block v. Lohan Associates, Inc.</u>, 645 N.E.2d 207, 210 (Ill. App. 1993). Even if the court were to examine the issue of proximate cause, however, it could still find no negligence on W&K's part, because no act or omission of W&K in the course of either its design work or its inspection work could possibly have caused Plaintiff's injuries.

This is so because, at the time W&K was doing both its design work and its inspection work, *there was no pool*, or even an agreed final design for a pool. There was only an oval hole -- a pool-shaped hole -- in middle of the sixth floor, and, directly below it, there was a pool-shaped slab of concrete on which the bottom of the pool would rest once the pool was actually installed.

> On September 1, 1998, there was no swimming pool, but instead there was an opening in the 6th floor slab and the structural slab and support beams at the 5th floor to support whatever pool would later be installed.

Jones Affidavit at ¶ 11. The installation of the pool, and all of the detail work entailed therein (steps, paint, etc.), would be done later -- in this case, much later -- long after W&K's involvement in inspecting the pool area had ceased.

W&K produced its final report on the structural work on September 1, 1998. See Exhibit 18. On November 30, 1998, three months later, the pool was still not installed, and the parties were still haggling over the details of its design. Architect Robins wrote to construction manager Delos Reyes: "[W]e cannot complete our work on the pool area at Level 6 until there is a clear direction on the final solution for the as-built condition."

- 21 -

Exhibit 37.[21] Seven months later still, on July 10, 1999, the issues were *still* not resolved, and David Su wrote to Robins to complain about that very fact:

> I am extremely disappointed and frustrated with your company. As of today, we still don't have detail drawings of the following:
>
> 1. pool design
> 2. pool edge design details
> 3. pool stairs
> . . .
>
> [A]s I recall, we had a comprehensive contract, but these above items were not provided as of today.

Exhibit 31. And even as late as the end of November 1999 -- *fifteen months* after the final completion of W&K's structural inspection work -- the architect was still advising the hotel on details regarding the pool steps. See Exhibit 32 (November 18 letter from Neil Paynter to Ronald Su: "Steps must be ADA compliant . . ."); Exhibit 33 (November 26, 1999, letter from Neil Paynter to Ronald Su, giving further advice on the steps, with accompanying drawings). Finally, some time in the "first half of 2000," the pool stairs were completed. David Su Deposition Transcript at 85.

Since the operative internal details of the pool were still being debated and finalized between the owners and the architects for more than a year after W&K's structural work and inspections were complete, nothing that happened during those inspections could have caused Plaintiff's injuries, nor could any of W&K's inspectors even have observed any of the conditions alleged to have caused those injuries. The situation is analogous to that of the defendant designer AES in the recent Guam case of

---

[21]    This and the other exhibits cited in this paragraph are attached to the Affidavit of Joseph E. Horey, filed herewith.

<u>Dueñas v. Outrigger Guam Limited Partnership</u>, Guam Super. Ct. Civ. No. CV 1067-03,

Decision and Order of December 9, 2005. The court in that case wrote:

> Defendant not only complied with applicable statutes, *it was not on notice*
> *regarding any other risk or danger* created by the UBC-compliant wheel
> stops it installed, as the premises were not open to the public while
> Defendant AES was completing the project. *By the time such notice may*
> *have arisen*, that is, by the time hotel employees and patrons encountered
> difficulties with the wheel stops, *Defendant AES no longer possessed the*
> *opportunity to correct or maintain the premises*. Thus, having fulfilled its
> obligations under the law, Defendant AES *could not have properly*
> *anticipated further risk or danger, and could not have been expected to*
> *protect against further risk or remedy a defect where the premises were no*
> *longer in Defendant AES's control.*

<u>Id.</u>, slip op. at 13 (emphasis added). Again, W&K is even further from liability than was

AES, because W&K had not only finished its inspection work by the time any defects in

the pool could have been noticed, it did not design or install the pool in the first place.

## CONCLUSION

Because W&K owed no duty to Plaintiff as a matter of law, and because it could

not have caused his injuries, summary judgment must be entered in favor of W&K.

Respectfully submitted this 4th day of April, 2006.

MAIR MAIR SPADE & THOMPSON
O'CONNOR BERMAN DOTTS & BANES
Attorneys for Defendant Winzler & Kelly


By:_____
    SANDRA E. CRUZ
    ROBERT J. O'CONNOR

- 23 -

# CERTIFICATE OF SERVICE

I, **SANDRA E. CRUZ**, hereby certify that I have caused a copy of the **MEMORANDUM IN SUPPORT OF WINZLER & KELLY'S MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE**, to be served upon the following offices as set forth below:

On April 4, 2006, to:

Patrick F. McTernan, Esq.
Cronin, Fried, Sekiya, Kekina & Fairbanks
841 Bishop Street, Suite 600
Honolulu, Hawaii 96813-3962
Telefax: (808) 536-2073

(by fax)

Jason S. Kim, Esq.
Law Offices of Jason S. Kim
Suite 303, Young's Professional Building
788 N. Marine Drive
Upper Tumon, Guam 96913

(by personal delivery)

*Attorneys for Plaintiff Hun Sang Lee*

G. Patrick Civille, Esq.
Civille & Tang, PLLC
330 Herman Cortez Avenue, Suite 200
Hagåtña, Guam 96910

(by personal delivery)

*Attorneys for Defendant, Cross-Claimant and Cross-Defendant Manhattan Guam, Inc. dba Royal Orchid Hotel*

Michael A. Pangelinan, Esq.
Jennifer Calvo-Quitugua, Esq.
Calvo & Clark, LLP
655 South Marine Corps Drive, Suite 202
Tamuning, Guam 96913

(by personal delivery)

- 24 -

Michael C. Carrolle, Esq.
Harvey J. Lung, Esq.
Bays, Deaver, Lung, Rose & Baba
1099 Alakea St. 16th Floor
Honolulu, Hawaii 96813
Fax No. (808) 533-4184

 (by fax)

*Attorneys for Defendant, Cross-Defendant and Cross-Claimant*
  *Anthony Robins and Associates*

Oscar A. Coloma
O.A. Coloma, P.C.
Suite 35, Paraoceana Business Center
674 Harmon Loop Road
Dededo, Guam 96929

*Pro se*

 (by first class US Mail)

Dated this 4th day of April, 2006.

**SANDRA E. CRUZ**

- 25 -