RANDALL TODD THOMPSON
MAIR, MAIR, SPADE & THOMPSON
Suite 801, Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910
Phone: (671) 472-2089
Fax: (671) 477-5206

ROBERT J. O'CONNOR
O'CONNOR BERMAN DOTTS & BANES
Second Floor, Nauru Building
Susupe, Saipan, CNMI
Mail: PO Box 50-1969 Saipan MP 96950
Phone: (670) 234-5684
Fax: (670) 234-5683

Attorneys for Defendant
Winzler & Kelly Consulting Engineers

**FILED**
DISTRICT COURT OF GUAM

APR 2 6 2006

MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HUN SANG LEE, | ) | Civ. No. CIV 04-00027 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **EXHIBIT 1** |
| | ) | |
| MANHATTAN GUAM, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

    Defendant Winzler & Kelly Consulting Engineers hereby submits "Exhibit 1" to the Affidavit of Robert J. O'Connor, filed herewith.

Respectfully submitted this 26th day of April, 2006.

MAIR MAIR SPADE & THOMPSON
O'CONNOR BERMAN DOTTS & BANES
Counsel for Winzler & Kelly

BY: _____
**SANDRA E. CRUZ**

ORIGINAL

## CERTIFICATE OF SERVICE

I, **SANDRA E. CRUZ**, hereby certify that I have caused a copy of **EXHIBIT 1** to be served upon the following offices as set forth below:

On April 26, 2006, to:

Patrick F. McTernan, Esq.
Cronin, Fried, Sekiya, Kekina & Fairbanks
841 Bishop Street, Suite 600
Honolulu, Hawaii 96813-3962
Telefax: (808) 536-2073

(by fax)

Jason S. Kim, Esq.
Law Offices of Jason S. Kim
Suite 303, Young's Professional Building
788 N. Marine Drive
Upper Tumon, Guam 96913

(by personal delivery)

Attorneys for Plaintiff Hun Sang Lee

G. Patrick Civille, Esq.
Civille & Tang, PLLC
330 Herman Cortez Avenue, Suite 200
Hagåtña, Guam 96910

(by personal delivery)

Attorneys for Defendant, Cross-Claimant and Cross-Defendant
    Manhattan Guam, Inc. dba Royal Orchid Hotel

Michael A. Pangelinan, Esq.
Jennifer Calvo-Quitugua, Esq.
Calvo & Clark, LLP
655 South Marine Corps Drive, Suite 202
Tamuning, Guam 96913

(by personal delivery)

Michael C. Carrolle, Esq.
Harvey J. Lung, Esq.
Bays, Deaver, Lung, Rose & Baba
1099 Alakea St. 16th Floor
Honolulu, Hawaii 96813
Fax No. (808) 533-4184

(by fax)

Attorneys for Defendant, Cross-Defendant and Cross-Claimant
Anthony Robins and Associates

Oscar A. Coloma
O.A. Coloma, P.C.
Suite 35, Paraoceana Business Center
674 Harmon Loop Road
Dededo, Guam 96929

Pro se

(by first class US Mail)

Dated this 26th day of April, 2006.

_____
**SANDRA E. CRUZ**

# EXHIBIT
# 1

**O'CONNOR BERMAN DOTTS & BANES**
**ATTORNEYS AT LAW**
SAIPAN OFFICE

SAIPAN OFFICE
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684
Fax: (670) 234-5683
Email: attorneys@saipan.com

POHNPEI OFFICE
Second Floor, Ace Commercial Bldg.
P.O. Box 1491
Kolonia, Pohnpei, FSM 96941
Telephone: (691) 320-2868
Fax: (691) 320-5450
Email: bermlaw@mail.fm

HONOLULU OFFICE
Suite 2800, Pacific Tower
Bishop Square, 1001 Bishop Street
Honolulu, Hawaii 96813-3580
Telephone: (808) 585-8858
Fax: (808) 599-4198
Email: Mark@Shklovlaw.com

GUAM OFFICE
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Fax: (671) 477-4366
Email: bermlaw@kuentos.guam.net

June 23, 2005

**BY DHL DELIVERY**

L. Richard Fried, Esq., Patrick F. McTernan, Esq.
Cronin, Fried, Sekiya, Kekina & Fairbanks
841 Bishop Street, Suite 600
Honolulu, Hawaii 96813-3962

*Re: Hun Sang Lee v. Royal Orchid Hotel, et al.*

Dear Messrs. Fried and McTernan:

I think our June 30 meeting in Honolulu will be more productive if I outline for you ahead of time the reasons why I believe your client ought to dismiss Winzler & Kelly Consulting Engineers from the above lawsuit.

The attached letter, with its exhibits, explains our position. Most likely this will be your first opportunity to see the attached letters, reports and contracts so I want you to have time to read, analyze and digest them in the context of our lawsuit. Since one of my exhibits is a letter to me on this case from a structural engineer, you might want to consult with your own structural engineer before our meeting to verify that the opinions and conclusions stated in that letter are honest, responsible and fair. Hopefully at our meeting, I can respond to any questions or doubts you might still be left with.

I look forward to our meeting.

Yours truly,

Robert J. O'Connor

2003-11-050623-LTR-Cover-RFriedMcTernan.doc

**SAIPAN OFFICE**
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684
Fax: (670) 234-5683
Email: attorneys@saipan.com

# O'CONNOR BERMAN DOTTS & BANES
**ATTORNEYS AT LAW**
SAIPAN OFFICE

**HONOLULU OFFICE**
Suite 2800, Pacific Tower
Bishop Square, 1001 Bishop Street
Honolulu, Hawaii 96813-3580
Telephone: (808) 585-8858
Fax: (808) 599-4198
Email: Mark@Shklovlaw.com

**POHNPEI OFFICE**
Second Floor, Ace Commercial Bldg.
P.O. Box 1491
Kolonia, Pohnpei, FSM 96941
Telephone: (691) 320-2868
Fax: (691) 320-5450
Email: bermlaw@mail.fm

**GUAM OFFICE**
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Fax: (671) 477-4366
Email: bermlaw@kuentos.guam.net

June 23, 2005

**BY DHL DELIVERY**

L. Richard Fried, Esq., Patrick F. McTernan, Esq.
Cronin, Fried, Sekiya, Kekina & Fairbanks
841 Bishop Street, Suite 600
Honolulu, Hawaii 96813-3962

*Re: Hun Sang Lee v. Royal Orchid Hotel, et al.*

Dear Messrs. Fried and McTernan:

I do not believe that Winzler & Kelly Consulting Engineers ("Winzler & Kelly") is an appropriate defendant in this case for the reasons stated below. I ask that you consider dismissing Winzler & Kelly from this action without the necessity of their filing a motion for summary judgment.

## I. The First Amended Complaint

Your first amended complaint makes the following allegations against Winzler & Kelly:

> 7. Upon information and belief, defendant Winzler & Kelly Consulting Engineers (hereinafter "Winzler & Kelly") participated in construction phase and post-construction phase inspections of the subject pool.
>
> ...
>
> 19. Defendants Robins, Coloma, Phoenix and Winzler & Kelly, and each of them, participated in the design, construction and/or inspection of the subject pool.
>
> 20. Defendants Robins, Coloma, Phoenix, and Winzler & Kelly, and each of then, owed to prospective users of the subject pool a duty to exercise

reasonable care in said Defendants' decisions, recommendations and activities relating to the design, construction and/or inspection of the subject pool.

21. Defendants Robins, Coloma, Phoenix, and Winzler& Kelly, and each of them, were negligent and breached their duty of reasonable care by, among other things:

    a. Allowing the subject pool to be designed, construction and/or maintained with dangerous concrete steps protruding into the swimming pool instead of recessed steps, in violation of Guam's Rule and Regulations relating to public swimming pools; and

    b. Allowing the subject pool to be designed, constructed and/or maintained without the protruding steps being painted a contrasting color, or otherwise containing warnings of the recessed steps' existence, to users of the subject pool; ...

You named Winzler & Kelly as a defendant solely because Manhattan Guam, Inc. identified Winzler & Kelly as a participant in the design and construction of the swimming pool.

Manhattan Guam, Inc. advised you broadly in responses to interrogatories and in its answer to your first amended complaint that Winzler & Kelly "participated in the design and/or construction of the swimming pool that is the subject of this lawsuit" (see Crossclaims of Manhattan Guam, Inc., par. 7 and their answers to interrogatories).

However, in response to Winzler & Kelly's first set of interrogatories, Manhattan Guam, Inc. clarified their allegations by given these answers to interrogatories –

## II. Interrogatories

Interrogatory No. 1

With regard to the swimming pool (hereinafter "The Royal Orchid Hotel Swimming Pool") as described in the first amended complaint in this action please identify:

    a. The contractor that built the Royal Orchid Hotel Swimming Pool.

    **Answer**: Phoenix United.

    b. The person or persons who designed the Royal Orchid Hotel Swimming Pool.

    **Answer**: Oscar Coloma and Anthony Robins.

c. The person or persons who inspected the Royal Orchid Hotel Swimming Pool's design.

**Answer**: Anthony Robins.

Interrogatory No. 4

Who designed the protruding steps in the Royal Orchid Hotel Swimming Pool?

**Answer**: The stairs in the pool were designed by Oscar Coloma and Anthony Robins.

Interrogatory No. 5

Who designed how the Royal Orchid Hotel Swimming Pool steps were to be painted?

**Answer**: Oscar Coloma and Anthony Robins.

Winzler & Kelly's "participation" in the design and construction of the swimming pool was limited to a structural design (Exhibit "A" hereto) which had nothing to do with the pool's stairs, and; special inspections during construction of concrete strength, bolt placement and steel reinforcement, which likewise had nothing to do with the pool's stairs.

### **III. The Contracts**

There are three contracts between Winzler & Kelly and Manhattan Guam, Inc. which are attached to this letter.

(a) Original $58,000 Contract.

The original contract (Exhibit "B" hereto) was for $58,000 and included the following scope of work:

Preliminary Design Phase

The Preliminary Design Phase will consist of reviewing the design of the *existing building* structure and determining any limitations for the proposed structure. We will perform a thorough review of the *original* design calculations, construction documents, and of the actual construction.

Construction Document Phase

This phase of the work will include completion of the construction documents for the *structural system* of the proposed expansion. Included will be connections to the existing structure. We have assumed that the existing structure will not require any retrofit work.

Construction Phase Services

*Construction phase services are not included in this proposal.* Any construction phase services are considered additional services and will be performed at a time and materials basis at our latest billing rates. (Emphasis mine.)

(i) Scope of Work

The scope of work statement above requires contextual interpretation. There was an existing building on site. This project was an expansion of that building into a larger hotel. Thus under the heading "Preliminary Design Phase", Winzler & Kelly was hired to review the design of the existing building structure to see if it was capable of holding up or being incorporated, structurally, into a larger building. This required a thorough review of the existing building's design calculations,[1] the existing building's old construction documents and whether or not the existing building ("actual construction") conformed to those design documents.

Under the heading "Construction Document Phase" it is clear that Winzler & Kelly is being hired to complete the "structural system" documentation which means a structural engineering analysis, as opposed to architectural drawings.

Under the heading, "Construction Phase Services", it is clearly stated that Winzler & Kelly is not being hired for construction management ("Construction phase services are not included in this proposal.").

(b) Second Contract for $7,000

The second contract is to perform the structural analysis required to add one floor to the existing building, (see Exhibit "C" hereto).

---

[1]  Structural engineering mathematical calculations showing what loads the building can bear or resist.

Again, under Attachment A to the contract you will see the "Scope of Work" portion of the contract limited Winzler & Kelly's responsibilities to structural designs for the one floor expansion and it specifically excluded any construction management ("construction phase services") for this expansion.[2]

### (c) Civil Engineering Contract

The civil engineering proposal and related documents are attached as Exhibit "E" to this letter. They show Winzler & Kelly's involvement as civil engineers on the project was limited to grading, drainage, sewage and other similar and typical civil engineer tasks, all of which were unrelated to the design, review or inspection of any swimming pool.

### IV. Special Inspections

As you can see form the attached March 12, 1998 letters from Winzler & Kelly to Manhattan Guam, Inc. and DPW, (Exhibit "F" hereto), Winzler & Kelly's "inspections" of the hotel project were not general "how is everything going?" inspections similar to what a construction manager might do. Winzler & Kelly inspections were "special inspections"[3] as defined and limited by section 1701.5 of the 1994 Uniform Building Code to concrete strength, bolt placement, and steel reinforcement.

### V. Final Inspection Report

Finally I have included as Exhibit "G" to this letter Winzler & Kelly's Final Inspection Report on the entire Royal Orchid Hotel Project (which at the time was called the "Royal Riviera Hotel").

The Final Report makes reference to the pool in the May 25, June 1 and July 8, 1998 weekly reports. In each case the reference is structural.

---

[2]   We attach as Exhibit "D" a May 26, 1997 letter from Winzler & Kelly to Manhattan's architects describing in a narrative the scope of their proposed services. This letter makes it clear that the contract was limited to structural engineering services. Manhattan made counterproposals which limited he scope of these services so that the contract price was reduced from the $101,950 proposed in this letter to $58,000.

[3]   The Final Report, described next, reiterates these inspections were limited (by the 1994 UBC §1701) "special inspections" for structural issues

## Engineer's Duty Is Defined By Its Contractual Obligations

Generally speaking, in an action for negligence, an engineer's duty will be defined by their contractual obligations.[4] More specifically, when a Plaintiff seeks to hold an engineer liable for their designs, the duty owed is strictly limited to those designs that the engineer actually creates, helps create or affixes their seal of approval to.[5] To do otherwise would "go against all settled principles of tort law and considerations of fairness and policy to visit liability upon" the engineer for negligence based upon a failure to do something that they were under no obligation to do.[6] Here, Winzler and Kelly were under no obligation, nor indeed had any control over, the design of the protruding steps in the pool. In fact, the stairs in question do not even appear on their designs.

Furthermore, any duty of an engineer to inspect the implementation of designs is, again, strictly limited by their contractual obligations.[7] Even though "all engineers have a professional obligation to see that the work they do is accurate and in conformance with accepted standards of care" this duty is limited to "the degree of responsibility which the engineer has agreed to undertake."[8] Even when an engineer is responsible "to assure compliance with construction plans an specifications" that engineer will not be liable to a member of the general public for injury unless "the engineer commits an affirmative act of negligence or such liability is clearly imposed by contract."[9] Again, Winzler and Kelly's obligations (and therefore, liability) are strictly limited to the type of supervision that they contracted to undertake. They did not undertake to do any sort of generalized

---

[4] *See Ferentchak v. Village of Frankfort,* 475 N.E.2d 822, 826 (Ill. 1985) (recognizing that even in a tort claim, the degree of duty owed is still based upon the contractual duties assumed) and *Yocum v. City of Minden,* 649 So.2d 129, 132 (La.App. 2 Cir. 1995) (mandating that "the court must consider the express provisions of the contract between the parties" when defining the scope of an engineer's duty (citations omitted)).

[5] *See Carvalho v. Toll Brothers and Developers,* 651 A.2d 492, 458-459 (N.J.Super. 1995).

[6] *Id.* (internal citations omitted).

[7] *See Block v. Lohan,* 645 N.E.2d 207, 216 (Ill.App.3d 1993) (where liability for an engineering firm was strictly limited as their contract "places no duty . . . to supervise construction, means, manners and methods").

[8] *Sykes v. Propane Power Corp.,* 224 N.J.Super. 686, 694 (A.2d 1988) (where an environmental engineer's duty in a tort action were strictly limited to those that he undertook contractually).

[9] *Fecht v. City of New York,* 244 A.D.2d 315 (1997) (where a firm's contract only specified that they were responsible to ensure designs complied with designs and specifications, no duty is imposed for further supervision).

supervision, but rather only were obliged to inspect certain, specific aspects of construction related to structural strength, and entirely unrelated to swimming pool steps.

These contract documents, as more completely explained by the proposals which preceded them or the Final Inspection Report which followed, show that Winzler & Kelly was hired by Manhattan Guam, Inc. only as a civil and structural engineer. In this dual capacity Winzler & Kelly never had any responsibility or authority to design the pool stairs, review or approve the design of the pool stairs or inspect the pool stairs or their architectural design, color or safety considerations. In fact I have concluded from talking to participants in this project that the pool stairs were probably not yet installed by the time Winzler & Kelly concluded its contract work with Manhattan Guam, Inc.

### What Happened

The attached letter to me from Dean Gillham is important for you to review. Mr. Gillham is a structural engineer on Guam with extensive experience, a lot of it involved with Guam hotels. The letter describes the different functions and responsibilities of various engineering disciplines in a hotel project. A major point made in this letter: *architects* design pools. They design pool steps and they select the color the steps will be painted. Structural engineers and civil engineers do not and cannot "review" or "approve" architectural designs.

Winzler & Kelly were hired only as structural engineers and civil engineers. A civil engineer deals with sidewalks, sewage and drainage. A structural engineer calculates forces and loads on the building to make sure it will stand and it will resist seismic forces.

Manhattan Guam, Inc.'s answers to interrogatories confirm that only Oscar Coloma and Anthony Robins, both architects, designed the pool steps and selected the color they were to be painted.

The one design Winzler & Kelly drew related to the swimming pool (Exhibit "A" hereto) is a structural design showing rebar placement and beam placement. It has nothing to do with the placement or color of stairs (the stairs are not even shown in this design)

The bottomline appears to be this:

(Design)
- Winzler & Kelly did a structural design, only, of the swimming pool for the purpose of placing rebar, beams and columns. The design did not include any steps.

(Review)
- Winzler & Kelly as the project civil engineer had no responsibility or ability at all to review or approve the pool's architectural plans or to inspect the pool or the construction of the pool.

(Review)
- Winzler & Kelly as the project structural engineer had no responsibility for, and did not have the qualifications necessary to review or approve the architectural design or the architectural plans for the swimming pool.

(Inspection)
- Winzler & Kelly as the structural engineer performed special inspections of the structure solely to determine if the construction adhered to the approved structural plans. Such an inspection would not have included an inspection of an architectural design for a pool's steps.

Winzler & Kelly should therefore be dismissed from your lawsuit. They did not design the pool's stairs. They had no responsibility to review or approve the architect's design of the stairs. They did not supervise the construction of the stairs. They did not and could not inspect the pool or its stairs for compliance with any safety regulations, but only to determine forces, loads and the placement of rebar and structural supports.

Yours truly,

Robert J. O'Connor

2003-11-050623-LTR-RFriedMcTernan.doc



W&K Job No._____

# W & K CONSULTING ENGINEERS

## STANDARD AUTHORIZATION FOR
## PROFESSIONAL SERVICES

**W & K Office Address**  Suite 904, GCIC Building, 414 West Soledad Ave., Agana, Guam 96910

**Project Description** Su Center Expansion (Hotel, Parking, & Retail Space)

_____ San Vitores Road, Tumon, Guam

**CLIENT** Manhattan Guam

**Address**  720 Pale San Vitores Road, Suite 201, Tumon, Guam

CLIENT hereby requests and authorizes W & K Consulting Engineers (ENGINEER) to perform services as set forth in this agreement.

**SCOPE OF SERVICES** as set forth below or in specified attachment(s).

PER ATTACHMENT A

_____

Terms of **COMPENSATION** as set forth below or in specified attachment(s).

Lump sum of $58,000.  Charges based on percent completion will be invoiced monthly and are due within 30 days.  A charge at the maximum legal rate of interest will be assessed on past due accounts.

In the event collection efforts are necessary to enforce the payment provisions of this Agreement, W & K shall be entitled to collect from the client any judgment or settlement sums, reasonable attorney's fees, court costs and other expenses incurred in connection therewith including, but not limited to, time spent in connection with the collection effort by its employees.

Services covered by this authorization shall be performed in accordance with **PROVISIONS** attached to this Standard Authorization and in the following attachment(s):  NONE

Approved for **CLIENT**  Date _____          Accepted for **ENGINEER**  Date _____

By _____          By _____

Print Name _____          Print Name  Roland S. Miller, P.E.

Title _____          Title   Asia-Pacific Region Manager

SAP.DOC                                                                               REV. 2/15/95

5-5

# PROVISIONS

**1. Authorization to Proceed**
Signing this form shall be construed as authorization by CLIENT for ENGINEER to proceed with the work, unless otherwise provided for in the authorization.

**2. Standard of Care**
The standard of care applicable to ENGINEER's services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.

**3. Subsurface Investigations**
In subsurface investigations, the actual characteristics may vary between successive test points (and between test points and locations other than where investigations have been made). Because of the uncertainties in subsurface evaluations, changed or unanticipated underground conditions may occur and could affect PROJECT cost. The effect of any such changes on total PROJECT costs is not the responsibility of the ENGINEER. ENGINEER makes no warranty, express or implied, that conditions found to exist in one location are to be found at other locations or throughout the PROJECT area.

**4. Ownership of Documents**
All drawings, specifications and other work products of ENGINEER for this PROJECT are instruments of service for this PROJECT only and shall remain the property of ENGINEER whether the PROJECT is completed or not. Reuse of any of the instruments of service of ENGINEER by the CLIENT on extensions of this PROJECT or on any other project without the written permission of ENGINEER shall be at the CLIENT's risk and the CLIENT agrees to defend, indemnify and hold harmless ENGINEER from all claims, damages, and expenses, including in-house costs and attorney's fees, arising out of such unauthorized reuse of ENGINEER's instruments of service by CLIENT or by others acting through CLIENT.

**5. Invoicing and Payments**
All fees and charges will be billed monthly and shall be due at the time of billing unless otherwise specified in this agreement. Fees will include the costs of preparing non-routine invoices prepared at the request of the CLIENT. No deductions shall be made from the ENGINEER'S compensation on account of penalty, liquidated damages, or other circumstances except those for which the ENGINEER has been found to be legally liable.

The CLIENT shall have ten (10) days from the receipt of each billing to notify the ENGINEER, in writing, of perceived inaccuracies, discrepancies or errors. After such time this billing shall be deemed correct and binding on the CLIENT.

The client agrees to pay a monthly late payment interest charge, equivalent to the lesser of one and one-half percent (1½%) per month or the maximum legal rate, applied to any unpaid balances commencing thirty (30) days after the date of the original billing. Payments will be credited first to interest and then to principal.

**6. ENGINEER's Personnel at Construction Site**
The presence of the ENGINEER's personnel at the PROJECT site, whether as onsite representative or otherwise, shall not make the ENGINEER responsible for those duties that belong to the CLIENT, the construction contractors or others; nor does the ENGINEER's presence relieve the construction contractors or others of their obligations, duties and responsibilities. Construction methods, means, techniques, sequences and procedures necessary for coordinating and completing all portions of the PROJECT in accordance with the Contract Documents, and any health or safety precautions required by such construction work, are not the ENGINEER's responsibility.

**7. Opinions of Cost, Financial Considerations, and Schedules**
The ENGINEER makes no warranty, express or implied, that the CLIENT's actual PROJECT costs, financial aspects, economic feasibility or schedules will not vary from the ENGINEER's opinions, analyses, projections, or estimates. When the ENGINEER must prepare quantity and material takeoffs or opinions of cost from plans and specifications that are less than 100 percent complete, the CLIENT will hold the ENGINEER harmless from any and all loss, liability, or claims resulting from the incompleteness.

**8. Construction Progress Payments**
Recommendations by the ENGINEER to the CLIENT for periodic construction progress payments to the construction contractor will be based on the ENGINEER's knowledge, information, and belief (from selective sampling) that the work has progressed to the point indicated. Such recommendations do not represent: that 1) continuous or detailed examinations have been made by the ENGINEER to ascertain that the construction contractor has completed the work in exact accordance with the contract documents; or that 2) the final work will be acceptable in all respects.

**9. ENGINEER's and CLIENT's liability**
ENGINEER's liability for all acts, errors, omissions or negligence, whether active or passive, shall not exceed in the aggregate $100,000 or the fees for this contract, whichever is less, for all injuries or losses stemming from radioactive, hazardous or toxic material, chemical, or condition. ENGINEER's liability for injuries or losses not described above shall not exceed in the aggregate $1,000,000 or the fees for this contract, whichever is less.

CLIENT agrees to defend, indemnify and hold harmless ENGINEER (including its officers, directors, employees, agents, or subcontractors) from any claim, liability or defense cost in excess of the limits set forth above for injuries or losses sustained or alleged by any person or entity (whether a party to this agreement or not) arising out of or related to ENGINEER's performance of services under this agreement.

**10. CLIENT - Furnished Data**
CLIENT will provide to ENGINEER all technical data in CLIENT's possession relating to ENGINEER's services on the PROJECT. ENGINEER will reasonably rely upon the accuracy, timeliness, and completeness of the information provided by CLIENT.

**11. Access to Site**
CLIENT will make the site accessible to ENGINEER as required for ENGINEER's performance.

**12. Advertisements, Permits and Access**
Unless otherwise agreed to in the Scope of Services, CLIENT will obtain, arrange, and pay for all advertisements for bids and approvals from any public or private entity, and access necessary for the ENGINEER's services.

**13. Timely Review and Prompt Notice**
CLIENT will examine ENGINEER's studies, reports, sketches, drawings, specifications, proposals, and other documents; obtain advice of an attorney, insurance counselor, accountant, auditor, and other consultants as CLIENT deems appropriate; and render decisions required of CLIENT in a timely manner. CLIENT will give prompt written notice to ENGINEER whenever CLIENT observes or becomes aware of any development that affects the scope or timing of ENGINEER's services, or any defect in the work of ENGINEER or construction contractor.

**14. CLIENT's Personnel**
CLIENT will be responsible for all acts of CLIENT's personnel.

**15. Contractor Indemnification**
If the Scope of Service calls for ENGINEER to make onsite amendments to plans and specification, then in any contract to complete the work contemplated by the PROJECT, CLIENT agrees to include notice (to the contractor) that the ENGINEER may exercise the CLIENT's authority to make the amendments. In addition CLIENT shall include in any such contract an indemnification provision for ENGINEER's benefit, which shall state as follows:

Contractor will hold harmless, indemnify and defend CLIENT and ENGINEER and their officers, employees, and agents from all claims, losses, damages and injuries, including attorneys' fees and other litigation costs relating to personal injuries or property damages suffered by any person arising out of the work performed by contractor. The contractor will carry comprehensive general liability insurance naming CLIENT and ENGINEER as additional insureds which shall include a contractual liability endorsement providing for the contractor's indemnity of CLIENT and ENGINEER as herein provided.
Contractor will further provide CLIENT and ENGINEER with a certificate of insurance evidencing the coverage herein specified, and evidencing that the insurance shall not be cancelled or amended without first giving twenty (20) days' notice, in writing, to CLIENT and ENGINEER.

**16. Insurance**
ENGINEER will provide CLIENT with evidence of insurance (to include WORKER's COMPENSATION, GENERAL LIABILITY, AUTOMOBILE LIABILITY, and PROFESSIONAL LIABILITY).

CLIENT will provide for a waiver of subrogation as to all CLIENT-carried insurance during construction and thereafter, in favor of ENGINEER (including its officers, employees, agents, and subcontractors); and will require similar waivers from CLIENT's other contractors and their subcontractors.

**17. Litigation Assistance**
Scope of Services does not include the ENGINEER's assistance in litigation undertaken or defended by the CLIENT. All such services requested of the ENGINEER will be paid by CLIENT under ENGINEER's fee schedule then in effect.

In the event of any lawsuit or other claim for breach of contract or other economic damages brought by the CLIENT's contractor or other person in which CLIENT and ENGINEER are jointly named as defendants, or in which the ENGINEER is named as the sole defendant, the CLIENT shall be solely responsible for all litigation expenses, including attorneys' fees, incurred by the ENGINEER in defense of the claim. Notwithstanding the foregoing, CLIENT shall have no such responsibility for litigation expenses where it is determined, in a court of competent jurisdiction, that the ENGINEER is liable to the claimants hereinabove described and where such liability resulted from a breach of ENGINEER's obligations described in this agreement.

**18. Termination**
This agreement may be terminated for convenience on thirty (30) days' written notice, or for cause if either party fails substantially to perform through no fault of the other and does not commence correction of such nonperformance within five (5) days of written notice and diligently complete the correction thereafter. On termination, the ENGINEER will be paid for all authorized work performed up to the termination date plus termination expenses, such as, but not limited to, reassignment of personnel, subcontract termination costs, and related closeout costs.

**19. Assignment**
Neither party may assign all or any part of this agreement without the prior written consent of the other party.

**20. Severability and Survival**
If any of the provisions contained in this agreement are held to be unenforceable, other provisions shall remain in effect and this agreement shall be construed as if unenforceable provisions had never been contained herein.

**21. Entire Agreement**
This agreement, including all attachments and schedules, constitutes the entire agreement between the parties and supersedes all prior written or oral understandings. This agreement may only be changed by a written agreement executed by both parties.

SAPS-PRO
10/2/96

REV.

K-5

ATTACHMENT A

Scope of Work

Preliminary Design Phase

The Preliminary Design Phase will consist of reviewing the design of the existing building structure and determining any limitations for the proposed structure. We will perform a thorough review of the original design calculations, construction documents, and of the actual construction.

Construction Document Phase

This phase of the work will include completion of the construction documents for the structural system of the proposed expansion. Included will be connections to the existing structure. We have assumed that the existing structure will not require any retrofit work.

Construction Phase Services

Construction phase services are not included in this proposal. Any construction phase services are considered additional services and will be performed at a time and materials basis at our latest billing rates.

W&K Job No._____

# W & K CONSULTING ENGINEERS

## STANDARD AUTHORIZATION FOR
## PROFESSIONAL SERVICES

**W & K Office Address**  Suite 904, GCIC Building, 414 West Soledad Ave., Agana, Guam  96910

**Project Description**  Sun Plaza Third Story Addition

San Vitores Road, Tumon, Guam

**CLIENT**  Manhattan Guam

**Address**  720 Pale San Vitores Road, Suite 201, Tumon, Guam

CLIENT hereby requests and authorizes W & K Consulting Engineers (ENGINEER) to perform services as set forth in this agreement.

**SCOPE OF SERVICES** as set forth below or in specified attachment(s).

PER ATTACHMENT A

Terms of **COMPENSATION** as set forth below or in specified attachment(s).

Lump sum of $7,000.  Charges based on percent completion will be invoiced monthly and are due within 30 days. A charge at the maximum legal rate of interest will be assessed on past due accounts.

In the event collection efforts are necessary to enforce the payment provisions of this Agreement, W & K shall be entitled to collect from the client any judgment or settlement sums, reasonable attorney's fees, court costs and other expenses incurred in connection therewith including, but not limited to, time spent in connection with the collection effort by its employees.

Services covered by this authorization shall be performed in accordance with **PROVISIONS** attached to this Standard Authorization and in the following attachment(s):  NONE

Approved for **CLIENT**  Date _____      Accepted for **ENGINEER**  Date _____

By _____      By _____

Print Name _____      Print Name  Roland S. Miller, P.E.

Title _____      Title  Asia-Pacific Region Manager

SAP.DOC                                                  REV. 2/15/95

4-5
½

ATTACHMENT A

Scope of Work

Construction Document Phase

This phase of the work will include completion of the construction documents for the structural system of the proposed expansion. The structure will be an independent structure straddling the existing building. The project will consist of the addition of one floor to the building, with a square footage of approximately 7,000 square feet.

Construction Phase Services

Construction phase services are not included in this proposal. Any construction phase services are considered additional services and will be performed at a time and materials basis at our latest billing rates.

4-5

# WINZLER & KELLY

Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910 USA
Tel: (671) 472-6792, 472-6793
Fax: (671) 477-6229

May 26, 1997

Mr. Dave McVeigh
HNC Architects, Inc.
316 Hernan Cortes, Suite 300
Agana, Guam 96910

Re:  **Su Center Expansion**
     **Structural Engineering Proposal**

Dear Anthony;

Winzler & Kelly Consulting Engineers is pleased to provide this proposal for the structural engineering for the expansion of the Su Center in Tumon. This proposal is based on our knowledge of the project, a review of the construction documents for the current construction, and our conversation regarding the plans for the expansion. There are a few areas of the project that are not clearly defined, so there may be some further modification to this proposal but I believe this will give us a good starting point for moving forward.

## PROJECT DESCRIPTION

The current construction is a two story concrete building structure planned for commercial / retail use. The project combines the retail space with parking at both levels and at the roof. The construction is cast-in-place concrete columns, walls, and beams with precast concrete double tees floors. The lateral system appears to be a combination of concrete shear walls and a concrete moment frame.

**SAIPAN OFFICE:**
Saipan Office Supply Bldg. B
Beach Rd., Garapan
Caller Box PPP 596, Box 10000
Saipan, MP 96950
Tel: (670) 234-0483, 234-5392
Fax: (670) 234-5675

**PALAU OFFICE:**
JR Professional Center
P.O. Box 1704, W105
Meketii, Koror, Palau 96940
Tel/Fax: (680) 488-3738

**CONSULTING ENGINEERS**

2-5

**WINZLER & KELLY**
CONSULTING ENGINEERS

The planned expansion entails adding five floors to the building. The floors will be a combination of hotel units with parking. The planned construction of the floors will be either double tees similar to the existing construction or cast-in-place concrete post-tensioned slabs. We anticipate that the lateral system will be a continuation of the system at the lower floors.

## SCOPE-OF-WORK

The following is our proposed scope-of-work for the structural engineering of the project:

### Preliminary Design Phase

The Preliminary Design Phase shall consist mainly of reviewing the design of the existing building structure and determining any limitations for the proposed expansion. We will perform a thorough review of the original design calculations, construction documents, and of the actual construction. For the proposes of this proposal we have assumed that we will have access to the original structural calculations which will save us considerable time in analyzing the structure.

Also included in the preliminary design phase is attending design meetings and analyzing the various structural framing systems available to determine the most efficient system for the expansion.

### Construction Documents Phase

During the Construction Documents Phase we anticipate performing the structural engineering of the expansion. This work shall include the following design items:

- Perform lateral (earthquake and typhoon) force resisting system analysis, design, and detailing. This shall include the analysis of the existing structural components for the loads transferred from above.
- Design and detailing of the new floor system.
- Design and detailing of the columns and vertical load carrying system.
- Verify the loading into the existing foundation system.
- Design of any stair and elevator cores. Design shall not include pre-manufactured steel stairs.
- Creation of specifications for the structural components in the building.
- Attending design meetings during the CD phase, we have included 60 hours for these meetings.

**WINZLER & KELLY**
CONSULTING ENGINEERS

*Construction Phase Services*

Time for Construction Phase Services includes, meetings during the construction of the project, review of shop drawings for conformance with the design, site visits during the construction, and responding to RFI's.

*Exclusions*

The following items have not been included in this proposal.

- Design of the interior partitions.
- Special Inspection during the construction of the project will be included in a separate proposal to follow.

**COMPENSATION**

The following is summary of our proposed fees per phase. A detailed breakdown of the fees is also attached so that you can see how we arrived at these numbers. We anticipate billing the project monthly on a percent complete basis.

| | |
|---|---|
| Preliminary Design Phase: | $ 11,710 |
| Construction Documents: | $ 72,270 |
| Construction Phase Services: | $ 13,910 |
| | |
| Subtotal | $ 97,900 |
| GRT ( 4.17%) | $  4,080 |
| | |
| **TOTAL PROPOSED FEE** | $ 101,980 |

We hope that this proposal meets your needs. Please give me a call if you should have any questions. Thank you for giving us the opportunity to provide this proposal and we look forward to discussing the project further.

Very Truly Yours;

John F. Jones, S.E.
Project Manager

CONSULTING ENGINEERS

# Fee Proposal

## Su Center Expansion - Structural Design

File Name : sul.fee
Date: 5/25/97

| | | |
|---|---|---|
| Number of Elevated Decks | 5 | EA |
| Elevated Deck Square Footage | 42,000 | SF |
| Slab-on-grade Square Footage | - | SF |
| Total Square Footage | 210,000 | SF |
| | | |
| Estimated Square Foot Costs | $ 70 | SF |
| Estimated Construction Budget | $ 14,700,000 | |

| | |
|---|---|
| Subtotal - Man Hours | $ 97,900.00 |
| GRT @    4.17% | $ 4,082.43 |
| TOTAL FEE | $ 101,982.43 |
| % Construction Cost | 0.69% |

| | $120.00 | $105.00 | $85.00 | $80.00 | $85.00 | $85.00 | $85.00 | $60.00 | $85.00 | $45.00 | $30.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Preliminary Design | | | | | | | | | | | |
| Review Existing Structure | | 16 | | | | | | | 24 | | |
| Columns | | | | | | | | | 16 | | |
| Connections to New Structure | | | | | | | | | 8 | | |
| Calculations | | 24 | | | | | | | | | |
| Lateral Design | | | | | | | | | 40 | | |
| Columns | | | | | | | | | 16 | | |
| Stair \ Elev. Core | | | | | | | | | 16 | | |
| S1.1  General Notes | | | | | | | | | 12 | 12 | |
| S2.1  3rd Floor Framing Plan | | | | | | | | | 24 | 20 | |
| S2.3  Roof Framing Plan | | | | | | | | | 12 | 16 | |
| S4.1  Column Schedule | | | | | | | | | 18 | 16 | |

Page 1

**Fee Proposal**

**Su Center Expansion - Structural Design**

| | | | $120.00 | $105.00 | $85.00 | $60.00 | $85.00 | $65.00 | $85.00 | $85.00 | $45.00 | $30.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | S4.2 | Column / Interface Details | | | | | | | | | | |
| 36 | S5.2 | Wall / Frame Elevations | | | 24 | | | | | | 20 | |
| 38 | S5.4 | Wall / Frame Details | | | 18 | | | | | | 16 | |
| 40 | S6.1 | Typical Floor Framing Details | | | 12 | | | | | | 18 | |
| 42 | S6.3 | Metal Roofs / Precast Cladding | | | 18 | | | | | | 20 | |
| 44 | | Specifications | | 8 | 24 | | | | | | | 32 |
| 48 | | Project Meetings | | | | | | | | | | |
| 50 | | Construction Documents | | | 60 | | | | | | | |
| 54 | | Construction Phase Services | | 24 | | | | | | | | |
| 56 | | Site Visits | | | 30 | | | | | | | |
| 58 | | Misc Items | | | 24 | | | | | | | |




WINZLER & KELLY
CONSULTING ENGINEERS

Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910
(671) 472-6792/3 Fax (671) 477-6229
guam@w-and-k.com
www.w-and-k.com

## FAX TRANSMITTAL

**TO:**     **Robert Delos Reyes**          **FAX NO: 646-3057**
**COMPANY:** **Manhattan Guam**
**FROM:**    Tor Gudmundsen               **DATE: February 9, 1999**

**RE:**      Royale Riviera Hotel          **PAGES: 2**

**JOB #:**    97430803
**Filename:** 02 / su-09.rr1
**CC:**       John Jones

Robert:

We are writing to briefly summarize the status of our work on the civil design for the hotel project.

1.     Design Status

The civil design reached the 90% completion status in May of last year. In May and June 1998 we issued memorandums stressing our concern about the grading for the driveway at San Vitores. The project was put on hold at that time while additional land was acquired at the property east side.

We checked on the status of the land acquisition with you periodically during June – December, 1998, each time it was clarified that the acquisition was pending and the project was on hold.

We received a survey map from you in late December, 1998, and we obtained the electronic file after we met to discuss the civil design status on January 07, 1999. On January 27, we submitted a memorandum to you again stressing that the grading at the front was too steep and suggesting that a concept with steps be considered. We joined you for meetings twice last week to discuss the grading. At this time, we have developed two grading schemes for the front driveway, the second one was submitted to your office last Friday, February 05, and are awaiting approval from the architect prior to completing the design.

This FAX is intended for the use of the individual or entity to whom it is addressed and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any copying, dissemination or distribution of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original FAX to us by mail. Thank you and have any a pleasant day.

FAX TRANSMITTAL
02/09/99
Page 2

2.    Design Services

The additional design services provided at this time, and anticipated through the design completion, involve the following:

- ❑ Addition of the 15' parcel acquired at the property east side
- ❑ Revised concrete ramp dimensions
- ❑ Front driveway grading
- ❑ Deletion of entrance doors at the northeast and northwest building corners
- ❑ Lowered floor elevations for the mechanical (AHU) rooms
- ❑ Relocated genset fuel storage tank
- ❑ Deletion of the taxi parking stalls at the front driveway
- ❑ Other miscellaneous site revisions

Despite providing work that is outside the original scope of services for several of these items, we have proceeded in the spirit of cooperation. At this time, if we receive prompt approval from the architect for the front driveway concept and grading, we can complete the work without charging additional fees. If other design revisions develop, we retain the option to consider charging additional fees at a later time.

Please call if you have any comments or questions.

Si Yu'os Ma'ase,

**WINZLER & KELLY**
**CONSULTING ENGINEERS**                                              *Guam Office*

Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910 USA
Tel: (671) 472-6792, 472-6793
Fax: (671) 477-6229

# FAX MEMORANDUM

TO:          Mr. Ronald Su                              Job No.: P7440001.008
COMPANY:  Manhattan Pacific Corporation                        FAX No:
FROM:      Tor Gudmundsen, P.E.

COPY:        John Jones                                    No. of Pages  2
DATE:        01 November 1997
RE:          **Su Commercial Center**
             **Revised Fee Proposal for Civil Engineering Services**

Dear Mr. Su:

Winzler & Kelly Consulting Engineers is pleased to provide our proposal for engineering
services for the referenced project.

PROJECT DESCRIPTION

The Su Center project includes a multi-story hotel and commercial building in Tumon
Bay. The site is adjacent to San Vitores Boulevard and south of the Pacific Islands
Club Hotel.

SCOPE OF SERVICES

1.    The scope of Civil Engineering services will be as follows:

         a.    Horizontal and Vertical Geometry
         b.    Site Grading
         c.    Storm Water Drainage and Disposal
         d.    Water Service (Including an Underground Storage Tank)
         e.    Sanitary Sewer Service
         f.    Site Retaining Walls - Miscellaneous Site Features

2.    Structural engineering services are provided for the underground tank(s) only.

The work will begin with our review of the concept plans and a site inspection.

We discussed the current TLUC application with Mr. Dave McVeigh at HNC Architects
and understand the basic site and building concept. We also obtained a copy of the
TENTATIVE DEVELOPMENT PLAN / VARIANCE APPLICATION package and reviewed
the Preliminary Infrastructure Analysis, prepared by MS Consultants, dated June 2,
1997. The report indicates that there is sufficient capacity in the utility lines in San
Vitores Boulevard to service the project.

FAX MEMORANDUM
Page 2

The scope of our work is generally to provide the Design Development and
Construction Documents.

FEES

Our fees for the civil design work are $18,750. We have estimated $2,000 for
Construction Phase (civil) Services. The construction phase work will be billed on an
hourly, Time & Materials basis, with the $2,000 limit not to be exceeded with out your
approval.

The structural services for the underground tank totals $3,670.

SCHEDULE

We are prepared to begin this work immediately upon receipt of a Notice to Proceed.
We understand the Architectural and other Engineering design is currently in the design
development phase.

ASSUMPTIONS

1.      The topographic survey in electronic format will be provided by others.

2.      Percolation data for sizing the percolation basins will be provided by others.

3.      The Concept and Schematic design has been approved by the appropriate
        government agencies and we can use the Preliminary Infrastructure Analysis
        information as a basis for continuing with the design development.

4.      The underground storage tank(s) civil design will include the geometry,
        earthwork/grading and water service to the water tank. We assume that the
        piping/plumbing/pumping design from the tank(s) into the building will be
        provided by others.

5.      The horizontal and vertical geometry for the upper level parking areas will be
        provided by others.

We appreciate the opportunity to provide our proposal for these services. We are
prepared to meet to discuss the scope and fees further at your convenience.

Si Yu'os Ma'ase,

# WINZLER & KELLY

Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910 USA
Tel: (671) 472-6792, 472-6793
Fax: (671) 477-6229

March 12, 1998

Mr. David Su
Manhattan Guam
Fountain Plaza Building
720 Pale San Vitores, Suite 201
Tumon, Guam 96911

Re: Special Inspection for Su Center Hotel Building

Dear David;

Winzler & Kelly is pleased to present this proposal for the Special Inspection on Su Center Hotel Building. The special inspection will follow the requirements of Guam Public Law 22-83 and the Special Inspection Provisions of The 1994 UBC Section 1701. The relevant sections of the code are attached and highlighted for your reference. A copy of our letter to send DPW at your request is also attached.

We propose to provide these services on an hourly basis per the attached fee schedule. As you know, construction work is currently continuing in progress 7 days a week. Therefore to comply with the code requirements, we estimate that one of our inspectors will be required to be on site approximately 32 hours/week.

If this proposal meets with your approval, please sign where indicated and return (fax OK). Thank you for allowing W&K to further serve you on this project.

Sincerely;

Bruce Swanney, S.E.
Chief Structural Engineer

accepted _____ for Manhattan Guam
　　　　　　(signed)
name _____ date _____

**SAIPAN OFFICE:**
Saipan Office Supply Bldg. B
Beach Rd., Garapan
Caller Box PPP 596, Box 10000
Saipan, MP 96950
Tel: (670) 234-0483, 234-5392
Fax: (670) 234-5615

**PALAU OFFICE:**
JR Professional Center
P.O. Box 1704, W105
Meketii, Koror, Palau 96940
Tel/Fax: (680) 488-3738

**W&K**
**CONSULTING ENGINEERS**

EXHIBIT "F"

1701-1701.5

1994 UNIFORM BUILDING CODE

# Chapter 17
# STRUCTURAL TESTS AND INSPECTIONS

## SECTION 1701 — SPECIAL INSPECTIONS

**1701.1 General.** In addition to the inspections required by Section 108, the owner or the engineer or architect of record acting as the owner's agent shall employ one or more special inspectors who shall provide inspections during construction on the types of work listed under Section 1701.5.

**EXCEPTION:** The building official may waive the requirement for the employment of a special inspector if the construction is of a minor nature.

**1701.2 Special Inspector.** The special inspector shall be a qualified person who shall demonstrate competence, to the satisfaction of the building official, for inspection of the particular type of construction or operation requiring special inspection.

**1701.3 Duties and Responsibilities of the Special Inspector.** The special inspector shall observe the work assigned for conformance with the approved design drawings and specifications.

The special inspector shall furnish inspection reports to the building official, the engineer or architect of record, and other designated persons. All discrepancies shall be brought to the immediate attention of the contractor for correction, then, if uncorrected, to the proper design authority and to the building official.

The special inspector shall submit a final signed report stating whether the work requiring special inspection was, to the best of the inspector's knowledge, in conformance with the approved plans and specifications and the applicable workmanship provisions of this code.

**1701.4 Standards of Quality.** The standards listed below labeled a "U.B.C. standard" are also listed in Chapter 35, Part II, and are part of this code.

    1. Concrete.

    U.B.C. Standard 19-3, Ready-mixed Concrete

    2. Connections.

    Chapter 22, Division IV, High-strength Bolting

    3. Fireproofing.

    U.B.C. Standard 7-6, Thickness and Density Determination for Spray-applied Fireproofing

**1701.5 Types of Work.** Except as provided in Section 1701.1, the types of work listed below shall be inspected by a special inspector.

    1. **Concrete.** During the taking of test specimens and placing of reinforced concrete. See Item 12 for shotcrete.

    **EXCEPTIONS: 1.** Concrete for foundations conforming to minimum requirements of Table 18-I-D or for Group R, Division 3 or Group M, Division I Occupancies, provided the building official finds that a special hazard does not exist.

    **2.** For foundation concrete, other than cast-in-place drilled piles or caissons, where the structural design is based on an $f'_c$ no greater than 2,500 pounds per square inch (psi) (17.2 MPa).

    **3.** Nonstructural slabs on grade, including prestressed slabs on grade when effective prestress in concrete is less than 150 psi. (1.03 MPa).

    **4.** Site work concrete fully supported on earth and concrete where no special hazard exists.

    2. **Bolts installed in concrete.** Prior to and during the placement of concrete around bolts when stress increases permitted by Footnote 5 of Table 19-E or Section 1925 are utilized.

    3. **Special moment-resisting concrete frame.** As required by Section 1921.9 of this code.



**FIGURE 16-3—NORMALIZED RESPONSE SPECTRA SHAPES**

SPECTRAL ACCELERATION
EFFECTIVE PEAK GROUND ACCELERATION

PERIOD, T
(Seconds)

ROCK AND STIFF SOILS (SOIL TYPE 1)

DEEP COHESIONLESS OR STIFF CLAY SOILS (SOIL TYPE 2)

SOFT TO MEDIUM CLAYS AND SANDS (SOIL TYPE 3)

EXCEPTION: The special inspections may be limited to an initial inspection to check the deck surface and placement of reinforcing. The special inspector shall supervise the preparation of compression test specimens during this initial inspection.

10. **Spray-applied fireproofing.** As required by U.B.C. Standard 7-6.

11. **Piling, drilled piers and caissons.** During driving and testing of piles and construction of cast-in-place drilled piles or caissons. See Items 1 and 4 for concrete and reinforcing steel inspection.

12. **Shotcrete.** During the taking of test specimens and placing of all shotcrete as required by Sections 1922.10 and 1922.11.

EXCEPTION: Shotcrete work fully supported on earth, minor repairs and when, in the opinion of the building official, no special hazard exists.

13. **Special grading, excavation and filling.** During earth-work excavations, grading and filling operations inspection to satisfy requirements of Chapter 18 and Appendix Chapter 33 of this code.

14. **Smoke-control system.**

14.1 During erection of ductwork and prior to concealment for the purposes of leakage test testing and recording of device location.

14.2 Prior to occupancy and after sufficient completion for the purposes of pressure differ-ence testing, flow measurements, and detection and control verification.

15. **Special cases.** Work which, in the opinion of the building official, involves unusual hazards or conditions.

**1701.6 Continuous and Periodic Special Inspection.**

**1701.6.1 Continuous special inspection.** Continuous special inspection means that the special inspector is on the site at all times observing the work requiring special inspection.

**1701.6.2 Periodic special inspection.** Some inspections may be made on a periodic basis and sat-isfy the requirements of continuous inspection, provided this periodic scheduled inspection is per-formed as outlined in the project plans and specifications and approved by the building official.

**1701.7 Approved Fabricators.** Special inspections required by this section and elsewhere in this code are not required where the work is done on the premises of a fabricator registered and approved by the building official to perform such work without special inspection. The certificate of registra-tion shall be subject to revocation by the building official if it is found that any work done pursuant to the approval is in violation of this code. The approved fabricator shall submit a certificate of com-pliance that the work was performed in accordance with the approved plans and specifications to the building official and to the engineer or architect of record. The approved fabricator's qualifica-tions shall be contingent on compliance with the following:

1. The fabricator has developed and submitted a detailed fabrication procedural manual reflect-ing key quality control procedures which will provide a basis for inspection control of workman-ship and the fabricator plant.

2. Verification of the fabricator's quality control capabilities, plant and personnel as outlined in the fabrication procedural manual shall be by an approved inspection or quality control agency.

3. Periodic plant inspections shall be conducted by an approved inspection or quality control agency to monitor the effectiveness of the quality control program.

4. It shall be the responsibility of the inspection or quality control agency to notify the approving authority in writing of any change to the procedural manual. Any fabricator approval may be re-voked for just cause. Reapproval of the fabricator shall be contingent on compliance with quality control procedures during the past year.

**SECTION 1702 — STRUCTURAL OBSERVATION**

Structural observation shall be provided in Seismic Zone 3 or 4 when one of the following condi-tions exists:

---

**4. Reinforcing steel and prestressing steel tendons.**

4.1 During all stressing and grouting of tendons in prestressed concrete.

4.2 During placing of reinforcing steel and prestressing tendons for all concrete required to have special inspection by Item 1.

EXCEPTION: The special inspector need not be present continuously during placing of reinforcing steel and prestressing tendons, provided the special inspector has inspected for conformance with the approved plans prior to the closing of forms or the delivery of concrete to the jobsite.

**5. Structural welding.**

5.1 **General.** During the welding of any member or connection which is designed to resist loads and forces required by this code.

EXCEPTIONS: 1. Welding done in an approved fabricator's shop in accordance with Section 1701.7.

2. The special inspector need not be continuously present during welding of the following items, provided the materials, qualifications of welding procedures and welders are verified prior to the start of work, periodic inspections are made of work in progress, and a visual inspection of all welds is made prior to completion or prior to shipment of shop welding:

2.1 Single-pass fillet welds not exceeding $^5/_{16}$ inch (7.9 mm) in size.

2.2 Floor and roof deck welding.

2.3 Welded studs when used for structural diaphragm or composite systems.

2.4 Welded sheet steel for cold-formed steel framing members such as studs and joists.

2.5 Welding of stairs and railing systems.

5.2 **Special moment-resisting steel frames.** During the welding of special moment-resist-ing steel frames. In addition to Item 5.1 requirements above, nondestructive testing as required by Section 1703 of this code.

5.3 **Welding of reinforcing steel.** During the welding of reinforcing steel.

EXCEPTION: The special inspector need not be continuously present during the welding of ASTM A 706 reinforcing steel not larger than No. 5 bars used for embedments, provided the materials, qualifications of welding procedures and welders are verified prior to the start of work, periodic inspections are made of work in progress, and a visual inspection of all welds is made prior to completion or prior to shipment of shop weld-ing.

**6. High-strength bolting.** As required by Chapter 22, Division IV. Such inspections may be per-formed on a periodic basis in accordance with the requirements of Section 1701.6.

**7. Structural masonry.**

7.1 For masonry, other than fully grouted open-end hollow-unit masonry, during preparation and taking of any required prisms or test specimens, placing of all masonry units, place-ment of reinforcement, inspection of grout space, immediately prior to closing of clean-outs, and during all grouting operations.

EXCEPTION: For hollow-unit masonry where the $f'_m$ is no more than 1,500 psi (10.34 MPa) for concrete units or 2,600 psi (17.93 MPa) for clay units, special inspection may be performed as required for fully grouted open-end hollow-unit masonry specified in Item 7.2 below.

7.2 For fully grouted open-end and hollow-unit masonry during preparation and taking of any required prisms or test specimens, at the start of laying units, after the placement of rein-forcing steel, grout space prior to each grouting operation, and during all grouting opera-tions.

EXCEPTION: Special inspection as required in Items 7.1 and 7.2 above need not be provided when design stresses have been adjusted as specified in Chapter 21 to permit noncontinuous inspection.

**8. Reinforced gypsum concrete.** When cast-in-place Class B gypsum concrete is being mixed and placed.

**9. Insulating concrete fill.** During the application of insulating concrete fill when used as part of a structural system.

1. The structure is defined in Table 16-K as Occupancy Category I, II, or III, or

2. The structure is required to comply with Section 403, or

3. When so designated by the architect or engineer of record, or

4. When such observation is specifically required by the building official.

The owner shall employ the engineer or architect responsible for the structural design, or another engineer or architect designated by the engineer or architect responsible for the structural design, to perform structural observation as defined in Section 220. Observed deficiencies shall be reported in writing to the owner's representative, special inspector, contractor and the building official. The structural observer shall submit to the building official a written statement that the site visits have been made and identifying any reported deficiencies which, to the best of the structural observer's knowledge, have not been resolved.

## SECTION 1703 — NONDESTRUCTIVE TESTING

In Seismic Zones 3 and 4, welded connections between the primary members of special moment-resisting frames shall be tested by nondestructive methods for compliance with approved standards and job specifications. This testing shall be a part of the special inspection requirements of Section 1701.5. A program for this testing shall be established by the person responsible for structural design and as shown on plans and specifications.

At a minimum, this program shall include the following:

All complete penetration groove welds contained in joints and splices shall be tested 100 percent either by ultrasonic testing or by radiography.

EXCEPTION: When approved, the nondestructive testing rate for an individual welder or welding operator may be reduced to 25 percent, provided the reject rate is demonstrated to be 5 percent or less of the welds tested for the welder or welding operator. A sampling of at least 40 completed welds for a job shall be made for such reduction evaluation. Reject rate is defined as the number of welds containing rejectable defects divided by the number of welds completed. For evaluating the reject rate of continuous welds over 3 feet (914 mm) in length where the effective throat thickness is 1 inch (25.4 mm) or less, each 12-inch increment (305 mm) or fraction thereof shall be considered as one weld. For evaluating the reject rate on continuous welds over 3 feet (914 mm) in length where the effective throat thickness is greater than 1 inch (25.4 mm), each 6 inches (152 mm) of length or fraction thereof shall be considered one weld.

For complete penetration groove welds on materials less than $^5/_{16}$ inch (7.9 mm) thick, nondestructive testing is not required; for this welding, continuous inspection is required.

When approved by the building official and outlined in the project plans and specifications, the nondestructive ultrasonic testing may be performed in place of an approved fabricator utilizing qualified test techniques in the employment of the fabricator.

Partial penetration groove welds when used in column splices shall be tested either by ultrasonic testing or radiography when required by the plans and specifications. For partial penetration groove welds when used in column splices, with an effective throat less than $^3/_4$ inch (19.1 mm), nondestructive testing is not required; for this welding, continuous inspection is required.

Base metal thicker than $1^1/_2$ inches (38.1 mm), when subjected to through-thickness weld shrinkage strains, shall be ultrasonically inspected for discontinuities directly behind such welds after joint completion.

Any material discontinuities shall be accepted or rejected on the basis of the defect rating in accordance with the (larger reflector) criteria of approved national standards.

## SECTION 1704 — PREFABRICATED CONSTRUCTION

### 1704.1 General.

1704.1.1 Purpose. The purpose of this section is to regulate materials and establish methods of safe construction where any structure or portion thereof is wholly or partially prefabricated.

1704.1.2 Scope. Unless otherwise specifically stated in this section, all prefabricated construction and all materials used therein shall conform to all the requirements of this code. (See Section 104.2.8.)

1704.1.3 Definition.

PREFABRICATED ASSEMBLY is a structural unit, the integral parts of which have been built up or assembled prior to incorporation in the building.

1704.2 Tests of Materials. Every approval of a material not specifically mentioned in this code shall incorporate as a proviso, the kind and number of tests to be made during prefabrication.

1704.3 Tests of Assemblies. The building official may require special tests to be made on assemblies to determine their durability and weather resistance.

1704.4 Connections. See Section 1612.1 for design requirements of connections for prefabricated assemblies.

1704.5 Pipes and Conduits. See Section 1612.2 for design requirements for removal of materials for pipes, conduit and other equipment.

1704.6 Certificate and Inspection.

1704.6.1 Materials. Materials and the assembly thereof shall be inspected to determine compliance with this code. Every material shall be graded, marked or labeled where required elsewhere in this code.

1704.6.2 Certificate. A certificate of approval shall be furnished with every prefabricated assembly, except where the assembly is readily accessible to inspection at the site. The certificate of approval shall certify that the assembly in question has been inspected and meets all the requirements of this code. When mechanical equipment is installed so that it cannot be inspected at the site, the certificate of approval shall certify that such equipment complies with the laws applying thereto in this code.

1704.6.3 Certifying agency. To be acceptable under this code, every certificate of approval shall be made by an approved agency.

1704.6.4 Field erection. Placement of prefabricated assemblies at the building site shall be inspected by the building official to determine compliance with this code.

1704.6.5 Continuous inspection. If continuous inspection is required for certain materials while construction takes place on the site, it shall also be required where the same materials are used in prefabricated construction.

EXCEPTION: Continuous inspection will not be required during prefabrication if the approved agency certifies to the construction and furnishes evidence of compliance.

Case 3:06-cv-00050-   Document 131-2   Filed 04/26/2006   Page 38 of ... 4

# WINZLER & KELLY

**Suite 904, GCIC Building**
**414 West Soledad Avenue**
**Agana, Guam 96910 USA**
**Tel: (671) 472-6792, 472-6793**
**Fax: (671) 477-6229**

March 12, 1998

Mr. Ed Borja, Chief Inspector
Administrator - One Stop
DPW, Building Permit Division
One Stop Permit Center
Anigua, Guam

Re: Special Inspections for Su Center Hotel Building,
    Building Permit Application No. B97001591

Dear Mr. Borja,

Winzler & Kelly has been hired by Manhattan Guam to do the Special Inspections, as per Guam Public Law 22-83 and Special Inspection Provision of the 1994 UBC Section 1701, on Su Center Hotel Building.

We have designated Richard Chien, Arnold Sioco, and Patrick Taitano as the special inspectors for this project. Inspection reports will be submitted to Department of Public Works, the Owner, and the Architect of Record.

This document is submitted as a pre-requisite prior to issuance of the Building Permit.

Very truly yours;

*Bruce Swanney*

Bruce Swanney, S.E.
Chief Structural Engineer

**WK**
**CONSULTING ENGINEERS**

**SAIPAN OFFICE:**
Saipan Office Supply Bldg. B
Beach Rd., Garapan
Caller Box PPP 596, Box 10000
Saipan, MP 96950
Tel: (670) 234-0483, 234-5392
Fax: (670) 234-5615

**PALAU OFFICE:**
JR Professional Center
P.O. Box 1704, W105
Meketii, Koror, Palau 96940
Tel/Fax: (680) 488-3738

W&K CONSULTING ENGINEERS, a CORPORATION, dba

# WINZLER & KELLY, CONSULTING ENGINEERS

## POLICIES & PRACTICES REGARDING
## CONTRACTS, INSURANCE, AND FEES

TO OUR CLIENTS:

### Professional Services by Winzler & Kelly Staff

Fees for services are based on actual time expended by our personnel, or by pre-negotiated lump-sum contracts.

### Other Direct Project Costs

In addition to charging for Professional Services (our employee time), we also charge you for subconsultants, out-of-pocket costs, and costs of maintaining certain in-house service capabilities. If we pay subconsultants, or other outside vendors on your behalf, we charge you our cost plus a 15% markup.

For recovering our costs of maintaining in-house service capability, we charge a rate per employee hour. This method is less costly than, and in place of, a method which would charge on an itemized basis. We charge $4.00 per employee hour for the labor-saving equipment we utilize, such as computers and reproduction systems. For land surveying time, we charge $7.00 per hour to recover our costs of the consumable supplies, small equipment and company vehicles applied to this type of activity. For environmental services we charge $6.50 per hour for small equipment, supplies, and protective gear. And lastly, we charge an hourly charge when highly specialized equipment is applied, based on hours the equipment is actually used.

### Compensation

It is our policy to obtain a retainer in advance of starting work. Requirement of a retainer may be waived for clients with whom we have worked before, and who have a history of prompt payment.

Our billing system produces an invoice for you once each month. Payment is due upon receipt, and delinquent after 30 days. Past due amounts are subject to a finance charge. Attorneys' fees or other costs incurred by us for collection efforts will be billed to you. Specialized invoice preparation at your request may result in extra charges to you.

We reserve the right to stop working on any project for which invoices are sixty days past due. In the event we do stop work, we may require payment of a start-up charge prior to resuming work.

### Insurance

We carry Worker's Compensation Insurance, Public Liability Insurance, and Professional Liability Insurance. Winzler & Kelly's liability for error, omission or negligence shall be limited to some mutually acceptable amount which fairly reflects our respective opportunities for profit or loss, to be negotiated with you.

### Contracts

Any deviation from our standard policies and practices regarding these matters must be stipulated in written agreement.

We revise our standard hourly rates annually as a matter of policy. We reserve the right to revise fees whenever circumstances necessitate. This statement was prepared in July, 1997.

# FEE SCHEDULE

## WINZLER & KELLY CONSULTING ENGINEERS

### Effective July 1997

### <u>Hourly Rates</u> [1]

| | |
|---|---|
| Principal | $120 |
| Project Manager | 105 |
| Project Engineer | 95 |
| Senior Engineer | 90 |
| Staff Engineer | 75 |
| Junior Engineer | 60 |
| Senior Technician/Designer | 50 |
| Technician | 40 |
| Senior CADD Drafter | 45 |
| CADD Drafter | 40 |
| Clerical Support | 35 |

[1]    A surcharge to our rates is added for forensic-related services. Gross Receipts Tax of 4% will be added to all invoices.

### <u>Out-of-Pocket Project Expenditures by Winzler & Kelly</u>

Actual cost plus 15%.

### <u>Miscellaneous In-House Services</u>

The cost of using equipment and specialized supplies is billed on the basis of employee hours dedicated to projects. This method is less costly, but less precise, than billing on the basis of "units of service." We strive to maintain fair and competitive rates, designed to recover our investment in these items which bring increased efficiency to employee labor. Instead of billing one rate with no regard to the types of projects, we have opted to apply four separate rates, such that only those projects utilizing certain types of equipment are charged. Our rates are:

| | | |
|---|---|---|
| A. | Office consumables | $4.00/hr |
| B. | Environmental Department consumables | $6.50/hr |
| C. | Survey consumables | $5.00/hr |
| D. | Environmental and Land Surveying equipment | Various at market rate |



# ROYAL RIVIERA HOTEL SPECIAL INSPECTION FINAL REPORT

**CLIENT:**      MANHATTAN GUAM
720 Pale San Vitores Road
Suite 201, Tumon, Guam 96911

**CONSULTANT:**      WINZLER & KELLY
Suite 904, GCIC Building
414 West Soledad Avenue
Agana, Guam 96910

**DATE:**      SEPTEMBER, 1998

EXHIBIT "G"

September 1, 1998

Mr. Ed Borja, Chief Inspector
Administrator – One Stop
Department of Public Works, Building Permit Division
One Stop Permit Center
Agana, Guam

RE:     **Special Inspection Final Report for Royal Riviera Hotel, Tumon, Guam**

Dear Mr. Borja,

Special inspection of the Royal Riviera Hotel began in March 1998 in conformance with Guam Public Law 22-83 and the Special Inspection provisions of the 1994 Uniform Building Code (UBC), Section 1701.

Patrick Taitano and Richard Chien of Winzler and Kelly, performed special inspections from March 1998 to August 1998 under my direction. The inspections included verifying the dimensions, quantities, and quality of construction specified on the plans correspond with the subcontractor's work and with the constructed structure. Daily inspections of construction discrepancies as well as reparations to correct discrepancies are itemized in the attached inspection reports. Pictures of the site and of addressed items are attached for the records. Also attached are concrete test results, structural drawings, bonded post-tensioned floor system information, and post-tensioned floor shop drawings.

The completed structure, following the inspection and the revisions arranged as per the inspection, conform to the completed design drawings and workmanship standards outlined in Guam Public Law 22-83 and the 1994 UBC.

Sincerely,

John F. Jones, S.E.
Asia-Pacific Region Manager

# TABLE OF CONTENTS

**A. DAILY/WEEKLY INSPECTION REPORTS**
**(REP - 001 TO REP – 026)**
**(SLAB CONCRETE POURING SCHEDULE)**

**B. PHOTOS**

**C. CONCRETE COMPRESSION TEST RESULTS**

**D. STRUCTURAL DRAWINGS**

**E. BONDED POST-TENSIONED FLOOR SYSTEM**
**MATERIAL TEST CERTIFICATES AND**
**SYSTEM INFORMATION**

**F. POST-TENSIONED FLOOR TENDON &**
**REINFORCEMENT SHOP DRAWINGS**

# A. DAILY/WEEKLY INSPECTION REPORTS
## (REP - 001 TO REP – 026)
## (SLAB CONCRETE POURING SCHEDULE)

SPECIAL INSPECTOR DAILY REPORT

**REP-001**

City of TUMON, GUAM             for (dated)     3/17/98

Project Name/Address:        Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                      [   ] Continuous                  [ X ] Periodic

Time Beginning Inspection:       8:45 AM            Time Ending Inspection: 12:00 PM

**Describe Inspections Made, Including Locations:** Inspection of the reinforcing steel was made to the beams of special moment-resisting concrete frame supporting the fourth (4th) floor. The beams that were inspected were limited to building lines 2, 3, 4, and up to but not including building line 5. See diagram-1, dated 3/17/98. The extent of the inspection included the following:

- Size & quantity of continuous rebar.
- Size, length and quantity of additional rebar, both sides of beam.
- Spacing of shear ties.
- Quantity of closed ties at column-beam joints.
- Anchored length of rebar at end-columns.
- Length of top/bottom splices.

**List Tests Made:**       None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1) Confinement Steel at grid intersections C2, C3, B4, F3 and F4, required additional #4 rebar at 6" o.c. Contractor began corrections immediately.
2) Additional top steel at beam F2-F3, required 10'-0" length, actual length was 9'-8". (Also, bottom splice length, required 4'-4", actual was 4'-0".)
3) Additional top steel at beams E2-E3, E3-E4, and D3-D4 require 10'-0" length, actual length was 9'-10". Contractor instructed by (R.C.) engineer that 2" variance was okay. No corrections were made.
4) Top splice length at beam D4-D5 requires 5'-8" length, actual 5'-7". No corrections were made.
5) Additional top steel at beam E4-D4, required 12'-9" length, actual length was 12'-0". Contractor made correction immediately, correction was re-inspected and found okay.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**      In general, the most common discrepancy was the top additional steel lengths. In most cases, the discrepancy was approximately 1" to 2". Contractor was briefed, concerning the sort of items that we were looking for in the inspection of beams.

The Contractor was also briefed concerning splice bends. For future construction, the 1 to 6 slope bend for splice purposes shall be on the main rebar which are further away from columns.

Also note, that at the time of inspection, all the column-beam joints were missing one closed tie. Contractor had the ties prepared, but they were not placed. Before the concrete pour the closed ties should be checked.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _(signature)_                       Date:    3/17/98

Print Full Name:   PATRICK TAITANO          I.D. Number:

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-002**

City of  TUMON, GUAM                                            for (dated)        March 25, 1998

Project Name/Address:              Su Center Building
                                                    San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                            [   ] Continuous                        [  X ] Periodic

Time Beginning Inspection:      2:30 PM                  Time Ending Inspection:  5:30 PM

**Describe Inspections Made, Including Locations:**  Inspection of 4th level, zone 1 rebar, confinement steel, tendons and workmanship.

**List Tests Made:**          None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1.  There were discrepancies with our drawings from VSL and what we saw in on the job site, concerning the tendons. The VSL foreman informed us that there were changes. To avoid this problem, we request that VSL issue revised drawings to W&K along with issuing the drawings to the job site.

2.  There were horizontal curves in a few of the tendons, this was discussed with the VSL foreman who informed us that there was a shift in the mechanical opening and that the shift conflicted with the tendon. This problem will be corrected by adding additional rebar around the opening.

3.  There were several locations were the intermost #4 ties were not touching the tendon anchor as called for in the drawings. These areas were corrected immediately.

4.  There were still some perimeter #9 rebar that were missing. The drawings called out 2-#9's continuous around the perimeter. We were informed that this would be done before the concrete pouring Thursday night (3/26).

5.  Under the direction of R.C. (W&K) #4 ties were placed at the live anchor ends in the North-West corner of the building.

6.  There was no reinforcing at the dead end tendons on the east side. We were informed that this work was not completed yet.

7.  The anchor end tendons on the east side of the building conflict with the 8-#9's in the C-1 columns. The anchors caused the two middle #9's to be bent. The solution to this problem was discussed in a meeting with Mark (VSL). Two additional epoxy grouted #9's would be added. The contractor was notified immediately to make changes. In the future, it was agreed that VSL would use two-2strand tendons through the columns to avoid having to bend the #9 column rebar.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**       This inspection is leading up to the first concrete pour. We have expected that there will be a learning curve established, however, there appeared to be many problems with the workmanship. In general, it does not seem that the site will be prepared before the concrete pour is scheduled.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _Patrick L. Taitano_                                                  Date: ___3/25/98___

Print Full Name:  _PATRICK    TAITANO_                          I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-003**

City of TUMON, GUAM                    for (dated)    3/26/98

Project Name/Address:        Su Center Building
                             San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                             [   ] Continuous              [ X ] Periodic

Time Beginning Inspection:   6:30 PM        Time Ending Inspection:  6:00 AM

**Describe Inspections Made, Including Locations:**  4th level, zone-1 concrete pouring.

**List Tests Made:**        Concrete samples were made, note that we expect higher strengths because of the use of plasticizer admixture to the cement batch.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

- 12-#5's top rebar at end column and beam joints were not placed in five locations. Rebar was immediately corrected.

- Experienced 4000 psi concrete flow into column-beam joint at gridline C3. The column-beam joint should be controlled. We experienced flow problems throughout the earlier part of the evening. We had better results controlling the flow and pouring of the 6000psi and 4000psi concrete, when using slump 2 or 3 for the 6000psi.

- On the east side, near line (3H), the 7-#5's were not centered on columns as called out on the drawings. This was corrected before the concrete pour.

- Under the direction of R.C. (W&K), the 6-#6 rebars on the east side, between grid (1) & (2) at grid (I), were extended to reach the columns.

- There was not enough rebar at column (3G), the drawings called out 14-#8's and 18-#5's.

- We experienced some discrepancies due to the late issue of the post-tensioning drawings. These drawings contained additional reinforcement. To aid our inspection, and to ensure that we are inspecting the latest design, we request that VSL issue an electronic drawing to W&K when they deliver any revised drawings to the job site. This will ensure that W&K has the latest revised plan with which to inspect.

- Under the direction of R.C. (W&K), two additional #9's were placed in the C-1 columns on the east side of the building. This was because the initial #9's, were placed in the wrong location. The initial-additional #9's were placed as a solution to the post-tensioning anchors running directly between the columns. This was discussed in the meeting with Mark (VSL) on Wednesday March 25, 5:00pm.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**      We experienced some difficulty with the 1st concrete pour. One of the pipes broke down and we had communication problems with the concrete strengths. The contractor had extreme difficulty placing the 6000 and 4000 strength concrete. It appeared that there were instances were a possible cold-joint was formed due to the breakdown of the pumps.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____        Date: _3/24/98_

Print Full Name: _PATRICK A TAITANO_                I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-004**

City of  TUMON, GUAM                                    for (dated)        3/27/98

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                               [   ] Continuous              [ X ] Periodic

Time Beginning Inspection:        7:00 PM          Time Ending Inspection:  5:00 AM

**Describe Inspections Made, Including Locations:**  Inspection of 4th level, zone-2 pouring of concrete slab and beams.

**List Tests Made:**          None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1.  Under the direction of R.C. (W&K) the over-spill of concrete at the construction joint from Zone I into Zone II, into the beams shall have an epoxy coat applied.  Also, 6000psi concrete will be poured at the construction joint.

2.  Winzler & Kelly will come up with a continuous numbering system for the columns, beams for convenience.

3.  Suggest that before the concrete pouring, that the pipes be inspected for hardened concrete.  If clogged, the pipes should be cleaned prior to the concrete pour, and the concrete deposits should be removed from the area of pour.  The deposits should in no circumstances be place in the beam forms.

4.  Interior column (D5), under direction of R.C. (W&K), revised rebar location.  Drawings called for 12-#9's centered on column, modified to slide more of the rebar opposite the beam face.

5.  Column (B4), corrected from 9-#6's each way to 13-#6's and 18-#6's. Drawings showed 18-#6's.

6.  Suggest that top rebar be supported by riser chairs to ensure that the top rebar is not deformed as it gets further away from the column.

7.  As discovered on Thursday's pour, when changing from 4000psi to 6000psi concrete, verify that operator cleans out the 4000psi concrete before placing 6000psi into beam-column joints.

8.  When using two pumps to pour concrete, suggest that there are two foremen assigned to each pump to monitor both crews. We caught some crew members just dumping left over concrete into the beam column joints.  This was done when moving pipes.   Also suggest that there be a pre-concrete pour educational meeting for the crew to establish better quality control. Items to be discussed should follow those suggested in this and previous memorandums.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**      This was the second pour, however we did experience many of the same problems.  It seems that the contractor in some cases does not comprehend the structural importance of the 6000 strength concrete and the importance of avoiding cold joints.  For the sole purpose of ease, the contractor has argued to pour all 6000 strength concrete at once. Although, pouring all 6000 strength at once would cut down the confusion, this is not a possible solution.  The formation of cold joints would definitely jeopardize the structural integrity of the beam-column joints and column capitals.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____        Date: ___3/27/98___

Print Full Name:   PATRICK A. TAITANO _____        I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-005**

City of  TUMON, GUAM _____    for (dated) _____ 4/1/98 _____

Project Name/Address:      Su Center Building
                              San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                   [    ] Continuous               [ X ] Periodic

Time Beginning Inspection:     11:00 AM        Time Ending Inspection:  2:00 PM

**Describe Inspections Made, Including Locations:**  Inspection of 4th level, zone-1 columns.

**List Tests Made:**      None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

1. It was apparent that the ductile column at grid (E2) was plastered over, possibly to fill voids that may have formed during the concrete pour. Since the ductile column is a very critical component in the structural system of the building, a portion of the plaster was chipped out, under the direction of Richard Chien. It was verified that there were voids. As directed by R.C. the voids are to be filled with non-shrinkage cement. This was told directly to the contractor.

2. In the event that this situation would occur again, the contractor should notify Winzler & Kelly prior to plastering the voids. W&K could then prescribe the necessary repairs.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _Timothy L. Tautano_ _____ Date: ____ 4/1/98 _____

Print Full Name: _PATRICK  A .  TAITANO_ _____ I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-006**
City of TUMON, GUAM

for (dated) 4/7/98

Project Name/Address:    Su Center Building
                         San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous                    [ X ] Periodic

Time Beginning Inspection: 12:30 PM          Time Ending Inspection: 3:00 PM

**Describe Inspections Made, Including Locations:** Inspection of the reinforcing steel were made to the beams of special moment-resisting concrete frame supporting the fourth (5th) floor. The beams that were inspected were limited to building lines 2 and 3. The extent of the inspection included the following:

- Size & quantity of continuous rebar.
- Size, length and quantity of additional rebar, both sides of beam.
- Spacing of shear ties.
- Quantity of closed ties at column-beam joints.
- Anchored length of rebar at end-columns.
- Length of top/bottom splices.

**List Tests Made:** None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1) Add diagonal reinforcing at the sleeve locations in the beam.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

In general, the workmanship for the beams inspected were much improved from the previous level beams. At the time of inspection they were still placing the confinement steel at Col-23 (C2).

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____    Date: 4/7/98
Print Full Name: PATRICK R. TAITANO    I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-007**
City of TUMON, GUAM                                    for (dated)   4/10/98

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                               [    ] Continuous              [  X  ] Periodic

Time Beginning Inspection:  3:00 PM              Time Ending Inspection:  7:00 PM

**Describe Inspections Made, Including Locations**:  A pre-concrete pouring inspection was made to Zone I, level 5.  The extent of the inspection included the following:

- Location, quantity and height of post-tensioning tendons.
- Top and bottom rebar, as specified on VSL drawings for Level 5.
- Workmanship of rebar placing (i.e. chair risers, support)

**List Tests Made**:  None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items**:

1.  Many bottom reinforcing steel was in contact with the plywood formwork.

2.  Diagonal reinforcing was added around the pipe sleeves running through the beams as required from previous report.

**List Changes to Approved Plans Authorized by Architect or Engineer**:

1.  The VSL drawings showed live end anchors at the NE corner of the building for (6) tendons (no. 111 to 116).  The contractor had placed dead end anchors.

2.  Also the VSL drawings showed tendons (no. 182 and 1110) terminating with a dead end anchor somewhere at middle of the building.  This was not the case in the field.  The tendons were spanned across the full length of the building, with live end anchors on both sides.

3.  The VSL drawings showed a shovel at tendon (no. 109).  Instead it was replaces with a dead end anchor.

**Comments:**

This inspection, was made approximately 12 hours prior to the scheduled concrete pour.  At the time of the inspection, the site was about 75% complete.  There was a significant amount of work that still needed to be done before the concrete pour would be allowed.  This included top and bottom rebar that was not placed, bottom rebar that was in contact with the concrete forms.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____          Date: ___4/10/98___
Print Full Name:_____PATRICK  TAITANO_____   I.D. Number:_____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-008**

City of TUMON, GUAM _____ for (dated) 4/11/98 _____

Project Name/Address:     Su Center Building
                          San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous              [ X ] Periodic

Time Beginning Inspection: 7:00 AM          Time Ending Inspection: 6:00 PM

**Describe Inspections Made, Including Locations:**  A pre-concrete pouring inspection and the witnessing of the concrete pour was made to zone I, level 5.

**List Tests Made:** None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

1. Many bottom rebar were still touching the plywood formwork. The contractor was told to install concrete spacers at all locations discovered, immediately.
2. There was not adequate cover for the tendons (no. 119 to 150) at the beam crossings. This was discovered at the same time the concrete was being poured. This was brought to the attention of the contractor immediately. The contractor was instructed to place concrete spacers on the beams to raise the plywood level at least 1" above the tendon sheath.
3. Column-27, top rebar was corrected. The contractor was instructed to change the #8's to be the topmost bars as called out in the drawing. This was corrected immediately.
4. The plywood that the contractor was using to control the slab thickness was found to be shorter than what was called out for in the drawings. The northwest corner of the building was discovered to be about 1" short of the required 9-1/2 inches. The contractor was notified and made corrections.

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

The concrete pour began at 7:15 AM. The condition of the workmanship seemed to be the biggest issue. There were many instances were the bottom steel was in contact with the plywood sheathing. The contractor should adequately support the bottom steel with concrete spacers.

Due to the delayed arrival of concrete from the supplier, there were a few locations that came questionably close to forming cold joints. As I monitored the arrival of concrete, there were several spans of elapsed time (30-50 minutes), where no concrete was being poured. I suggest that the Owner talk with the supplier prior to the concrete pour, to ensure that the supplier has an adequate supply of cement. Hopefully, this will eliminate this problem in the future.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _Patrick L. Taitano_ _____ Date: _4/11/98_

Print Full Name: _PATRICK TAITANO_          I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

## SPECIAL INSPECTOR DAILY REPORT

**REP-009**

City of TUMON, GUAM                    for (dated)  4/13/98

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous                    [ X ] Periodic

Time Beginning Inspection:  3:45 PM          Time Ending Inspection:  5:00 PM

**Describe Inspections Made, Including Locations:**  Inspection of the columns located in zone I, level 5.

- Size & quantity of vertical rebar.
- Location and Spacing of closed/cross ties.
- Length splices.

**List Tests Made:**  None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

At the time of the inspection, some columns already had the forms closed.  Those that were checked all appeared to comply with the drawings.  Columns (19,21 and 22) were not complete.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____  Date: __4/13/98__

Print Full Name: _PATRICK TAITANO_              I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-010**
City of TUMON, GUAM _____ for (dated) 4/17/98 _____

Project Name/Address:      Su Center Building
                           San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous              [ X ] Periodic

Time Beginning Inspection: 2:15 PM _____     Time Ending Inspection: 6:00 PM _____

**Describe Inspections Made, Including Locations:** Inspection of the repair of column no. 16 (E2), level 4.

- Chipping and cleaning column voids.
- Application of Epoxy
- Non-shrinkage cement grout

List Tests Made: None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

The column voids were chipped and found to be mostly sand and very little cement. The column was cleaned with a vacuum and air compressor before the epoxy was applied. I witnessed the application of the epoxy and the placing of the forms around the column base. A total of 10 bags of non-shrinkage cement were used to grout into the column base. The contractor had difficulty operating the grouting machine. The 10 bags were not enough to fill up the column base. This posed a problem, as suppliers were already closed for business. Two additional bags were bought and grouted into the column base.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _Patrick A. Taitano_ _____ Date: 4/17/98 _____
Print Full Name: PATRICK TAITANO _____ I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR DAILY REPORT

**REP-011**

City of TUMON, GUAM_____　　for (dated)　4/18/98_____

Project Name/Address:　　　　Su Center Building
　　　　　　　　　　　　　　　San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

　　　　　　　　　　　　[　] Continuous　　　　　　[ X ] Periodic

Time Beginning Inspection:　10:45 AM_____　Time Ending Inspection:　11:45 AM_____

**Describe Inspections Made, Including Locations:**　Inspection of the column 16 (E2), level 4.

- Opening forms.

**List Tests Made:**　None.

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

At the time of the inspection, the form work for column 16, level 4 was removed. A (1" to 3") ridge had formed around the top of the grouted area. Mr. Li (Phoenix Foreman) was informed to apply epoxy before plastering with non-shrinkage cement.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed:_____　Date:　___4/18/98___

Print Full Name:　_PATRICK TAITANO_____　I.D. Number:_____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-012**

City of  TUMON, GUAM

Project Name/Address:  Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**  Inspection of 4th level, zone 3 steel rebar and post-tensioning system and inspection of beams at 5th level.

**List Tests Made:**          Concrete samples were taken of concrete on 4/25.

**Total Inspection Time Each Day:**

| Date  | 4/20 | 4/21 | 4/22 | 4/23 | 4/24 | 4/25 | 4/26 |
|-------|------|------|------|------|------|------|------|
| Hours | 2    | 2    | 2    |      | 1.5  | 5    |      |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
1.  Missing rebar at column no. 54 (F6A).
2.  Spacers at bottom rebar @ SE corner of building.
3.  5–#5's top reinforcing missing SE corner – edge of slab (see note on drawings 37-#'5s).

We required that epoxy be applied at the construction joint before concrete was poured.  The epoxy had to be reapplied in some areas because the epoxy was already dried when the concrete pouring began in those areas.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
1.  Changes as noted on fax received from Mark Geoghegan (VSL), dated April 20, 1998.  See attached fax.
2.  Additional tendons were added and modified as noted on attached drawing.

The post tensioning system had changed as directed by VSL.  These changes were not shown on the drawing plans that I was using during my inspection.  The changes were verified by Juan (VSL foreman).

**Comments:**  4/20: At the time of the inspection, many reinforcing were still missing.  The contractor was also still placing a few of the post-tension tendons.  Although there was still a fair amount of work to be done, it is reasonable that the site will be ready for concrete pouring Tuesday evening.

4/21: Much work has been completed.  Aside from the few items that are listed above, the site is generally well prepared.  I do not foresee a problem being able to pour concrete this evening.  A general house-keeping sweep should be made prior to the placing of 2x4's to control slab height.

Again, we are having problems with the workmanship.  There should be more concrete spacers to support the bottom rebar.  Also, the epoxy should be applied in short segments and there should be only a short elapsed time from the time the epoxy is applied and the time the concrete is poured in that particular area.  This would prevent the epoxy from drying up.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____  Date: _____4/27/98_____
Print Full Name:  _PATRICK A. TAITANO_____  I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-013**

City of TUMON, GUAM

Project Name/Address: Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[ ] Continuous    [ X ] Periodic

**Describe Inspections Made, Including Locations:** Inspection of 5th level beams, confinement steel, post-tensioning system, reinforcing bars and workmanship were conducted. The pre-concrete pouring inspection was made for 5th level, zone-2 and water tank slab.

**List Tests Made:** Concrete samples were taken during the concrete pour on 5/2. Three samples were taken of the 6000 psi concrete and four samples of the 4000 psi concrete.

**Total Inspection Time Each Day:**

| Date | 4/27 | 4/28 | 4/29 | 4/30 | 5/1 | 5/2 | 5/3 |
|------|------|------|------|------|-----|-----|-----|
| Hours | 4 | 4 | 2 | 6 | 8 | 6.5 | |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**
There were many changes to the design of the water tank. These changes were not reflected on the drawings, however they were noted on documents faxed to Manhattan Guam.

**Comments:** The workmanship of the slab appeared to be better this time around. There was additional bottom rebar that was being used. This was at the owner's request.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____ Date: 5/4/98
Print Full Name: PATRICK TAITANO    I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

# SPECIAL INSPECTOR WEEKLY REPORT

**REP-014**

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                                San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous                    [ .X ] Periodic

**Describe Inspections Made, Including Locations:**  Inspection of 5th level, zone-2 columns prior to, during and after concrete pouring.  Inspection of 6th level, zone-1 beams and forms were conducted.  Inspection of water tank columns and walls.

**List Tests Made:**

**Total Inspection Time Each Day:**

| Date  | 5/4 | 5/5 | 5/6 | 5/7 | 5/8 | 5/9 | 5/10 |
|-------|-----|-----|-----|-----|-----|-----|------|
| Hours |     | 6   | 4   | 2   | 8   | 2   |      |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
Contractor was told to pour concrete grout (cement and water only) into the column forms prior to pouring concrete into the column forms.

**List Changes to Approved Plans Authorized by Architect or Engineer:**          None

**Comments:**     Contractor should not use concrete from the pump that was spilled on the deck as grout.  On one occasion I witnessed the contractor shoveling concrete that was pump out into the same bucket that was used for grout.  This was told to the contractor and should not happen again.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings. specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _Patrick I. Taitano_                                          Date: _5/11/98_

Print Full Name: _PATRICK  TAITANO_                        I.D. Number:

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-015**

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon. Guam
Inspection Type(s)/Coverage:

                               [   ] Continuous              [ X ] Periodic

**Describe Inspections Made, Including Locations:**  Inspection of the 6th level, zone-1.  Inspection included reinforcing of beams, bottom reinforcing, post-tensioning tendons and anchors, reinforcing at openings and beam-column joints, general workmanship and concrete pouring.

**List Tests Made:**          Concrete samples were made during the pouring of the 6th level, zone-1.

**Total Inspection Time Each Day:**

| Date  | 5/11 | 5/12 | 5/13 | 5/14 | 5/15 | 5/16 | 5/17 |
|-------|------|------|------|------|------|------|------|
| Hours | 4    | 16   | 6    | 4    |      |      |      |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
There were some concrete spacers that still needed to be placed.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
The reinforcing at the beams and beam column joints around the special moment resisting frame was changed.  These changes were not shown on the latest drawings.  For instance the #6's at 9" O.C. were changed to #5's at 6" O.C.  and the #5's at 12" were changed to #5's at 8" O.C.

**Comments:**      In general, the workmanship was better.  However, a concern that seems to come up when pouring the slab is the clearance above the tendons.  At places where the tendons cross above the beams there needs to be at least 1 inch of concrete cover above the tendon sleeves.  This is important because when the tendons are stressed there could be damage to the slab if there is not sufficient cover.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____   Date: ____5/18/98____
Print Full Name:  PATRICK  TAITANO                  I.D. Number:_____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-016**

City of  TUMON, GUAM

Project Name/Address:  Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**

Inspection of the rebar, workmanship and concrete pouring of the 6th level, zone 1 columns, 4th level ramp up, and 5th level swimming pool perimeter beams and slab were conducted.

**List Tests Made:**

**Total Inspection Time Each Day:**

| Date | 5/18 | 5/19 | 5/20 | 5/21 | 5/22 | 5/23 | 5/24 |
|------|------|------|------|------|------|------|------|
| Hours | 2 | 8 | 8 | 4 | 4 | | |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**
The ramp reinforcing design was changed, the owner ran out of #6 rebar and decided to use #5's at closer spacing. This was approved by R.C. (W&K).

**Comments:**  During the concrete pouring of the columns on the 6th level. The pump had broke down. There were no more available pumps from Perez Bros. This posed a problem because one of the Special Moment Resisting Columns (E3) was only 1/3 completed. I talked w/ R.C. (W&K) about this problem. It was decided that if the pumping resumed within several hours then the contractor would need to add grout before completing the remaining 2/3[rds] and maintain good vibrating throughout the pour.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _~Patrick Taitano~_  Date: _5/25/98_
Print Full Name: _PATRICK TAITANO_  I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

REP-017

City of TUMON, GUAM

Project Name/Address:     Su Center Building
San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous           [ X ] Periodic

**Describe Inspections Made, Including Locations:** Inspection of 4th level beams and columns, particularly looking at discovered cracks and chipped columns. Also, inspected the reinforcing of beams at the construction joint at 4th level for concrete pouring scheduled for 5/28.
5/28: Inspection of concrete pouring for construction joint on 4th level.
5/29: Inspection of 1st level column chipping.
5/30: Inspection of 5th level, zone 3 reinforcing and post-tensioning tendons.
5/31: Inspection of 5th level, zone 3 concrete pouring.

**List Tests Made:**
3 sets of concrete samples were made for the 5th level, zone 3 pour on 5/31. The last sample taken was of a particularly watery batch of concrete.

**Total Inspection Time Each Day:**

| Date | 5/25 | 5/26 | 5/27 | 5/28 | 5/29 | 5/30 | 5/31 |
|------|------|------|------|------|------|------|------|
| Hours | | | 3 | 6 | 4 | 2 | 8 |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
Column (F2) shows signs of sand and loose particles at the column base. This situation is similar to the sand and loose particles found at column (E2). The repair requirement is the same as that of (E2), chipping of all loose particle and sand, vacuum cleaning, epoxy applications and non-shrinkage grout.

Column (F4) has cracks at top of column at the corners. This situation as described by Mr. Lee (Phoenix) is due to damages caused when removing nails and forms. Richard requires repair with non-shrinkage grout.

Beam from D4 to E4 has exposed rebar. The contractor thinks it is a #4 tie that accidentally fell in the beam and was not removed prior to pouring.

Crack at ramp from 3rd to 4th, on 4th level slab. Richard requires repair with epoxy injection.

During the concrete pour (5/31), the last batch of concrete at PT-3 was very watery. A sample was taken to ensure the strength. The contractor hand-tossed 2 bags of cement and manually mixed with the batch concrete manually with rakes.

**List Changes to Approved Plans Authorized by Architect or Engineer:** Richard issued the drawings for the swimming pool gutter and concrete column retrofit details for the missing column ties on the first three levels.

**Comments:** When looking at the workmanship at the construction joint at 4th level, there is some dried concrete at the beam column joints. Richard has required that Phoenix apply epoxy on the exposed concrete surface and at areas where there is dried concrete prior to pouring new concrete.
During the concrete pour on 5/28, the 14"x30" beam at SE corner of building had it's forms give way and a big section of concrete started to spill onto the lower level floor. The contractor stopped the flow of concrete, provided extra shoring to keep the forms closed. They re-vibrated the concrete and then poured more concrete into the beam. When the forms are removed, the beam should be checked for voids, all loose cement should be chipped and plastered over. Should check with Richard to see if non-shrink grout is necessary.
Also, the contractor forgot to follow the instructions from Richard regarding the concrete column. Contractor was told by Richard to apply epoxy onto the existing concrete surface of the 30"x30" column. Contractor did not apply epoxy on the surface facing the east of the building.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____ Date: 6/1/93
Print Full Name: PATRICK TAITANO    I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-018**

City of   TUMON, GUAM

Project Name/Address:          Su Center Building
                                 San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous                    [ X ] Periodic

**Describe Inspections Made, Including Locations:**   Inspection of the columns 5th level, zone 3 columns, which included vertical rebar and horizontal ties was conducted. Inspection of the beams on the 7th level was conducted. Inspection of the 6th level, zone 2 beams was conducted. Inspection of the forms, rebar, tendons, workmanship and the concrete pour for the 6th level, zone 2 was conducted.

**List Tests Made:**          Concrete samples were made of the concrete pouring of the 6th level, zone 2 on 6/6.

**Total Inspection Time Each Day:**

| Date | 6/1 | 6/2 | 6/3 | 6/4 | 6/5 | 6/6 | 6/7 |
|------|-----|-----|-----|-----|-----|-----|-----|
| Hours | 4 | 8 | 4 | 2 | 4 | 4 | 4 |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**      Richard had asked VSL to provide additional rebar for the cantilevered slab near the swimming pool prior to the concrete slab pouring of the 6th level, zone 2.

**Comments:**

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____             Date: 6/8/98

Print Full Name: _PATRICK TAITANO_           I.D. Number

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

## SPECIAL INSPECTOR WEEKLY REPORT

**REP-019**

City of   TUMON, GUAM

Project Name/Address:          Su Center Building
                                     San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

                           [   ] Continuous                    [ X ] Periodic

**Describe Inspections Made, Including Locations:**

1)       Inspection of the columns 6th level, zone 2 columns, which included vertical rebar and horizontal ties was conducted.
2)       Inspection of the beams on the 7th level was conducted.
3)       Inspection of the 6th level, zone 2 beams was conducted.
4)       Inspection of the forms, rebar, tendons, workmanship and the concrete pour for the 6th level, zone 3 was conducted.

**List Tests Made:**         Concrete samples were made of the concrete pouring of the 6th level, zone 3 on 6/13.

**Total Inspection Time Each Day:**

| Date | 6/8 | 6/9 | 6/10 | 6/11 | 6/12 | 6/13 | 6/14 |
|------|-----|-----|------|------|------|------|------|
| Hours | X | X | 2 | 2 | 4 | 8 | X |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**



**List Changes to Approved Plans Authorized by Architect or Engineer:**



**Comments:**       The chipping of the concrete columns on the ground floor are approximately 90% complete.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _Robert L. Foster_                                 Date: _6/16/98_

Print Full Name: _PATRICK TAITANO_                      I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-020**

City of  TUMON, GUAM

Project Name/Address:       Su Center Building
                            San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

[   ] Continuous              [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)      Inspection of beams on 7th level, zone 1.
2)      Inspection of columns at 6th level, zone 3.

**List Tests Made:**

**Total Inspection Time Each Day:**

| Date  | 6/15 | 6/16 | 6/17 | 6/18 | 6/19 | 6/20 | 6/21 |
|-------|------|------|------|------|------|------|------|
| Hours | X    | X    | 2    | 4    | X    | 4    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**       Manhattan Guam has commented that their supply of #9 rebar is running low, it has been discussed with R.C. of (W&K), that the use of an approximately equal area of #11 rebar is okay.

**Comments:**

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____.           Date: ___6/23/98____
Print Full Name:    PATRICK  TATTANO                   I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-021**

City of  TUMON, GUAM

Project Name/Address:        Su Center Building
                             San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:
                    [    ] Continuous              [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)    Inspection of 7th level zone-1 prior to and during concrete pouring.  Inspection included beam rebar size and
      number, slab reinforcing, column and beam joints and workmanship.
2)    Concrete pour of wall footing (6/23)

**List Tests Made:**       Concrete samples were taken on Wednesday (6/24) during the concrete pouring, the samples were
taken in accordance with Code per every 150 cubic yards.

**Total Inspection Time Each Day:**

| Date | 6/22 | 6/23 | 6/24 | 6/25 | 6/26 | 6/27 | 6/28 |
|------|------|------|------|------|------|------|------|
| Hours | 2 | 2 | 8 | X | X | X | X |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**


**List Changes to Approved Plans Authorized by Architect or Engineer:**
Under the approval of the engineer the equivalent area of #5's, #6's or #8's were substituted for #9's called out in the
drawings.  The substitution occurred at the perimeter slab rebar, the shallow beams from line 1 to line 2, and other various
areas.

**Comments:**       The concrete pouring ran fairly smoothly, the use of three pumps definitely was a plus.  However, the
supply of concrete to the site once again was the bottleneck in the process.  The approximate volume of the concrete pour
(6/24) was 800+ cubic yards.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings,
specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____ Date: _____6/30/98_____
Print Full Name: _____PATRICK  TAITANO_____ I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

SPECIAL INSPECTOR WEEKLY REPORT

**REP-022**

City of  TUMON, GUAM

Project Name/Address:                Su Center Building
                                     San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                        [    ] Continuous                    [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)      Inspection of 2nd level deck rebar prior to and during concrete pouring on Thursday 7/2.
2)      Inspection of 7th level, zone 2 prior to and during concrete pouring on Friday 7/3.
3)      Inspection of 7th level, zone 1 column after forms were removed.

**List Tests Made:**        Concrete samples were taken (7/3) during the concrete pouring of the 7th level, zone 2 slab. These samples are for concrete strength tests to occur at the 7th and 28th day.

**Total Inspection Time Each Day:**

| Date  | 6/29 | 6/30 | 7/01 | 7/2 | 7/3 | 7/4 | 7/5 |
|-------|------|------|------|-----|-----|-----|-----|
| Hours | X    | X    | 4    | 4   | 6   | X   | X   |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
Inspection of the columns revealed that there was cement-aggregate separation at many of the column locations.  The areas to be repaired should be chipped, cleaned with vacuum and/or air compressor, applied with epoxy and cemented with non-shrinkage grout.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
1)   Richard C. required additional rebar at the 2nd level deck at the cantilevered section near the staircase. (12-#5, 6'-6")
2)   In some areas where #9 rebar was called for in the drawings, 2-#8 bars were used instead.
3)   In areas where #6 rebar was called for in the drawings, an equivalent area of #5 rebar were used instead.

**Comments:**
        1)   The 2nd level deck was approx. 120 cubic yards.
        2)   The 7th level concrete pour was approx. 650 cubic yards.
        3)   Other works ongoing at the time of inspections; excavation for column footing at rear ramp, welding and retrofit on ground floor.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____                        Date: _____ 7/7/98
Print Full Name: _____                   I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

REP-023

City of  TUMON, GUAM

Project Name/Address:           Su Center Building
                                San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                    [   ] Continuous              [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)      Inspection of 7th level.
2)      Inspection of 7th level, zone 2 column rebar and pouring.

**List Tests Made:**

**Total Inspection Time Each Day:**

| Date  | 7/6 | 7/7 | 7/8 | 7/9 | 7/10 | 7/11 | 7/12 |
|-------|-----|-----|-----|-----|------|------|------|
| Hours | X   | X   | 2   | 4   | 2    | X    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.

Signed: _____     Date: ___7/13/98___

Print Full Name: _PATRICK A. TAITANO_      I.D. Number: _____

(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

**REP-024**

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:
                               [   ] Continuous                    [ X ] Periodic

**Describe Inspections Made, Including Locations:**
1)      Inspected beam rebar for the roof, only for zone-1.
2)      Inspected concrete slab rebar for the roof, only zone-1.
3)      Inspected column rebar at the roof level, only zone-1.
4)      Inspected location and placement of post-tensioning tendons.

**List Tests Made:**         Concrete samples were taken (7/18) during the concrete pouring of the Roof level, zone 1 slab.

**Total Inspection Time Each Day:**

| Date  | 7/13 | 7/14 | 7/15 | 7/16 | 7/17 | 7/18 | 7/19 |
|-------|------|------|------|------|------|------|------|
| Hours | X    | X    | 2    | 6    | 3    | 8    | X    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**
1)      There was a conflict with the vertical stirrups and the post tensioning tendons at the beams on the roof from gridline
        1 to gridline 2. Due to the tendons, the stirrups were not properly hooked around the supporting rebar. An
        additional stirrup was required at all these areas.

**List Changes to Approved Plans Authorized by Architect or Engineer:**
1)      The drawings for the roof were only preliminary, hence there were some changes. There were additional concrete
        piers that were added at the both corners of the roof zone-1. The piers are for the tower supports.
2)      There was a cold joint formed extending from grid 1 to 3 close to gridline E, the solution was to apply epoxy to help
        with the bonding.
3)      In the beams where #9 rebar was called for in the drawings, an equivalent area of #8 bars were used instead.
4)      In the slab reinforcing where #6 rebar was called for in the drawings, an equivalent area of #5 rebar were used
        instead.

**Comments:**

The concrete pouring ran smoothly. The pouring began at around 6:00 am and ended around 6:00pm. The estimated volume
of the pour was approximately 720-730 cubic yards. There were two pumps throughout the pour. The concrete batch supply
evenly matched the rate of placement for the first 2/3rds of the time. However, the supply dropped considerably the last leg
of the pour and once again, we had crews waiting around for concrete to be brought to the site.

Overall, the pour was relatively fast. There was a cold joint formed that extended from grid 1 to grid 3 this was due to the
fast drying of the concrete. The cold joint was not even and very jagged and inconsistent. In the future, Robert D.R.
suggested that there be a temporary construction joint to prevent this from occuring.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings,
specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____          Date: _____7/20/98_____
Print Full Name: _____PATRICK A. TAITANO_____       I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

# SPECIAL INSPECTOR WEEKLY REPORT

**REP-025**

City of  TUMON, GUAM

Project Name/Address:          Su Center Building
                               San Vitores Road, Tumon, Guam

Inspection Type(s)/Coverage:

[   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**   Inspection of PT-slab reinforcing and tendons.   Inspection of shallow beams and column rebar.  Pre-inspection for concrete pouring scheduled for Monday 7/27.

**List Tests Made:**          None

**Total Inspection Time Each Day:**

| Date  | 7/20 | 7/21 | 7/22 | 7/23 | 7/24 | 7/25 | 7/26 |
|-------|------|------|------|------|------|------|------|
| Hours | 1    | X    | 2    | 2    | 2    | X    | 2    |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**      Overall the steelwork is satisfactory.  There are no major problems.  The tendons and beams are well supported and properly anchored.  The concrete pour is scheduled to start at 6:00 am.  There will be a pump stationed at the JFK field.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _Richard Chien_                                    Date: _7/26/98_
Print Full Name: _Richard Chien_                        I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)

## SPECIAL INSPECTOR WEEKLY REPORT

REP-026

City of  TUMON, GUAM

Project Name/Address:           Su Center Building
                                San Vitores Road, Tumon, Guam
Inspection Type(s)/Coverage:

                     [   ] Continuous          [ X ] Periodic

**Describe Inspections Made, Including Locations:**  Inspection of concrete pour for roof, zone 2.  Inspection of PT-slab reinforcing and tendons.  Inspection of shallow beams and column rebar.

**List Tests Made:**      Concrete samples were taken (7/27) during the concrete pouring of the Roof level, zone 2 slab.

Total Inspection Time Each Day:

| Date  | 7/27 | 7/28 | 7/29 | 7/30 | 7/31 | 8/1 | 8/2 |
|-------|------|------|------|------|------|-----|-----|
| Hours | 8    | 4    | X    | X    | X    | X   | X   |

**List Items Requiring Correction, Corrections of Previously Listed Items and Previously Listed Uncorrected Items:**

**List Changes to Approved Plans Authorized by Architect or Engineer:**

**Comments:**    Overall the concrete pouring went fairly well.  No major problems.  There was some heavy rain at several points throughout, however the rain showers did not last for long durations.

To the best of my knowledge, work inspected was in accordance with the building department approved design drawings, specifications and applicable workmanship provisions of the U.B.C. except as noted above.
Signed: _____Richard Chien_____  Date: _8/3/98_
Print Full Name: _____Richard Chien_____  I.D. Number: _____
(This report to remain at the jobsite with the contractor for review by the building department's inspector upon request)



SLAB CONCRETE POURING SCHEDULE

# B. PHOTOS

# PHOTO INDEX

| ID | Date | Location | Remarks |
|----|------|----------|---------|
| 1 | 3/26/98 | 4th Level – Zone 1 | Column vertical rebar bent due to post-tensioning tendons |
| 2 | 3/26/98 | 4th Level – Zone 1 | Column vertical rebar bent due to post-tensioning tendons |
| 3 | 3/26/98 | 4th Level – Zone 1 | 4000 psi concrete pouring into beam-column joint |
| 4 | 3/26/98 | 4th Level – Zone 1 | Concrete pouring |
| 5 | 3/26/98 | 4th Level – Zone 1 | Column H3 – 7#5 (top) rebar are not centered on column |
| 6 | 3/26/98 | 4th Level – Zone 1 | Column B3 |
| 7 | 3/26/98 | 4th Level – Zone 1 | Column G3 – not enough rebar |
| 8 | 3/27/98 | 4th Level - Zone 2 | Dried concrete on deck from previous pour |
| 9 | 3/27/98 | 4th Level - Zone 2 | Spillage of previous concrete pour into beam |
| 10 | 3/27/98 | 4th Level - Zone 2 | Concrete workers using plywood ramp to place concrete into beam-column joints |
| 11 | 3/27/98 | 4th Level - Zone 2 | Concrete workers using plywood ramp to place concrete into beam-column joints |
| 12 | 3/27/98 | 4th Level - Zone 2 | Samples of hardened concrete found in steel pipes, caused delay in pouring. |
| 13 | 3/27/98 | 4th Level - Zone 2 | Spillage of concrete into beams, concrete was particularly sandy. |
| 14 | 3/27/98 | 4th Level - Zone 2 | View of spillage from inside beam |
| 15 | 3/27/98 | 4th Level - Zone 2 | View of anchor end of post-tension tendon |
| 16 | 3/27/98 | 4th Level - Zone 2 | Staggered top rebar. |
| 17 | 3/27/98 | 4th Level - Zone 2 | Bad workmanship! Worker just dumped flexible pipe into beam-column joint with no regard to concrete strength. |
| 18 | 4/11/98 | 5th – zone 1 | Concrete pour at type (C-1) column |
| 19 | 4/11/98 | 5th – zone 1 | Concrete pour at beam-column joint |
| 20 | 4/11/98 | 5th – zone 1 | Concrete pour at beam-column joint |
| 21 | 4/11/98 | 5th – zone 1 | Concrete pour at type (C-1) column |
| 22 | 4/13/98 | 5th – zone 1 | Column rebar inspection – Slanted rebar |
| 23 | 4/13/98 | 5th – zone 1 | Column rebar inspection – forms |
| 24 | 4/13/98 | 5th – zone 1 | Column rebar inspection – forms |
| 25 | 4/13/98 | 5th – zone 1 | View of (C-1) column rebar |
| 26 | 4/13/98 | 5th – zone 1 | View of (C-3) column rebar |
| 27 | 4/13/98 | 5th – zone 1 | View of (C-1) column rebar (slightly slanted) |
| 28 | 4/13/98 | 5th – zone 1 | View of (DC-1) column |
| 29 | 4/13/98 | 5th – zone 1 | View of (DC-1) column |
| 30 | 4/13/98 | 5th – zone 1 | View of (DC-1) column – concrete spacers |
| 31 | 4/13/98 | 5th – zone 1 | View of (DC-1) column – workers prepare to place forms |
| 32 | 4/13/98 | Ramp (3rd to 4th) | View of support beam rebar |
| 33 | 4/13/98 | Ramp (3rd to 4th) | View of support beam rebar & beam-column joint |
| 34 | 4/13/98 | Ramp (3rd to 4th) | View of support beam rebar |
| 35 | 4/13/98 | Water tank –below grade | View of excavation for column footing |
| 36 | 4/13/98 | Water tank –below grade | View of excavation for water tank |
| 37 | 4/24/98 | 5th level –swimming pool | View of deep support beams for swimming pool |
| 38 | 4/24/98 | 5th level –swimming pool | View of deep support beams for swimming pool |
| 39 | 4/24/98 | 5th level –swimming pool | View of deep support beam-column joint for pool |
| 40 | 4/24/98 | 5th level –swimming pool | View of deep support beams for swimming pool |
| 41 | 4/24/98 | Water tank –below grade | Placement of rebar for bottom slab of water tank |
| 42 | 4/24/98 | Water tank –below grade | Placement of rebar for sump pit of water tank |
| 43 | 4/24/98 | Water tank –below grade | Placement of rebar for bottom slab of water tank |
| 44 | 4/25/98 | 4th level – zone 3 pour | Spillage of concrete into beam |
| 45 | 4/25/98 | 4th level – zone 3 pour | Spillage of concrete into beam |
| 46 | 4/25/98 | 4th level – zone 3 pour | Spillage of concrete into beam |
| 47 | 4/25/98 | 4th level – zone 3 pour | View of (2"x4") forms above tendons – insufficient clearance |
| 48 | 4/25/98 | 4th level – zone 3 pour | View of (2"x4") forms above tendons – insufficient clearance |
| 49 | 5/27/98 | Water tank –below grade | View of completed water tank walls (below grade) |
| 50 | 5/27/98 | Water tank –below grade | View of completed water tank walls (below grade) |
| 51 | 5/27/98 | 2nd level – shoring | View of shoring at 2nd level for 4th level construction joint |

| 52 | 5/27/98 | 4th level – cont. joint | View of support beam rebar |
|----|---------|-------------------------|----------------------------|
| 53 | 5/27/98 | 4th level – cont. joint | View of shoring support |
| 54 | 5/27/98 | 4th level – cont. joint | View of support beam rebar |
| 55 | 5/27/98 | 4th level – column F2 | View of chipped column base |
| 56 | 5/27/98 | 4th level – column F2 | Close up view of chipped column base |
| 57 | 5/27/98 | 4th level – column F2 | View of chipped column base (adjacent side) |
| 58 | 5/27/98 | 4th level –slab at ramp | View of small cracks at 4th level slab near ramp |
| 59 | 5/27/98 | 4th level – column F4 | View of crack at top corner of column |
| 60 | 5/27/98 | 4th level – column F4 | View of crack at (adjacent) top corner of column |
| 61 | 5/27/98 | 4th level – beam (D4-E4) | View of exposed rebar |
| 62 | 5/28/98 | 4th level –cont. joint | View of support beam rebar and penetrating elec. Ducts |
| 63 | 5/28/98 | 4th level –cont. joint | View of construction joint slab rebar |
| 64 | 6/23/98 | Water tank –below grade | View of completed water tank walls |
| 65 | 6/23/98 | 7th level – zone 1 | View of 72"x18" beam |
| 66 | 6/23/98 | 7th level – zone 1 | View of 72"x18" beam |
| 67 | 6/23/98 | 7th level – zone 1 | View of 72"x18" beam |
| 68 | 6/23/98 | 7th level – zone 1 | View of column rebar & 72"x18" beam |
| 69 | 6/23/98 | 7th level – zone 1 | Stirrup hooks that are not properly installed. |
| 70 | 6/23/98 | Wall footing–below grade | View of concrete pouring |
| 71 | 6/23/98 | Wall footing–below grade | View of concrete pouring |
| 72 | 6/23/98 | Wall footing–below grade | View of concrete pouring |
| 73 | 6/24/98 | 7th level – zone 1 pour | Concrete crew working at AES pump |
| 74 | 6/24/98 | 7th level – zone 1 pour | Completed middle section – concrete crew at PT-3 waiting |
| 75 | 6/24/98 | 7th level – zone 1 pour | Concrete crew at PT-1 waiting |
| 76 | 6/24/98 | 1st level – column retrofit | View of completed welding and wire mesh retrofit |
| 77 | 6/24/98 | 1st level – column retrofit | Close-up view of welded column tie |
| 78 | 7/16/98 | Roof level | Preparing roof level for concrete pouring |
| 79 | 7/17/98 | Roof level | Vertical stirrups not properly hooked, at 48"x18" beams, from grid 1 to 2 |
| 80 | 7/17/98 | Roof level | Close-up view of improper vertical stirrups, conflict w/ PT tendons |
| 81 | 7/17/98 | Roof level | View of preparation of pipes for concrete pour |
| 82 | 7/18/98 | Roof level | View of rebar for concrete piers for tower supports |
| 83 | 7/18/98 | Roof level | Additional stirrup at conflict w/ PT tendons |
| 84 | 5/28/98 | 1st level – column retrofit | View of laborer chipping concrete to expose vertical column ties |
| 85 | 5/28/98 | 1st level – column retrofit | View concrete chipping to expose vertical column ties |
| 86 | 5/28/98 | 1st level – column retrofit | Close-up view of exposed vertical column ties |
| 87 | 5/28/98 | 1st level – column retrofit | Close-up view of exposed vertical column ties |
| 88 | 5/28/98 | 6th level – column E3 | Noticeable line where cold joint formed due to pump breakdown |
| 89 | 5/28/98 | 4th level – construction joint | Vibrating 14"x30" beam at SE corner |
| 90 | 5/28/98 | 4th level – construction joint | Formwork failed at 14"x30" beam |
| 91 | 5/28/98 | 4th level – construction joint | Laborer applying epoxy to column with dried concrete on rebar. |
| 92 | 5/28/98 | 4th level – construction joint | Top view of failed formwork at 14"x30" beam |
| 93 | 5/28/98 | 4th level – construction joint | Bottom view of failed formwork at 14"x30" beam |
| 94 | 5/28/98 | 4th level – construction joint slab | Chair risers supporting top rebar failed |
| 95 | 5/28/98 | 3rd level – parking ramp | Top view of trench drain |
| 96 | 5/28/98 | 3rd level – parking ramp | Side view of trench drain |
| 97 | 5/28/98 | 3rd level – R.C. slab | View of slab reinforcing |
| 98 | 5/28/98 | 4th level – construction joint slab | Side of column applied with epoxy, however, other side where new concrete has been poured did not have epoxy applied. |
| 99 | 7/26/98 | Roof level | Vertical ties at columns |
| 100 | 7/26/98 | 1st level – column retrofit | Void in column face, need to apply epoxy and grout with non-shrink cement |

# GK2 inc. CONSULTING ENGINEERS

Dean Gillham, S.E
Chairman

Ruben U. Velasrubio, S.E.
President

Mr. Robert O'Connor
O'Connor Berman Dotts & Banes
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969

Subject: Hun Sang Lee v. Royal Orchid Hotel, Winzler & Kelly, et al.

Dear Mr. O'Connor

The purpose of this letter report is to briefly address the duties and responsibilities of various disciplines associated with the design and inspection of buildings, including swimming pools, and to present my professional opinion of the scope of duties and responsibilities of Winzler and Kelly with respect to the design and construction of the swimming pool for the Royal Orchid Hotel on Guam. The following discussion and opinions are based on industry standards and professional practice, and as such should not be construed as legal opinions.

Building designs typically require the services of at least 5 distinct and separate design and inspection disciplines.
   a) Architect
   b) Structural Engineer
   c) Civil Engineer
   d) Electrical Engineer
   e) Mechanical Engineer
Several other disciplines may be involved in building designs, acoustical engineer, interior designer etc. Although the various disciplines must be coordinated, the duties and responsibilities of each discipline remain separate and distinct.

Typically, the Architect prepares concept drawings that address the size, shape and details of the building and appurtenances (swimming pools e.g.) and is responsible for selecting finishes and colors. With respect to safety issues;
   a) The Architect is responsible for ensuring room dimensions, corridors, hand rails, building egress, number and location of exits and swimming pool depths, steps, colors and signage meet applicable codes.

*Julale Center Suite 230 Hagatna, Guam 96910 * P.O. Box 3207 Hagatna, Guam 96932*
*(671) 477-9224 / 9231 / 472-9758 * Fax: (671) 477-3456 * E-Mail: gk2@gk2guam.com * http://www.gk2guam.com*

b) The structural engineer is responsible for ensuring the structural system meets all applicable codes for dead loads (weight of building, weight of swimming pool and swimming pool contents e.g.), code specified floor live loads, roof live load, wind loads and seismic induced inertial forces on the building.

c) The Electrical Engineer is responsible for ensuring the electrical system meets all applicable codes.

d) The Mechanical Engineer is responsible for ensuring the plumbing system and HVAC (Heating Ventilating and Air Conditioning) systems meet applicable codes.

e) The Civil Engineer is responsible for ensuring the exterior drainage system and sewer system meets all applicable codes and local ordinances. (no further discussion on the subject of Civil Engineering is included in this report since it is not germane to the subject of this report).

With respect to inspection, each professional inspects his/her work, i.e.

- The Architect inspects architectural elements such as floor finishes, wall finishes, swimming pool ingress and egress elements (stairs e.g.), colors and signage.
- The structural engineer inspects structural elements (size of structural elements, placement of rebar and placement and quality of concrete).
- The Electrical Engineer inspects the installation of conduit, panel boards, electrical fixtures etc.
- The Mechanical Engineer inspects the construction of the plumbing systems and HVAC systems.

The duties and responsibilities of each discipline are separate and distinct, for a number of reasons.

1. Typically, each discipline possesses knowledge and experience in his/her particular discipline, and not the other disciplines. For example, the Electrical Engineer is not an expert in structural design and the Structural Engineer is not an expert in electrical design, therefore the intrusion of the Structural Engineer on the domain of the Electrical Engineer or the Architect (and vice versa) could spell disaster for the project.

2. Duplication of duties and responsibility would result in complete chaos.

   a) If the duties of the Architect, Electrical Engineer, Mechanical Engineer and Structural Engineer all encompass structural engineering, whose opinion prevails during the design process? The Architect? The Electrical Engineer? The Mechanical Engineer? The Structural Engineer? Similarly, if all of the disciplines are responsible for ensuring the exit facilities meet code (the domain of the Architect), whose opinion prevails during the design process? The Architect? The Electrical Engineer? The Mechanical Engineer? The Structural Engineer?

June 20, 2005

b) If the Architect, Electrical Engineer, Mechanical Engineer and Structural Engineer are all responsible for the electrical design and the building is damaged by fire due to faulty electrical design, from whom does the Owner seek redress? The Architect? The Electrical Engineer? The Mechanical Engineer? The Structural Engineer?

c) Item b) above also applies to inspection. If the building were damaged by fire due to faulty electrical installation, from whom does the Owner seek redress? The Contractor? The Architect? The Electrical Engineer? The Mechanical Engineer? The Structural Engineer?

d) Division of duties and responsibilities would place all of the disciplines in untenable positions. No sane Structural Engineer would accept an assignment that saddled the Structural Engineer with the duties and responsibilities of the Architect, the Electrical Engineer and/or the Mechanical Engineer, just as no sane Electrical Engineer would accept an assignment that saddled him/her with the duties and responsibilities of any or all of the other disciplines. If the courts were to find each discipline were responsible for the actions of all other disciplines, I assure you Architectural/Engineering (A/E) design professionals would soon be included in the Endangered Species List as design professionals simply could not afford to accept such an onerous assignment.

With respect to the subject lawsuit, the swimming pool design would normally encompass the four major disciplines.

a) The Architect determines the size, depth, ingress and egress elements (steps e.g.), color scheme and signage, and provides inspection during construction.

b) The Mechanical Engineer designs and inspects the mechanical elements (pumps, piping etc.).

c) The Electrical Engineer designs and inspects the power supply for the mechanical equipment and lights.

d) The Structural Engineer designs and inspects the support system for the swimming pool.

Each professional has the authority and responsibility to make decisions with respect to both the design and the construction quality for his/her particular discipline, **but has neither authority nor responsibility with respect to the other disciplines.**

**A Discussion of Special Inspection**

The 1994 Uniform Building Code, the official building code for Guam at the time of the design and construction of the Royal Orchid Hotel, is divided into three volumes.

**Volume 1** addresses architectural requirements for various occupancies (Retail, Educational, Residential etc. Residential includes Hotels)

**Volume 2** (titled "Structural Engineering Design Provisions") includes Chapters 16 through 23, which address structural requirements (see attachment).

**Volume 3** addresses material, testing and installation standards.

June 20, 2005

Special Inspection is addressed in Chapter 17 (titled "Structural Tests and Inspections") and relates to the inspection of the construction and installation of structural materials. When a Structural Engineer is commissioned to provide "inspection, observance or special inspection" it is understood that the Structural Engineer will be inspecting **structural elements**, not electrical equipment, not mechanical equipment, not plumbing systems and not architectural elements associated with swimming pools or any other part of the building, as, unless the structural engineer is also a registered electrical engineer, registered mechanical engineer, and registered architect, he/she is not qualified to either design, inspect or supervise inspection of the electrical elements, mechanical elements and architectural elements of the building and/or the swimming pool.

**Professional Opinion**

Unless Winzler and Kelly were

a) Specifically obligated (in writing) to provide the conceptual design of the swimming pool, including the including design of the steps, color selection and signage.

b) Or Winzler and Kelly certified the pool architectural design (as opposed to certifying the design of the structural elements supporting the pool),

It is my professional opinion that Winzler and Kelly is not responsible for the design of the swimming pool steps, ladders, color selection and signage, nor is Winzler and Kelly responsible for ensuring the swimming pool ingress and egress elements, color selection and signage meet applicable codes and local ordinances.

Winzler and Kelly is responsible for the structural work performed by, and certified by, Winzler and Kelly, and inspection of the structural elements listed in Chapter 17 of the 1994 Uniform Building Code, no more and no less.

As a note of interest, I have been designing buildings with swimming pools for the past four decades, but until this issue arose I was completely unaware of any local ordinance addressing swimming pool steps, colors or signage. My ignorance of these design elements stems from the fact that, as Structural and Civil Engineers, GK2 has never been involved in the conceptual design (i.e. size, depths, steps, colors, signage etc.) of swimming pools. Our duties and responsibilities have been limited to ensuring the swimming pools have adequate structural support and can withstand the hydrostatic pressures created by the pool contents.

Very Truly Yours

Dean Gillham, Registered Structural Engineer

# 1994

# UNIFORM

# BUILDING

# CODE™

## VOLUME 2

## STRUCTURAL ENGINEERING DESIGN PROVISIONS



Section 1404 ---- Vinyl Siding . . . . . . . . . . . . . . . . . . 1–217

**Chapter 15   Roofs and Roof Structures** . . . . . . . . . . . . . . . . . . . . 1–219
Section 1501 — Scope . . . . . . . . . . . . . . . . . . . . . . . 1–219
Section 1502 --- Definitions . . . . . . . . . . . . . . . . . . . . . 1–219
Section 1503 — Roof-covering Requirements . . . . . . . . . . . . 1–221
Section 1504 — Roof-covering Classification . . . . . . . . . . . . 1–221
Section 1505 — Attics: Access, Draft Stops and Ventilation . . . . . . . . . . . . . . 1–222
Section 1506 — Roof Drainage . . . . . . . . . . . . . . . . . . . . 1–223
Section 1507 — Roof-covering Materials and Application . . . . . . . . . . . . . . 1–223
Section 1508 --- Valley Flashing . . . . . . . . . . . . . . . . . . . 1–224
Section 1509 --- Other Flashing . . . . . . . . . . . . . . . . . . . 1–225
Section 1510 — Roof Insulation . . . . . . . . . . . . . . . . . . . 1–225
Section 1511 — Penthouses and Roof Structures . . . . . . . . . . . 1–226
Section 1512 — Towers and Spires . . . . . . . . . . . . . . . . . 1–226
Section 1513 — Access to Rooftop Equipment . . . . . . . . . . . . . 1–226

**Excerpts from Chapter 16   Structural Forces** . . . . . . . . . . . . . . . . . . 1–237

**Excerpts from Chapter 17   Structural Tests and Inspections** . . . . . . . . . . . . 1–247

**Excerpts from Chapter 18   Foundations and Retaining Walls** . . . . . . . . . . 1–252

**Excerpts from Chapter 19   Concrete** . . . . . . . . . . . . . . . . . . . . . . . 1–263

**Excerpts from Chapter 21   Masonry** . . . . . . . . . . . . . . . . . . . . . . . 1–286

**Excerpts from Chapter 22   Steel** . . . . . . . . . . . . . . . . . . . . . . . . . 1–304

**Excerpts from Chapter 23   Wood** . . . . . . . . . . . . . . . . . . . . . . . . . 1–306

**Chapter 24   Glass and Glazing** . . . . . . . . . . . . . . . . . . . . . . . . 1–331
Section 2401 --- Scope . . . . . . . . . . . . . . . . . . . . . . . 1–331
Section 2402 — Identification . . . . . . . . . . . . . . . . . . . . 1–331
Section 2403 — Area Limitations . . . . . . . . . . . . . . . . . . . 1–331
Section 2404 — Glazing Support and Framing . . . . . . . . . . . . 1–331
Section 2405 — Louvered Windows and Jalousies . . . . . . . . . . 1–332
Section 2406 — Safety Glazing . . . . . . . . . . . . . . . . . . . . 1–332
Section 2407 — Hinged Shower Doors . . . . . . . . . . . . . . . . 1–334
Section 2408 — Racquetball and Squash Courts . . . . . . . . . . . 1–334
Section 2409 --- Sloped Glazing and Skylights . . . . . . . . . . . . 1–334

**Chapter 25   Gypsum Board and Plaster** . . . . . . . . . . . . . . . . . . 1–337
Section 2501 --- Scope . . . . . . . . . . . . . . . . . . . . . . . 1–337
Section 2502 ---- Materials . . . . . . . . . . . . . . . . . . . . . . 1–337
Section 2503 --- Vertical Assemblies . . . . . . . . . . . . . . . . . 1–338
Section 2504 --- Horizontal Assemblies . . . . . . . . . . . . . . . . 1–339
Section 2505 --- Interior Lath . . . . . . . . . . . . . . . . . . . . . 1–339
Section 2506 — Exterior Lath . . . . . . . . . . . . . . . . . . . . . 1–340
Section 2507 --- Interior Plaster . . . . . . . . . . . . . . . . . . . 1–340
Section 2508 --- Exterior Plaster . . . . . . . . . . . . . . . . . . . 1–341
Section 2509 --- Exposed Aggregate Plaster . . . . . . . . . . . . . 1–342
Section 2510 --- Pneumatically Placed Plaster (Gunite) . . . . . . . . 1–343
Section 2511 — Gypsum Wallboard . . . . . . . . . . . . . . . . . . 1–343

# Chapter 17

# STRUCTURAL TESTS AND INSPECTIONS

## SECTION 1701 — SPECIAL INSPECTIONS

**1701.1 General.** In addition to the inspections required by Section 108, the owner or the engineer or architect of record acting as the owner's agent shall employ one or more special inspectors who shall provide inspections during construction on the types of work listed under Section 1701.5.

> **EXCEPTION:** The building official may waive the requirement for the employment of a special inspector if the construction is of a minor nature.

**1701.2 Special Inspector.** The special inspector shall be a qualified person who shall demonstrate competence, to the satisfaction of the building official, for inspection of the particular type of construction or operation requiring special inspection.

**1701.3 Duties and Responsibilities of the Special Inspector.** The special inspector shall observe the work assigned for conformance with the approved design drawings and specifications.

The special inspector shall furnish inspection reports to the building official, the engineer or architect of record, and other designated persons. All discrepancies shall be brought to the immediate attention of the contractor for correction, then, if uncorrected, to the proper design authority and to the building official.

The special inspector shall submit a final signed report stating whether the work requiring special inspection was, to the best of the inspector's knowledge, in conformance with the approved plans and specifications and the applicable workmanship provisions of this code.

**1701.4 Standards of Quality.** The standards listed below labeled a "U.B.C. standard" are also listed in Chapter 35, Part II, and are part of this code.

1. **Concrete.**

U.B.C. Standard 19-3, Ready-mixed Concrete

2. **Connections.**

Chapter 22, Division IV, High-strength Bolting

3. **Fireproofing.**

U.B.C. Standard 7-6, Thickness and Density Determination for Spray-applied Fireproofing

**1701.5 Types of Work.** Except as provided in Section 1701.1, the types of work listed below shall be inspected by a special inspector.

1. **Concrete.** During the taking of test specimens and placing of reinforced concrete. See Item 12 for shotcrete.

> **EXCEPTIONS:** 1. Concrete for foundations conforming to minimum requirements of Table 18-I-D or for Group R, Division 3 or Group M, Division 1 Occupancies, provided the building official finds that a special hazard does not exist.
>
> 2. For foundation concrete, other than cast-in-place drilled piles or caissons, where the structural design is based on an $f'_c$ no greater than 2,500 pounds per square inch (psi) (17.2 MPa).
>
> 3. Nonstructural slabs on grade, including prestressed slabs on grade when effective prestress in concrete is less than 150 psi. (1.03 MPa).
>
> 4. Site work concrete fully supported on earth and concrete where no special hazard exists.

2. **Bolts installed in concrete.** Prior to and during the placement of concrete around bolts when stress increases permitted by Footnote 5 of Table 19-E or Section 1925 are utilized.

3. **Special moment-resisting concrete frame.** As required by Section 1921.9 of this code.

2–43

**4. Reinforcing steel and prestressing steel tendons.**

4.1 During all stressing and grouting of tendons in prestressed concrete.

4.2 During placing of reinforcing steel and prestressing tendons for all concrete required to have special inspection by Item 1.

EXCEPTION: The special inspector need not be present continuously during placing of reinforcing steel and prestressing tendons, provided the special inspector has inspected for conformance with the approved plans prior to the closing of forms or the delivery of concrete to the jobsite.

**5. Structural welding.**

5.1 **General.** During the welding of any member or connection which is designed to resist loads and forces required by this code.

EXCEPTIONS: 1. Welding done in an approved fabricator's shop in accordance with Section 1701.7.

2. The special inspector need not be continuously present during welding of the following items, provided the materials, qualifications of welding procedures and welders are verified prior to the start of work; periodic inspections are made of work in progress; and a visual inspection of all welds is made prior to completion or prior to shipment of shop welding:

2.1 Single-pass fillet welds not exceeding $^5/_{16}$ inch (7.9 mm) in size.

2.2 Floor and roof deck welding.

2.3 Welded studs when used for structural diaphragm or composite systems.

2.4 Welded sheet steel for cold-formed steel framing members such as studs and joists.

2.5 Welding of stairs and railing systems.

5.2 **Special moment-resisting steel frames.** During the welding of special moment-resisting steel frames. In addition to Item 5.1 requirements above, nondestructive testing as required by Section 1703 of this code.

5.3 **Welding of reinforcing steel.** During the welding of reinforcing steel.

EXCEPTION: The special inspector need not be continuously present during the welding of ASTM A 706 reinforcing steel not larger than No. 5 bars used for embedments, provided the materials, qualifications of welding procedures and welders are verified prior to the start of work; periodic inspections are made of work in progress; and a visual inspection of all welds is made prior to completion or prior to shipment of shop welding.

**6. High-strength bolting.** As required by Chapter 22, Division IV. Such inspections may be performed on a periodic basis in accordance with the requirements of Section 1701.6.

**7. Structural masonry.**

7.1 For masonry, other than fully grouted open-end hollow-unit masonry, during preparation and taking of any required prisms or test specimens, placing of all masonry units, placement of reinforcement, inspection of grout space, immediately prior to closing of cleanouts, and during all grouting operations.

EXCEPTION: For hollow-unit masonry where the $f'_{m}$ is no more than 1,500 psi (10.34 MPa) for concrete units or 2,600 psi (17.93 MPa) for clay units, special inspection may be performed as required for fully grouted open-end hollow-unit masonry specified in Item 7.2 below.

7.2 For fully grouted open-end hollow-unit masonry during preparation and taking of any required prisms or test specimens, at the start of laying units, after the placement of reinforcing steel, grout space prior to each grouting operation, and during all grouting operations.

EXCEPTION: Special inspection as required in Items 7.1 and 7.2 above need not be provided when design stresses have been adjusted as specified in Chapter 21 to permit noncontinuous inspection.

**8. Reinforced gypsum concrete.** When cast-in-place Class B gypsum concrete is being mixed and placed.

**9. Insulating concrete fill.** During the application of insulating concrete fill when used as part of a structural system.

Case 1:04-cv-00027    Document 131-4    Filed 04/26/2006    Page 12 of 17

**EXCEPTION:** The special inspections may be limited to an initial inspection to check the deck surface and placement of reinforcing. The special inspector shall supervise the preparation of compression test specimens during this initial inspection.

10. **Spray-applied fireproofing.** As required by U.B.C. Standard 7-6.

11. **Piling, drilled piers and caissons.** During driving and testing of piles and construction of cast-in-place drilled piles or caissons. See Items 1 and 4 for concrete and reinforcing steel inspection.

12. **Shotcrete.** During the taking of test specimens and placing of all shotcrete and as required by Sections 1922.10 and 1922.11.

**EXCEPTION:** Shotcrete work fully supported on earth, minor repairs and when, in the opinion of the building official, no special hazard exists.

13. **Special grading, excavation and filling.** During earth-work excavations, grading and filling operations inspection to satisfy requirements of Chapter 18 and Appendix Chapter 33 of this code.

14. **Smoke-control system.**

14.1 During erection of ductwork and prior to concealment for the purposes of leakage testing and recording of device location.

14.2 Prior to occupancy and after sufficient completion for the purposes of pressure difference testing, flow measurements, and detection and control verification.

15. **Special cases.** Work which, in the opinion of the building official, involves unusual hazards or conditions.

**1701.6 Continuous and Periodic Special Inspection.**

**1701.6.1 Continuous special inspection.** Continuous special inspection means that the special inspector is on the site at all times observing the work requiring special inspection.

**1701.6.2 Periodic special inspection.** Some inspections may be made on a periodic basis and satisfy the requirements of continuous inspection, provided this periodic scheduled inspection is performed as outlined in the project plans and specifications and approved by the building official.

**1701.7 Approved Fabricators.** Special inspections required by this section and elsewhere in this code are not required where the work is done on the premises of a fabricator registered and approved by the building official to perform such work without special inspection. The certificate of registration shall be subject to revocation by the building official if it is found that any work done pursuant to the approval is in violation of this code. The approved fabricator shall submit a certificate of compliance that the work was performed in accordance with the approved plans and specifications to the building official and to the engineer or architect of record. The approved fabricator's qualifications shall be contingent on compliance with the following:

1. The fabricator has developed and submitted a detailed fabrication procedural manual reflecting key quality control procedures which will provide a basis for inspection control of workmanship and the fabricator plant.

2. Verification of the fabricator's quality control capabilities, plant and personnel as outlined in the fabrication procedural manual shall be by an approved inspection or quality control agency.

3. Periodic plant inspections shall be conducted by an approved inspection or quality control agency to monitor the effectiveness of the quality control program.

4. It shall be the responsibility of the inspection or quality control agency to notify the approving authority in writing of any change to the procedural manual. Any fabricator approval may be revoked for just cause. Reapproval of the fabricator shall be contingent on compliance with quality control procedures during the past year.

## SECTION 1702 — STRUCTURAL OBSERVATION

Structural observation shall be provided in Seismic Zone 3 or 4 when one of the following conditions exists:

# DEAN GILLHAM

GK2 INC.
P.O. BOX 3207
HAGATNA, GUAM 96932
WORK: (671) 477-9224 / 472-8758 FAX: 477-3456 Email: dg@gk2guam.com

## PERSONAL INFORMATION

| | |
|---|---|
| Date of Birth: | July 25, 1936 |
| Place of Birth: | Arkansas |
| Citizenship: | U.S. |
| Sex: | Male |

## PROFESSIONAL BACKGROUND

$GK^2$ Inc. President

## EDUCATION

University of Arkansas, Arkansas, U.S.A

## DEGREES

Bachelor of Science in Engineering, 1960

## HONORS

Recipient of Arkansas Foundry Scholarship (Based on Academic Achievements)
Tau Beta Phi – National Engineer's Honor Society
Chi Epsilon – National Civil Engineer's Honor Society
Phi Theta Kappa – National Junior College Honor Society

## PROFESSIONAL REGISTRATION

| | | |
|---|---|---|
| Registered Professional Engineer | (Civil) #14607 | California |
| Registered Professional Engineer | (Civil) #20 | CNMI |
| Registered Professional Engineer | (Structural) #21 | CNMI |
| Registered Professional Engineer | (Civil) #85 | Territory of Guam |
| Registered Professional Engineer | (Structural) #357 | Territory of Guam |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| Guam Society of Professional Engineers | -Charter Member, Past President |
| National Society of Professional Engineers | |
| Earthquake Engineering Research Institute | |
| Society of American Military Engineers | -Past President |

**PROFESSIONAL EXPERIENCE**

Mr. Dean Gillham has been on CNMI, Guam and Micronesia for the past 40 years, and has extensive experience in the structural design and project management of buildings and related civil work. Dean has been the Chief Engineer and Vice-President of Guam A/E Firms from 1967 to 1970, and assumed the Presidency of GK2 Inc. in 1970.

**TYPICAL STRUCTURAL DESIGN PROJECT MR. GILLHAM HAS BEEN INVOLVED IN INCLUDE:**

- Pacific Islands Club Phase I, II, III & IV - Guam
- Pacific Islands Club Phase I, II, III – Saipan
- Leo Palace - Guam
- Dai Ichi Hotel – Guam
- Dai Ichi Hotel Extension – Saipan
- Hilton Hotel – Guam
- Hotel Nikko – Guam
- Sherwood Hotel Seismic Retrofit – Guam
- Onward Agana Beach Hotel - Guam
- Palace Hotel - Guam
- Marriot Hotel - Guam
- Miyama Hills Hotel - Guam
- Fujita Hotel – Guam
- Tropical Plaza - Saipan
- Villa Kanton Tasi – Guam
- Holiday Tower – Guam
- Ladera Tower – Guam
- Tumon Holiday Manor - Guam

## DEAN GILLHAM'S RATE SCHEDULE FOR EXPERT WITNESS
## SERVICES ON A TIME AND MATERIAL BASIS

|  | **HOURLY** |
|---|---|
| ANALYSIS & REPORT WRITING | $150 |
| EXPERT TESTIMONY & DEPOSITIONS | $260 |
| DEPOSITION PREPARATION | $210 |

June 20, 2005

Prior Testimony

First Industrial Corp. vs. Maeda
Super Court Case Unknown

Sherwood Ltd. vs. Mackinley Winnaker McNiel
American Arbitration Assoc.
Case Number Unknown

Royal Palm Resort Litigation
Super Court Case Unknown

*Street Address: Julale Center Suite 230, 424 W. O'Brien Drive, Hagatna, Guam 96910*
*Mailing Address: P.O. Box 3207 Hagatna, Guam 96932*
*(671) 477-9224 / 472-8758 * Fax: (671) 477-3456 * E-Mail: gk2main@gk2guam.com*